Filed 7/24/23

CERTIFIED FOR PARTIAL PUBLICATION*

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| NICOLE WOODWORTH, | |
| Plaintiff and Appellant, | E072704 |
| v. | (Super.Ct.No. CIVDS1408640) |
| LOMA LINDA UNIVERSITY MEDICAL CENTER, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. David S. Cohn, Judge. Affirmed in part; reversed in part with directions. Motion to dismiss appeal denied. Motion to dismiss cross-appeal granted.

Law Office of Joseph Antonelli, Joseph Antonelli, Janelle Carney; Clarkson Law Firm and Glenn A. Danas for Plaintiff and Appellant Nicole Woodworth.

Lewis Brisbois Bisgaard & Smith, Jeffry A. Miller, Allison Arabian Hill, Jon P. Kardassakis and Michael K. Grimaldi for Defendant and Appellant Loma Linda University Medical Center.

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I, III, IV, V, and VII of the Discussion.

Seyfarth Shaw, Jeffrey A. Berman and Kiran A. Seldon for California Hospital Association as Amicus Curiae on behalf of Defendant and Appellant Loma Linda University Medical Center.

Nicole Woodworth was a registered nurse at Loma Linda University Medical Center (the medical center) from December 2011 to June 2014. In June 2014, she filed this putative class action against the medical center, alleging a host of wage and hour claims on behalf of herself and other employees. She later amended her complaint to add a cause of action under the Private Attorneys General Act of 2004 (PAGA) (Lab. Code, § 2698 et seq.). (Unlabeled statutory citations refer to the Labor Code.)

After several years of litigation, only her individual claim for failure to provide rest periods remained. The court had granted four motions for summary adjudication in favor of the medical center, denied Woodworth's motion for class certification, and denied her motion to strike putative class members' declarations. Woodworth appeals from those orders, which disposed of the putative class members' claims, the PAGA claims, and all of her individual claims (apart from her claim about rest periods). The medical center moves to dismiss most of Woodworth's appeal, but we deny the motion.

We affirm the orders in large part but reverse in a number of respects. In particular, we reverse in part the order denying class certification. The court erred with respect to Woodworth's proposed wage statement class, which consisted of employees who received allegedly inaccurate wage statements. We remand for the trial court to reconsider certification of that class.

2

We also conclude that the court erred by granting summary adjudication for the medical center on the PAGA rest period, regular rate, wage statement, and waiting time claims, as well as Woodworth's individual wage statement claim. We thus reverse the order granting the relevant motions and direct the court to enter a new order granting the motions in part and denying them in part.

Additionally, the court erred by granting summary adjudication for the medical center on Woodworth's claim that she and other nonexempt employees were underpaid as a result of time rounding. The medical center had a policy of rounding employees' time punches down to the nearest tenth of an hour. *See's Candy Shops, Inc. v. Superior Court* (2012) 210 Cal.App.4th 889 (*See's Candy*) approved of time rounding, so long as the rounding policy is "fair and neutral on its face" and "'used in such a manner that it will not result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked.'" (*Id.* at p. 907.) Recently, another appellate court rejected the *See's Candy* rounding standard. (*Camp v. Home Depot U.S.A., Inc.* (2022) 84 Cal.App.5th 638, 643 (*Camp*), review granted Feb. 1, 2023, S277518.) We publish our discussion of the rounding motion to express our agreement with *Camp*.

We also publish another portion of our discussion regarding the alternative workweek schedule (AWS) instituted by the medical center. California law permits employers to institute an AWS that operates as an exception to overtime requirements. (§§ 510, subd. (a)(1), 511; *Maldonado v. Epsilon Plastics, Inc.* (2018) 22 Cal.App.5th 1308, 1314 (*Maldonado*).) Employees must vote to adopt an AWS, and the law requires employers to disclose the effects of an AWS before the vote. (Cal. Code Regs., tit. 8,

3

§ 11050, subd. 3(C)(3).) The medical center moved for summary adjudication on its AWS defense to Woodworth's claim for unpaid overtime. The trial court granted that motion, and we affirm that order. In doing so, we hold that an employer's failure to comply with the pre-election disclosure requirement renders an AWS election null and void only if the employer omits material information about the proposed AWS's effects.

The medical center has filed a cross-appeal from the order denying its motion to strike all of the PAGA allegations from the operative complaint on the ground that the PAGA claims were unmanageable. Woodworth moves to dismiss the cross-appeal. We grant that motion, but we consider the arguments raised in the cross-appeal to the extent that they provide alternative grounds to affirm the erroneous orders terminating the PAGA claims.

We conclude that the medical center's manageability arguments do not provide alternative grounds for affirmance. There is a split in the appellate courts over whether trial courts may strike or dismiss PAGA claims for lack of manageability, and we also publish the relevant portion of our discussion to express our agreement with one side of that split. (*Wesson v. Staples the Office Superstore, LLC* (2021) 68 Cal.App.5th 746, 756 (*Wesson*) [holding that courts have inherent authority to strike unmanageable PAGA claims]; *Estrada v. Royalty Carpet Mills, Inc.* (2022) 76 Cal.App.5th 685, 697 (*Estrada*), review granted June 22, 2022, S274340 [holding that courts cannot strike PAGA claims on the basis of manageability concerns].) We agree with the court in *Estrada* and hold that trial courts may not strike or dismiss a PAGA claim for lack of manageability. When faced with unwieldy PAGA claims, trial courts may limit the scope of the claims or the

4

evidence to be presented at trial but may not prohibit PAGA plaintiffs from presenting their claims entirely.

BACKGROUND

I. *The Operative Complaint*

Woodworth's third amended complaint (TAC) alleged numerous theories of liability. First, Woodworth alleged that the medical center failed to pay overtime compensation to hourly nonexempt employees for work in excess of eight hours per day. Employees in the healthcare industry may adopt an AWS consisting of 10- or 12-hour workdays for which they will not receive overtime pay. (Cal. Code Regs., tit. 8, § 11050, subd. 3(B)(1), (8).) Employees adopt the AWS through a secret-ballot election in which at least two-thirds of the affected employees vote in favor of the AWS. (*Maldonado*, *supra*, 22 Cal.App.5th at p. 1314.) According to Woodworth's TAC, the medical center did not comply with all AWS election procedures when it instituted 10- and 12-hour shifts for employees, so the AWS was invalid, and the medical center owed those employees overtime pay for work under the AWS (the overtime claim).

Second, Woodworth alleged that the medical center miscalculated overtime rates and premium pay for missed meal or rest periods by failing to include all remuneration in the employees' regular rate of pay (the regular rate claim). In particular, the medical center allegedly failed to include nondiscretionary bonuses in the employees' regular rate of pay. Overtime hours are compensated at either one and one-half times or twice an employee's "regular rate of pay." (§ 510, subd. (a).) If an employer fails to provide a

5

meal or rest period as required by law, it must pay the employee an additional hour at the employee's "regular rate of compensation." (§ 226.7, subd. (c).)

Third, Woodworth alleged that the medical center rounded the number of hours that employees worked to the nearest tenth of an hour. She alleged that as a result of the rounding policy, the medical center systematically underpaid her and the other nonexempt employees (the rounding claim).

Fourth, Woodworth alleged that the medical center failed to provide a third rest period for employees who worked 10 hours or more per shift. The medical center allegedly failed to implement a relief system that would enable employees to take mandated rest periods (the rest period claim).

Fifth, Woodworth alleged that the medical center failed to pay employees all wages due, or failed to pay them in a timely manner, when the employees separated from the medical center. She sought penalties for those alleged "delays in the payment of end-of-employment wages," which are "commonly referred to as 'waiting time penalties'" (the waiting time claim). (*Naranjo v. Spectrum Security Services, Inc.* (2022) 13 Cal.5th 93, 106 (*Naranjo*).)

And sixth, Woodworth alleged that the medical center failed to provide employees with accurate itemized wage statements. The wage statements allegedly were improper in a number of respects, including by failing to show "total hours worked by the employee[s]" (the wage statement claim). (§ 226, subd. (a).)

On the basis of the foregoing allegations, the TAC alleged seven overlapping causes of action, styled as follows: (1) violations of the unfair competition law (UCL)

6

(Bus. & Prof. Code, § 17200 et seq.); (2) recovery of unpaid wages and penalties under numerous Labor Code sections (§§ 204, 206, 218, 226, 510, 511, 1194, 1198); (3) violation of sections 201 through 203, requiring payment of all wages due upon separation; (4) failure to provide accurate itemized wage statements (§ 226); (5) failure to provide rest periods (§ 226.7); (6) failure to pay all wages because of illegal rounding (§§ 510, 1194, 1197, 1198; Cal. Code Regs., tit. 8, § 11000(2)); and (7) violations of PAGA. The TAC also alleged a cause of action for failure to provide meal periods, but Woodworth does not challenge the court's ruling granting summary adjudication for the medical center on that cause of action.

II. *The Motions and Rulings at Issue*

Woodworth challenges the court's ruling on six motions between November 2018 and May 2019. In the medical center's cross-appeal, it challenges the court's ruling on one motion during that period. For now, we briefly describe the relevant motions and challenged rulings. In the discussion section, *post*, we take each motion in turn, providing more background and reviewing the parties' evidence and arguments in detail.

First, the medical center moved for summary adjudication on the rounding claim. In November 2018, the court granted that motion as to the stand-alone cause of action alleging rounding, as well as to the UCL cause of action, the PAGA cause of action, and the cause of action for recovery of unpaid wages, to the extent that they alleged illegal rounding.

Next, Woodworth moved for class certification. As part of its opposition to the motion, the medical center filed 43 declarations from putative class members.

7

Woodworth moved to strike those putative class members' declarations. In March 2019, the court denied the motion to strike the declarations and denied the motion for class certification.

While the parties were briefing the motion for class certification, the medical center filed three motions for summary adjudication and a motion to strike the PAGA allegations. One motion sought summary adjudication on the regular rate claim, the wage statement claim, and the waiting time claim. Another motion sought summary adjudication on the PAGA cause of action on the ground that Woodworth had failed to exhaust administrative remedies. The third motion sought summary adjudication on the medical center's AWS defense to the overtime claim. And the medical center moved to strike the PAGA allegations on the ground that the PAGA cause of action was unmanageable.

In May 2019, the court entered an order (1) granting the motion for summary adjudication on the regular rate claim, the wage statement claim, and the waiting time claim and (2) granting the motion for summary adjudication on the AWS defense to the overtime claim. The court's ruling disposed of the various causes of action, including the UCL and PAGA causes of action, to the extent that they were predicated on those claims.

The May 2019 order also granted the motion for summary adjudication on the PAGA cause of action, to the extent that the court had "not otherwise summarily adjudicated" the cause of action in favor of the medical center. More specifically, the court ruled that Woodworth had not provided sufficient notice of her rest period claim to the Labor and Workforce Development Agency (LWDA). Lastly, the May 2019 order

8

denied the medical center's motion to strike the PAGA allegations. The court ruled that the motion was moot in light of its rulings on the medical center's other motions. But the court also ruled that even if the motion were not moot, it would deny the motion, because there was no controlling authority for striking a PAGA claim as unmanageable. After all of those rulings, only Woodworth's individual rest period claim survived.

DISCUSSION

I. *Motions to Dismiss*

Woodworth appeals from (1) the November 2018 order granting the medical center's motion for summary adjudication on the rounding claim; (2) the March 2019 order denying her motion to strike the putative class members' declarations and denying her motion for class certification; and (3) the May 2019 order granting the medical center's motion for summary adjudication on the regular rate claim, the wage statement claim, and the waiting time claim; granting the medical center's motion for summary adjudication on the AWS defense; and granting the medical center's motion for summary adjudication on the PAGA cause of action for failure to exhaust administrative remedies.

The medical center cross-appeals from the court's May 2019 order denying the motion to strike the PAGA allegations.

Both parties have filed motions to dismiss. The medical center moves to dismiss all but a small portion of Woodworth's appeal. Woodworth moves to dismiss the cross-appeal in its entirety. The medical center's motion lacks merit, but Woodworth's motion is well taken.

9

A. *The Medical Center's Motion for Partial Dismissal of the Appeal*

The medical center contends that, under the death knell doctrine, we may review only the order denying class certification of the rest period claim and the order denying the motion to strike the putative class declarations. According to the medical center, we have no jurisdiction to review the remainder of the order denying the motion for class certification or any of the other orders that Woodworth challenges. We disagree.

"Under the one final judgment rule, '"an appeal may be taken only from the final judgment in an entire action."'" (*In re Baycol Cases I & II* (2011) 51 Cal.4th 751, 756 (*Baycol*).) The death knell doctrine is a judicially created exception to the one final judgment rule. (*Id.* at p. 757.) Under the doctrine, we treat an order that terminates class claims but permits individual claims to proceed "as in essence a final judgment" on the class claims. (*Ibid.*) Such an order effectively rings "the death knell for the class claims" and is "appealable immediately." (*Ibid.*)

"The doctrine is animated by two basic considerations: (1) The order terminating class claims is the practical equivalent of a final judgment for absent class members; and (2) without the possibility of a group recovery, the plaintiff will lack incentive to pursue [individual] claims to final judgment, thus allowing the order terminating class claims to evade review entirely." (*Cortez v. Doty Bros. Equipment Co.* (2017) 15 Cal.App.5th 1, 8 (*Cortez*).)

The death knell doctrine also applies when an order terminates representative PAGA claims and permits only individual claims to proceed. (*Miranda v. Anderson Enterprises, Inc.* (2015) 241 Cal.App.4th 196, 199, 201 (*Miranda*).) The concerns

underlying the doctrine apply to PAGA claims and class claims in equal measure. (*Id.* at p. 201.) That is, without the possibility of group recovery, plaintiffs will lack an economic incentive to pursue their individual claims, thereby permitting the order terminating PAGA claims to evade review. (*Ibid*.)

But the death knell doctrine does not apply when PAGA claims remain pending after the trial court terminates class claims. (*Cortez*, *supra*, 15 Cal.App.5th at p. 8; *Nguyen v. Applied Medical Resources Corp.* (2016) 4 Cal.App.5th 232, 243; *Young v. RemX, Inc.* (2016) 2 Cal.App.5th 630, 635; *Munoz v. Chipotle Mexican Grill, Inc.* (2015) 238 Cal.App.4th 291, 310.) In those circumstances, the possibility of group recovery under PAGA still exists despite the termination of class claims. (*Cortez*, at p. 8.) "[T]he PAGA plaintiff remains incentivized by the statutory scheme to proceed to judgment on behalf of himself or herself as well as the individuals he or she represents." (*Ibid.*)

In this case, the May 2019 order granting the medical center's three motions for summary adjudication constituted an appealable order under the death knell doctrine. That order terminated Woodworth's PAGA cause of action, sounding the death knell for the claims of the absent aggrieved employees. (See *ZB, N.A. v. Superior Court* (2019) 8 Cal.5th 175, 184-185 [PAGA "empowers employees to sue on behalf of themselves and other aggrieved employees to recover civil penalties"].) Woodworth's individual rest period claim survived, but the persistence of that "'de minimis individual'" claim "'creates a risk no *formal* final judgment will ever be entered.'" (*Miranda*, *supra*, 241 Cal.App.4th at p. 202.) And although the court had terminated Woodworth's class claims by denying class certification several months earlier, the death knell doctrine did not

11

render that order appealable. Her pending PAGA cause of action precluded that result. (*Cortez*, *supra*, 15 Cal.App.5th at p. 8.)

The medical center argues that *Baycol* requires dismissal of most of the appeal. We are not persuaded. *Baycol* considered an order sustaining a demurrer to class claims and individual claims, which disposed of the plaintiff's action entirely. (*Baycol*, *supra*, 51 Cal.4th at p. 755.) Our Supreme Court reasoned that the death knell doctrine did not render the order immediately appealable because the plaintiff could (and did) appeal from the judgment of dismissal. (*Id*. at pp. 760-762.) Thus, there was "no need to apply any special exception to the usual one final judgment rule to ensure appellate review of class claims." (*Id.* at p. 754.) The court held that the death knell "doctrine renders appealable only those orders that effectively terminate class claims but permit individual claims to continue." (*Ibid*.)

According to the medical center, *Baycol* limits our review to the denial of class certification on the rest period claim, because "the class part of the claim is foreclosed and, at the same time, the underlying 'individual claim[] survive[s].'" *Baycol* does not impose that limitation on our review. The *Baycol* court required that an order must allow individual claims to survive in order to trigger the death knell exception. But it did not limit the parts of the appealable order that are reviewable once the exception applies. And the limitation that the medical center seeks to impose makes no sense, given the rationale for the death knell doctrine. Suppose we reviewed only that part of the order denying class certification on the rest period claim, and we affirmed it. On remand, the concerns underlying the death knell doctrine would still exist. Woodworth's class claims

12

would be terminated entirely, and only her individual rest period claim would remain. She would still lack an incentive to pursue that individual claim to judgment, so most of the order terminating her class claims would evade review. That is to say nothing of the May 2019 order terminating her PAGA cause of action, which would also evade review if we were to follow the course urged by the medical center.

The proper course is to review the entirety of the orders underlying the "de facto final judgment for absent plaintiffs." (*Baycol*, *supra*, 51 Cal.4th at p. 759; see *Wallace v. GEICO General Ins. Co.* (2010) 183 Cal.App.4th 1390, 1395-1396 & fn. 5 [appellate court could review interim order on summary judgment motion, because the ruling "impacted the trial court's decision to strike the class allegations"].) As to the absent putative class members, that means we should review the order denying Woodworth's motion to strike their declarations and denying her motion for class certification. (*Barriga v. 99 Cents Only Stores LLC* (2020) 51 Cal.App.5th 299, 320-321 (*Barriga*) [order denying motion to strike putative class declarations was reviewable on appeal from order denying class certification motion].) As to the absent aggrieved employees, it means we should review the May 2019 order granting the medical center's motions for summary adjudication, plus the November 2018 order granting the medical center's motion for summary adjudication on the rounding claim. The court granted each of those motions with respect to the PAGA cause of action (as well as Woodworth's individual claims). Collectively, the two orders disposed of every theory of liability on which Woodworth based the PAGA cause of action—the regular rate claim, the wage statement claim, the waiting time claim, the overtime claim, the rest period claim, and the rounding

13

claim. All of those orders contributed to the de facto final judgment for the absent plaintiffs.

For all of these reasons, we deny the medical center's motion for partial dismissal of the appeal.

B. *Woodworth's Motion to Dismiss the Cross-Appeal*

Woodworth moves to dismiss the medical center's cross-appeal, arguing that the death knell doctrine renders the orders that she challenges appealable, but it does not give the medical center the right to appeal. We agree.

As discussed, the death knell doctrine permits us to review orders that terminated the claims of absent class members and absent aggrieved employees. But the order from which the medical center cross-appeals—the order denying the motion to strike the PAGA allegations—did not contribute to that de facto final judgment against the absent class members and aggrieved employees. Rather, the order would have kept the PAGA claims alive, if the claims had survived the medical center's other motions. The death knell doctrine therefore does not give us jurisdiction over the cross-appeal.

Nevertheless, Woodworth observes that we may consider the medical center's arguments in its cross-appeal as "alternative grounds to affirm" the court's rulings terminating the PAGA cause of action, so the cross-appeal is "wholly unnecessary." Again, we agree with her. To the extent that we conclude the trial court erred by terminating the PAGA claims, we consider the arguments advanced by the medical center in its motion to strike the PAGA allegations as alternative grounds to affirm those orders. (See *Hicks v. Kaufman & Broad Home Corp.* (2001) 89 Cal.App.4th 908, 924, fn. 56 ["it

14

is not necessary for the respondent to file a cross-appeal in order to raise an additional legal ground for affirming the judgment or order against the appellant"].)

For these reasons, we dismiss the cross-appeal but consider the arguments raised in the cross-appeal as alternative grounds to affirm the orders from which Woodworth appeals.

II. *Motion for Summary Adjudication on the Rounding Claim*

Woodworth argues that the trial court erred by granting the medical center's motion for summary adjudication on the rounding claim. In particular, she urges us to follow *Camp*. *Camp* reversed a judgment for the employer on a rounding claim, holding that "if an employer . . . can capture and has captured the exact amount of time an employee has worked during a shift, the employer must pay the employee for 'all the time' worked." (*Camp*, *supra*, 84 Cal.App.5th at p. 660.) We agree with the reasoning in *Camp*, and we accordingly reverse the order granting summary adjudication for the medical center on the rounding claim.

A. *Relevant Background*

The medical center's motion for summary adjudication argued that its rounding policy was fair and neutral as to all nonexempt employees, and the policy therefore was lawful under *See's Candy*, *supra*, 210 Cal.App.4th 889. (*Id.* at p. 903 ["Assuming a rounding-over-time policy is neutral, both facially and as applied, the practice is proper under California law"].) It sought summary adjudication on the stand-alone cause of action alleging rounding and several other causes of action, including the PAGA cause of action, to the extent that they were based on the rounding claim.

15

The evidence offered by the medical center showed that employees clock in and out for work on a computer-based system. For purposes of calculating employees' pay, the medical center rounds the employees' time punches. The hourly time clock is divided into 10 six-minute increments beginning with the hour mark, and the time punches are rounded down to the nearest tenth of an hour. For example, if an employee clocks in for a 7:00 a.m. shift at 6:59 a.m., the time punch is rounded down to 6:54 a.m. If that same employee clocks in at 7:05 a.m., the time punch is rounded down to 7:00 a.m. And if the employee clocks in at 7:00 a.m., no rounding occurs, because the time punch is already at the nearest tenth of an hour.

In support of the motion, the medical center also offered the declaration of Michael J. Buchanan, an applied economist with experience in evaluating economic and statistical issues in class action cases. Buchanan analyzed the timekeeping and payroll data for all hourly nonexempt employees from June 2010 to August 2015. (Woodworth proposed a class period starting in June 2010.) The data set included records for 10,534 employees. He compared the rounded time from the payroll data to the unrounded clock entries from the timekeeping data. The timekeeping data reflected "the actual time an employee punched in or out."

Buchanan concluded that 5,418 employees (or approximately 51.4 percent) were paid for more time than they were on the clock, while 5,002 employees (or approximately 47.4 percent) were paid for less time than they were on the clock. Another 114 employees (or about 1.1 percent) were unaffected by rounding. Buchanan opined that the

16

rounding policy was neutral and that there was no systematic advantage to either the medical center or the employees.

In opposition to the motion for summary adjudication, Woodworth argued that the rounding policy was not neutral because it systematically undercompensated employees assigned to work 12-hour shifts (the 12-hour employees). She asserted that she was going to seek certification of a rounding class consisting of 12-hour employees only.

Woodworth offered the declaration of Brian Kriegler, a statistician who was the managing director of an economic and statistical consulting firm. Kriegler analyzed the timekeeping and payroll data from the same period as Buchanan, but Kriegler did not analyze the data for all nonexempt employees. Instead, he analyzed the data only for the 12-hour employees. His data set included 4,620 employees.

Kriegler's analysis differed from Buchanan's analysis in another way. Kriegler conducted a "'weighted hours'" analysis that attempted to quantify how rounding impacted the 12-hour employees' earnings. He noted that 12-hour employees worked straight time hours but often also worked overtime hours (one and one-half times their regular rate of pay) and double time hours (two times their regular rate of pay). He opined that determining "whether rounding is fair in terms of earnings requires taking into account the respective amounts of straight time, overtime, and double time—and not simply applying equal weight to all hours worked."[1] Kriegler criticized Buchanan's

---

[1]    Kriegler explained his weighted hours analysis as follows: "[O]ne way to think about how employees are paid is in terms of the equivalent number of straight time hours: [¶] 1.0 x Straight Time Hours + 1.5 x Overtime Hours + 2.0 x Double Time Hours. [¶]

17

analysis because it compared the employees' time on the clock to their rounded time, but it did not examine how the difference might have affected their earnings, and it did not apply "the correct weight to straight time, overtime, and double time hours."

According to Kriegler's weighted hours analysis, 3,121 of the 12-hour employees (or approximately 67.6 percent) were underpaid because of rounding, while 1,477 of them (or about 32 percent) were overpaid. Another 22 of the 12-hour employees (or about 0.5 percent) were neither underpaid nor overpaid. Kriegler also analyzed all of Woodworth's own data. He concluded that the medical center underpaid her in 37 out of 60 pay periods, resulting in 6.3 weighted hours of unpaid work worth $202.72.

In the medical center's reply brief, it argued that Woodworth's evidence did not dispute that the rounding policy was neutral as applied to all employees. Instead, her evidence focused on 12-hour employees, a theory that she did not plead in the TAC. The TAC defined the putative class for the rounding claim as all hourly nonexempt employees. Likewise, the PAGA cause of action defined "'aggrieved employees'" as all hourly nonexempt employees of the medical center. The medical center asserted that opposition papers could not "create issues outside the pleadings." It further argued that it was irrelevant whether Woodworth was underpaid as a result of rounding, because the proper analysis examined the effect of rounding on the employees as a whole.

---

. . . [C]onsider an 8-hour shift employee who works 12.5 hours in a day and is paid $25 per hour. This employee's Weighted Hours are 1.0 x 8 + 1.5 x 4 + 2.0 x 0.5 = 15 Weighted Hours. This employee's earnings are 15 x $25/hour = $375."

The court granted the medical center's motion for summary adjudication on Woodworth's individual rounding claim and the PAGA cause of action, to the extent that the cause of action "reiterate[d] the rounding claim." The court ruled that Buchanan's declaration constituted a "prima facie" showing that the rounding policy was neutral on its face and as applied. The court reasoned that Kriegler's declaration did not controvert that evidence, because he looked only at the 12-hour employees. The TAC defined the issues for summary adjudication, and the TAC defined the allegedly affected class as all nonexempt employees, not just the 12-hour employees. The court further reasoned that Woodworth's individual experience was irrelevant, because the question was how the employees as a group fared.

B. *Standard of Review*

A defendant may move for summary adjudication on a cause of action if the defendant contends that the cause of action has no merit. (Code Civ. Proc., § 437c, subd. (f)(1).) The defendant may carry its initial burden by showing that one or more elements of the challenged cause of action cannot be established or that there is a complete defense to the cause of action. (Code Civ. Proc., § 437c, subd. (p)(2).) For purposes of summary adjudication, a cause of action "'means "'a group of related paragraphs in the complaint reflecting a *separate theory* of liability.'"'" (*Silva v. See's Candy Shops, Inc.* (2016) 7 Cal.App.5th 235, 257 (*Silva*), disapproved on another ground by *Donohue v. AMN Services, LLC* (2021) 11 Cal.5th 58, 77.)

Once the moving defendant has carried its initial burden, the burden shifts to the plaintiff to show a triable issue of material fact with respect to the cause of action. (Code

19

Civ. Proc., § 437c, subd. (p)(2).)  The trial court must consider all of the evidence and the reasonable inferences from it in the light most favorable to the nonmoving party. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843.)  The court may grant the motion if there is no triable issue of material fact and the issues raised by the pleadings may be decided as a matter of law.  (Code Civ. Proc., § 437c, subds. (c), (f)(1); *Biancalana v. T.D. Service Co.* (2013) 56 Cal.4th 807, 813.)  "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof."  (*Aguilar*, *supra,* at p. 850.)

We review summary adjudication orders de novo and apply the same legal standard as the trial court.  (*Travelers Property Casualty Co. of America v. Superior Court* (2013) 215 Cal.App.4th 561, 574.)  We independently examine the record to determine whether there are triable issues of material fact and whether the moving party is entitled to summary adjudication as a matter of law.  (*Id.* at p. 574.)

C.  *Analysis*

A federal regulation "allows employers to compute employee worktime by rounding 'to the nearest 5 minutes, or to the nearest one-tenth or quarter of an hour,' provided that the rounding system adopted by the employer 'is used in such a manner that it will not result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked.'"  (*AHMC Healthcare, Inc. v. Superior Court* (2018) 24 Cal.App.5th 1014, 1020-1021 (*AHMC Healthcare*), quoting 29 C.F.R. § 785.48(b).)  Under that regulation, the practice of rounding time is lawful "'if the

20

employer applies a consistent rounding policy that, on average, favors neither overpayment nor underpayment.'" (*See's Candy*, *supra*, 210 Cal.App.4th at p. 901.) "'Presumably, this arrangement averages out so that the employees are fully compensated for all the time they actually work.'" (*Ibid.*)

In 2012, *See's Candy* adopted the federal regulatory standard for rounding claims under California law. (*See's Candy*, *supra*, 210 Cal.App.4th at p. 907.) The court reasoned that no California statute or case law prohibited the practice of rounding, and in the absence of state authorities, California courts generally look to federal labor law for guidance. (*Id.* at pp. 901, 903.) The court also found persuasive that the agency responsible for enforcing California's labor laws, the Division of Labor Standards Enforcement (DLSE), had adopted the federal regulation in the agency's 2002 revised enforcement manual. (*Id.* at p. 902.) The *See's Candy* court thus held that a rounding policy is lawful if it is facially neutral and applied "'in such a manner that it will not result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked." (*Id.* at p. 907.)

Since 2012, other courts of appeal have followed *See's Candy* by applying the federal regulatory standard to rounding claims under California law. (*David v. Queen of Valley Medical Center* (2020) 51 Cal.App.5th 653, 664-665; *AHMC Healthcare*, *supra*, 24 Cal.App.5th at pp. 1028-1029.) In one case, the court observed that the federal standard does not require that a rounding policy "work out neutrally for every employee." (*AHMC Healthcare*, at p. 1022; accord *Corbin v. Time Warner Entm't-Advance/Newhouse P'ship* (9th Cir. 2016) 821 F.3d 1069, 1077 [rejecting the argument

21

that every employee must "gain[] or break[] even over *every* pay period or set of pay periods analyzed"].)  Requiring neutral results for every individual employee "'would undercut the purpose' and 'gut the effectiveness' of the typical rounding policy." (*AHMC Healthcare*, at p. 1022.)

*Camp* recently broke with the *See's Candy* line of cases.  In *Camp*, the stipulated evidence showed that under the employer's rounding policy, 56.6 percent of employees were paid for the same or a greater amount of time than their actual work time, while 43.4 percent of employees were underpaid.  (*Camp*, *supra*, 84 Cal.App.5th at p. 646.) The plaintiff was one of the employees whom the employer had underpaid—he had lost 7.83 hours because of rounding.  (*Ibid.*)

The employer argued that its rounding policy was lawful under *See's Candy* and that it therefore was entitled to summary judgment on the plaintiff's claim for unpaid wages, but the *Camp* court rejected that argument.  (*Camp*, *supra*, 84 Cal.App.5th at pp. 643-644.)  The court held that if an employer "can capture and has captured the exact amount of time an employee has worked during a shift, the employer must pay the employee for 'all the time' worked."  (*Id*. at p. 660.)

The *Camp* court relied heavily on two California Supreme Court decisions that postdate *See's Candy*.  The first decision, *Troester v. Starbucks Corp.* (2018) 5 Cal.5th 829 (*Troester*), concerned the de minimis doctrine found in federal labor law, which "excuse[s] the payment of wages for small amounts of otherwise compensable time upon a showing that the bits of time are administratively difficult to record."  (*Id.* at p. 835.) *Troester* declined to adopt the federal de minimis doctrine.  (*Id.* at pp. 835, 837-841.)

22

The second decision, *Donohue v. AMN Services, LLC* (2021) 11 Cal.5th 58 (*Donohue*), held that "employers cannot engage in the practice of rounding time punches . . . in the meal period context. The meal period provisions are designed to prevent even minor infringements on meal period requirements, and rounding is incompatible with that objective." (*Id.* at p. 61.)[2]

*Camp* identified four reasons for rejecting the employer's showing that its rounding policy was lawful. (*Camp*, *supra*, 84 Cal.App.5th at pp. 656-658.) First, *Troester* clarified that the Labor Code and the relevant wage order both contemplate that employers will pay employees for "'all work performed.'"[3] (*Camp*, at p. 657.) The evidence in *Camp* showed that the employer had not paid the plaintiff for all work performed. (*Ibid.*)

Second, as our high court explained in *Troester*, the Labor Code and the wage order provisions form a regulatory scheme that "'is . . . concerned with "small things."'" (*Camp*, *supra*, 84 Cal.App.5th at p. 657.) And when *Troester* rejected the de minimis doctrine, it "indicated that even small amounts of worktime—indeed amounts measured in minutes—are compensable where the worktime is regularly occurring." (*Camp*, at

---

[2]     *Donohue* held that rounding is unlawful in the meal period context but stopped short of deciding the validity of the *See's Candy* rounding standard. (*Donohue*, *supra*, 11 Cal.5th at p. 72.) The court noted that it had not been asked to decide that issue. (*Ibid.*) It instead assumed the validity of *See's Candy* and determined that rounding in the meal period context did not comport with the *See's Candy* neutrality standard. (*Donohue*, at p. 72.)

[3]     The Industrial Welfare Commission (IWC) has adopted wage orders that are "'accorded the same dignity as statutes'" and that "take precedence over the common law to the extent they conflict." (*Troester*, *supra*, 5 Cal.5th at p. 839.)

p. 657; accord *Donohue*, *supra*, 11 Cal.5th at p. 68 [given the regulatory scheme's concern "with small amounts of time" and "the relatively short length of a 30-minute meal period, the potential incursion that might result from rounding is significant"].) The evidence in *Camp* demonstrated that the small amounts of worktime periodically lost through rounding could add up over time—indeed, the plaintiff lost more than seven hours of worktime over five-plus years. (*Camp*, at pp. 646, 657.)

Third, there was no convincing evidence that the IWC or the Legislature intended to adopt the federal rounding regulation for determining whether time is compensable under state law. (*Camp*, *supra*, 84 Cal.App.5th at p. 657.) Under those circumstances, our high court had declined to adopt by implication any federal standard that expressly eliminates substantial protections for employees. (*Ibid.*) Similarly, our high court had cautioned against relying on federal labor law to construe state labor law if the language or intent of the laws substantially differs. (*Ibid.*) In the case of rounding, there was not merely a difference in language but "a complete absence of language." (*Ibid.*) The federal regulation has no analog in the Labor Code or in the relevant wage order. (*Id*. at p. 657.) In the 60-plus years since the federal regulation took effect, neither the Legislature nor the IWC had amended the law to recognize a rounding exception to the general requirement that an employee be paid for all time worked. (*Id.* at p. 658.) *Troester* declined to adopt the federal de minimis doctrine under substantially similar circumstances. (*Troester*, *supra*, 5 Cal.5th at p. 841; *Camp*, at p. 658.)

Fourth and finally, *Donohue* "appear[ed] to have called into question the efficiencies historically attributed to time rounding given that advances in technology

have enabled employers to more easily and more precisely capture time worked by employees." (*Camp*, *supra*, 84 Cal.App.5th at p. 658.) *Donohue* recognized that employers had developed rounding as a way to efficiently calculate hours worked and wages owed. (*Donohue*, *supra*, 11 Cal.5th at p. 73.) But the employer in *Donohue* used an electronic timekeeping system that "had to take the extra step of converting the unrounded time punches to rounded ones," so it was unclear what efficiencies the employer had gained from the practice. (*Id.* at p. 74.) The same was true in *Camp*: The employer's timekeeping system recorded time worked to the minute and took the extra step of rounding that time, but there were no clear efficiencies gained. (*Camp*, at p. 658.)

We find *Camp*'s reasons for rejecting the *See's Candy* rounding standard persuasive. We therefore conclude that the medical center was not entitled to summary adjudication on Woodworth's individual rounding claim or the PAGA rounding claim. The medical center's evidence showed that over 5,000 employees were not paid for all time worked under the rounding policy. Woodworth's evidence showed that she was not paid for 6.3 weighted hours under the policy. In addition, the evidence showed that the medical center's computer-based timekeeping system captured the employees' time to the minute and took the extra step of rounding the time punches. Because the medical center could and did capture the exact number of minutes that employees worked, it "must pay the employee[s] for 'all the time' worked." (*Camp*, *supra*, 84 Cal.App.5th at p. 660.)

*Camp* was decided after we issued our tentative opinion in this matter, so we gave the parties an opportunity to file supplemental briefs regarding the case. In its supplemental brief, the medical center contends that Woodworth forfeited the argument

25

that *See's Candy* does not apply here. It points out that Woodworth did not challenge *See's Candy* in the trial court or in her opening or reply brief on appeal. We agree that, in general, appellants forfeit arguments not raised in the trial court or in their appellate briefing. (*DiCola v. White Brothers Performance Products, Inc.* (2008) 158 Cal.App.4th 666, 676 (*DiCola*).) But we also have discretion to consider a forfeited issue on the merits. (*JRS Products, Inc. v. Matsushita Electric Corp. of America* (2004) 115 Cal.App.4th 168, 179.)

We conclude that there are good reasons to exercise that discretion here. *Camp* had not been decided when the parties briefed this motion in the trial court. Even the cases on which *Camp* relied, *Troester* and *Donohue*, were decided after the parties had fully briefed the motion in mid-July 2018. And when the trial court ruled on the motion in November 2018, *See's Candy* was binding appellate authority. *Troester*, *Donohue*, and *Camp* represent an intervening change in the case law that validates the new argument urged on appeal. (*In re Marriage of Moschetta* (1994) 25 Cal.App.4th 1218, 1227, fn. 12.)

Moreover, the medical center has not identified any disputed factual issue precluding reliance on *Camp*. (See *Krechuniak v. Noorzoy* (2017) 11 Cal.App.5th 713, 725 [if a "'new theory contemplates a factual situation . . . open to controversy'" and "'not put in issue or presented'" in the trial court, then "'the opposing party should not be required to defend against it on appeal'"].) It argues that section 2928 "require[s] a new factual analysis" and that *Camp* is distinguishable because it does not address section 2928. On this record, we disagree that section 2928 renders *Camp* inapplicable.

26

Section 2928 states: "No deduction from the wages of an employee on account of his coming late to work shall be made in excess of the proportionate wage which would have been earned during the time actually lost, but for a loss of time less than thirty minutes, a half hour's wage may be deducted." The medical center asserts that nothing in the record shows that Woodworth would have lost time if the medical center had chosen to apply section 2928 as opposed to rounding. The apparent argument is that Woodworth might have fared better under rounding than she would have if the medical center had deducted one-half hour's wage every time she clocked in fewer than 30 minutes late. But that comparative analysis would not change the fact that in actual practice, the medical center was applying rounding and not section 2928. And the evidence showed that under that rounding policy, Woodworth was not paid for all time worked.

The medical center further argues that we should decline to follow *Camp* because the court did not identify any language in the Labor Code or wage orders prohibiting a neutral rounding policy. On the contrary, *Camp* identified specific provisions of the Labor Code and the relevant wage order that required employees to "'be paid for all work performed.'" (*Camp*, *supra*, 84 Cal.App.5th at p. 657, citing § 510, subd. (a), Cal. Code Regs., tit. 8, § 11070, subds. 2(G), 3(A), 4(A).) And although *Camp* involved wage order No. 7-2001 (*Camp*, at p. 648), and this case involves wage order 5-2001 (Wage Order 5), there are no material differences between the relevant provisions of the two wage orders. (Cal. Code Regs., tit. 8, § 11070, subds. 2(G), 3(A), 4(A); Cal. Code Regs., tit. 8, § 11050, subds. 2(K), 3(A), 4(A); see *Singh v. Superior Court* (2006) 140 Cal.App.4th 387, 390, 397-398 (*Singh*) [Wage Order 5 governs hospitals].)

The medical center lastly argues that *Camp*'s holding should apply prospectively only, given the longstanding approval of rounding by the DLSE manual and *See's Candy*. The medical center contends that retroactive application would be unfair and violate its due process rights. We are not persuaded. "The general rule that judicial decisions are given retroactive effect is basic in our legal tradition." (*Newman v. Emerson Radio Corp.* (1989) 48 Cal.3d 973, 978.) In exceptional circumstances, "'"fairness and public policy may require that a decision be given only prospective application. [Citations.] Particular considerations relevant to the retroactivity determination include the reasonableness of the parties' reliance on the former rule, the nature of the change as substantive or procedural, retroactivity's effect on the administration of justice, and the purposes to be served by the new rule.'"" (*Claxton v. Waters* (2004) 34 Cal.4th 367, 378-379.) The medical center relies on the reasonableness of its reliance on the pre-*Camp* authorities but ignores the other relevant factors. The medical center thus fails to demonstrate that this case warrants an exception to the general rule of retroactivity.

In sum, we agree with *Camp* that if an employer "can capture and has captured the exact amount of time an employee has worked during a shift, the employer must pay the employee for 'all the time' worked." (*Camp*, *supra*, 84 Cal.App.5th at p. 660.) The evidence in this case showed that under the rounding policy, (1) the medical center captured the exact number of minutes employees worked, and (2) Woodworth and many other employees were not paid for all time worked. The medical center therefore was not entitled to summary adjudication on Woodworth's individual rounding claim or the PAGA rounding claim.

III. *Motion to Strike the Putative Class Members' Declarations*

Woodworth contends that the court erred by denying her motion to strike the putative class members' declarations. She argues that the court abused its discretion because she presented evidence that the medical center's counsel behaved in a deceptive and coercive manner with respect to the declarants. We conclude that Woodworth has not shown an abuse of discretion.

A. *Relevant Background*

Woodworth moved to certify five classes of current and former medical center employees. The medical center offered 43 putative class member declarations in support of its opposition. All 43 declarants were current employees of the medical center.

The declarations all stated that the declarant understood a former employee had "filed a proposed class action lawsuit which alleges that she and other hourly employees were denied rest breaks, not paid all wages owed due to an invalid [AWS] and failing to include certain bonuses in calculating overtime, and provided with inaccurate paystubs."

The final numbered paragraph of 42 of the declarations stated: "The statements in this declaration are voluntary and I understand that I do not have any obligation to sign this declaration. I understand that whether I choose to do so or not will not affect my employment status in any way. I have not been pressured or promised anything in connection with this declaration, nor have I been coerced to provide this declaration. I have had the opportunity to review the contents of this declaration and make any changes I believe are necessary to ensure that it is accurate. I understand that this declaration may be used in the proposed class action case entitled *Woodworth v. Loma Linda University*

29

*Medical Center*. I have also been advised that I could potentially be a member of such a class action if the Plaintiff is successful, and that my statement and this declaration could affect whether this matter is certified as a class action and my potential recovery from such a lawsuit, if any. I understand that the attorney who discussed this testimony with me is the [medical center's] attorney and that the [medical center] does not represent me or the individual who brought this lawsuit. Finally, I know that if I ever become a participant in the lawsuit, my interests will be opposed to [the medical center's] interests." The 43rd declaration contained the same final numbered paragraph with one minor change—the declarant crossed out "coerced" and handwrote "forced" in its place.

Woodworth moved to strike all of the putative class members' declarations, arguing that the medical center misled the declarants about the nature of the lawsuit and obtained statements against the declarants' interests in a coercive setting. She also argued that the defense counsel had violated the California Rule of Professional Conduct governing communications between an organization's lawyer and the organization's constituents.

A few days after Woodworth moved to strike the declarations, she also filed an ex parte application seeking to disqualify defense counsel or, in the alternative, to limit counsel's communications with putative class members. Like the motion to strike, the ex parte application argued that defense counsel's communications with the putative class members were misleading and coercive, and the ex parte application also requested that the court strike the declarations. The court ordered the ex parte application to proceed as a noticed motion, giving the parties time to file opposition and reply briefs.

### 1. *The Declarants' Deposition Testimony*

Woodworth based her motion to strike and ex parte application largely on the deposition testimony of 10 declarants. She randomly selected the 10 deponents from the group of 43 declarants. In the medical center's opposition briefs, it also relied on portions of the deposition testimony. We summarize relevant deposition testimony in the following paragraphs.

Maricela Baca: Baca's director told her that the director had to choose two people from the department for an interview with the medical center's lawyers regarding breaks. The director said that someone was going to cover for Baca so that the lawyers could interview her. The medical center's lawyers told her about this case, but not "down to detail." They "mainly" told her that a former employee (a nurse) was suing the medical center "over breaks and the three 12s." Baca did not know that Woodworth was alleging the medical center should have included Christmas bonuses when calculating the overtime rate. She discussed her pay stub with the medical center's lawyers, and she told them that she understood it. No one explained to her that Woodworth was claiming an employee should be able to look at his or her pay stub and see "'the total number of hours'" worked.

Baca did not know that Woodworth had filed this lawsuit on behalf of the state, and she did not know that Woodworth was seeking penalties for the state on behalf of the medical center employees. No one told her that she would be considered an aggrieved employee under PAGA, and no one told her that she might be a class member in this

case. No one explained to her that the plaintiff's attorney was "on [her] side" and "want[ed] the employees to be paid properly."

Baca did not remember if anyone told her that her declaration would be filed in court. The medical center's lawyers did not say whether they were going to do anything with the declaration. They did not tell her that her declaration might hurt Woodworth's chances of prevailing on the motion for class certification. No one told her to look at her declaration before she signed it. But the statements about the "day-to-day work environment" in her declaration were true. The statements in her declaration were also voluntary, no one forced her to sign the declaration, and no one promised her anything for signing it. She did not get a copy of her declaration.

Marissa Benter: Benter's boss told her that she needed to meet with the medical center's lawyer regarding a declaration. Benter felt that she could refuse to go to the meeting, and it was not a "scary" meeting. The medical center's lawyer told her that Woodworth's case was a proposed class action. The lawyer told her that she could be a potential member of the class because Woodworth was seeking to represent "the whole hospital." The lawyer explained that Woodworth was attempting to invalidate the AWS.

Benter did not know whether her declaration had been filed in court, but the lawyer told her that the declaration was "[f]or the lawsuit." Benter reviewed her declaration and made changes before signing it. All of the statements in the final numbered paragraph of her declaration were true.

Elvia Bermudez: A nurse manager asked Bermudez if she could go to a meeting about a case against the medical center. The manager said that a person was suing the

32

medical center about breaks, and she said that if Bermudez did not feel comfortable going to the meeting, Bermudez could refuse.  Bermudez said that she would go.  At the meeting, the lawyers told her that they worked for a law firm that represented the medical center.  They explained that a person named "Nicole" was suing the medical center about rest breaks "and all this stuff," but she did not recall exactly what they said.

Bermudez did not remember the lawyers using the term "class action," and they did not tell her that if the lawsuit were successful, she would receive money.  They did not tell her that Woodworth was suing on behalf of all employees, and they did not tell her that Woodworth was suing as a private attorney general.  She also did not remember them saying that Woodworth was suing on behalf of the state.  She did not understand what it meant "to be potentially a member of a class action" or "to be certified as a class action."  The lawyers did not tell her that she could talk to the lawyer representing the employees, and they did not tell her that she could contact Joseph Antonelli, who represented Woodworth.

Bermudez did not know what the following sentence from her declaration meant: "'I know that if I ever become a participant in the lawsuit, my interests will be opposed to [the medical center's] interests.'"  But she signed the declaration because she "was agreeing" with what she had said, and no one forced her to sign it.  She reviewed it line by line before signing it.  Woodworth's counsel asked whether Bermudez would have signed the declaration if she knew that the medical center would use it to defeat the class action and that Bermudez would "'not get money.'"  Bermudez replied:  "Well, I cannot do just because the money.  I just can say the truth about the money."

With one minor correction to a date, Bermudez confirmed that everything in her declaration was accurate. No one told Bermudez that the declaration would be filed in court, and the lawyers did not tell her that the declaration might be against her interests. But they told her that her declaration could be used by the medical center.

Steven Clark: Clark did not feel that the meeting with the medical center's lawyers was a coercive environment, and he did not feel intimidated. The lawyers introduced themselves and told him that they represented the medical center. They told him that a former employee was suing the medical center regarding rest periods, pay, and "something else," but he did not remember their exact words. Before he signed his declaration, he did not know that Woodworth's pay stub claim involved the failure to put the words "'Total Hours Worked'" on the pay stubs.

Clark did not remember anyone using the term "private attorney general" before he signed his declaration. He had never heard of the "Private Attorney General Act of California." He did not remember the medical center's lawyers explaining that Woodworth was representing the employees on behalf of the state. Nobody explained that Woodworth was seeking more than $60 million in penalties for failing to put "'Total Hours Worked'" on the pay stubs. Clark did not remember the lawyers telling him that he was a potential class member, but he read that in the declaration. Clark also did not remember the lawyers saying that he had a right to speak to the lawyers representing Woodworth or the employees.

When Clark signed the declaration, he believed that the declaration "could be used to support the case." The lawyers did not specify how they would use the declaration.

34

He did not remember if they told him that Woodworth had filed a class certification motion, and they did not explain that his declaration could be against his interests. Clark confirmed that he understood the statements in the final numbered paragraph of his declaration at the time he signed it. He reviewed the declaration before signing it and believed everything in it was accurate. He would not make any changes to the statements in his declaration about his experience at the medical center. He did not get a copy of his declaration.

Devon Dean: One of Dean's supervisors asked whether she would be willing to talk with "some people for the [medical center] about meal breaks." The supervisor did not say that the meeting involved a lawsuit. The lawyers that interviewed her did not explain "anything really about the case."

The medical center's lawyers did not tell Dean that Woodworth was suing on behalf of the state and all employees as a private attorney general. At one point, she testified that she did not remember if the lawyers told her that the case involved a class action claim or that she might be a member of a class action. But at another point, she testified that they said this could be a class action lawsuit and that she could be included as a class member. Before Dean signed her declaration, the lawyers did not tell her that she could speak to Woodworth's attorneys. They did not mention Antonelli by name. She did not remember the lawyers telling her that she could talk to any lawyer of her choosing about this case.

The medical center's lawyers did not explain how her declaration could affect her potential recovery from this lawsuit. The lawyers said that her declaration could be used

35

in court and that it might be used against her as a potential class member, but she did not recall what they said about how it could be used. The lawyers "wanted to make sure that [she] agreed with everything that [she] was about to sign," so they had her review her declaration. Dean reviewed it and signed it. She did not get a copy of her declaration.

Rebecca Manzo: Manzo's manager asked her to go to a meeting, and Manzo agreed. Manzo did "not really" know what the meeting was about before she got there. She met with two women whom she believed were lawyers, and she knew that they represented the medical center. They told her that a former employee was suing the hospital, and they wanted to ask her some questions. Manzo could not recall whether the medical center's lawyers told her about Woodworth's claims.

The medical center's lawyers told Manzo that Woodworth had filed a class action, and Manzo knew that she could be a member of a class action, but they did not tell her what a class action was. They did not tell her that Woodworth was seeking to represent other hourly employees, and she did not understand what a class action was when she signed her declaration.

The lawyers told her that the judge in this case might see her declaration, but they did not tell her that the medical center would use the declaration to oppose Woodworth's request for class certification. Manzo testified that each of the statements in the final numbered paragraph of her declaration were true at the time she signed it. She reviewed her declaration before signing it. She explained: "So I just know that when I signed this, I was willing and voluntarily [*sic*] to just give the truth of whatever I know to the best of

my ability and whoever it's going to help or not help." She did not get a copy of her declaration.

Craig Midget: Midget's supervisor asked Midget if he "would . . . mind going to talk to the lawyers." He felt that he could refuse to go to the meeting. He could not remember what the supervisor said about the subject of the interview. When Midget met with the lawyers, he understood that they represented the medical center. The lawyers told him that Woodworth was trying "to invalidate the [AWS], the voting part of it." He might have been told that Woodworth was seeking overtime wages for her AWS claim, but he could not remember. He could not remember if he had been told about her rest period allegations, but he had been told about her allegations regarding pay stubs.

Midget asked the medical center's lawyers about "the exact nature of this lawsuit," and they explained that the plaintiff had alleged a class action on behalf of herself and other hourly employees. They did not say that Midget could be a member of the class if Woodworth were successful, but he understood that he might be entitled to some money if Woodworth were successful.

The medical center's lawyers stressed that his declaration "would go to the other side," and he assumed that meant the judge would see it also. He reviewed his declaration, and he did not think that he made any changes to it. Midget did not recall the lawyers giving him the contact information for the plaintiff's lawyers. He did not receive a document from the medical center's lawyers asking for a conflict waiver.

Brittany Ormerod: Ormerod's manager asked her "to meet with our lawyers and talk about the rest breaks and other things that might come up due to a lawsuit that was

37

going on with the hospital." When she met with the lawyers, they told her that they represented the medical center, and she did not think that they represented her. She felt that she could have told her manager that she did not want to meet with the lawyers, and she felt that she could leave the meeting at any time.

The medical center's lawyers did "[n]ot really" tell Ormerod anything about this lawsuit. They told her about the rest period allegations, but she did not think they mentioned a claim for overtime or allegations about pay stubs, and she could not remember any allegations about the Christmas bonus. But they asked her questions about all of those things. The lawyers might have told her that Woodworth had brought a class action, but she did not recall. She understood that she could be a class member if Woodworth were successful, although she did not recall what the lawyers said about that possibility.

The medical center's lawyers told Ormerod that her declaration could be used in the lawsuit, but she did not recall if they told her for "which side" it could be used. She did not know whether they had filed her declaration. She did not receive or sign any documents referring to a waiver of any conflict. She reviewed her declaration before she signed it, and everything in it was truthful.

Dominic Ortiz: Ortiz's managers asked him if he would be willing to meet with the medical center's lawyers. When he met with the lawyers, they told him that they represented the medical center. They wanted to know about his rest breaks, and they told him that "there was someone filing a lawsuit." He believed they told him that this case was a class action, but no one explained that Woodworth had brought the action on behalf

38

of herself and all hourly nonexempt employees. He did not think that they told him he would stand to win if Woodworth won the lawsuit. He does not remember whether they said anything about the lawsuit also being a private attorney general action. No one explained that employees can sue on behalf of the state and all the employees at a place of business.

Ortiz did not remember the medical center's lawyers mentioning that there was a plaintiff's lawyer in this case or providing the name of that person. They did not tell him that he could talk to Woodworth's lawyers. They told him that his declaration would probably be used in this lawsuit, but they did not explain how. He did not know how his declaration could affect whether the matter was certified as a class action. Ortiz understood that if he had any questions, the medical center's lawyers would answer them, but he did not have any questions. He reviewed his declaration and made one change to it before he signed it.

Elizabeth Picazo: Picazo's supervisor asked if she could go to a meeting to talk about how everything works in Picazo's unit, and Picazo agreed. At the meeting, the medical center's lawyers told her that they represented the hospital. They told her that there was a pending lawsuit, they wanted to ask her questions, and they "wanted [her] honest opinion." She did not remember if they told her what the lawsuit was about, and she did not remember their words "exactly." They did not say anything about the Christmas bonus in the meeting. No one explained Woodworth's claim that the pay stubs should include "'Total Hours Worked'" on them. Picazo did not know whether Woodworth wanted "to get rid of" the AWS. No one explained that Woodworth was

39

claiming the medical center "didn't do the right things" necessary to pay the employees "straight time for 12 hours," and no one explained that Woodworth was seeking backpay for everyone who worked overtime on 12-hour shifts.

Picazo did not recall if the medical center's lawyers told her that Woodworth was suing on behalf of other people. She did not know what a class action was, and they did not tell her that she was a potential class member. She did not know that she had the chance of recovering some money if this lawsuit were successful. It was possible the medical center's lawyers told her that Woodworth was suing on behalf of the state as a private attorney general. But Picazo had never heard of the "Private Attorney General Act." No one explained to her that this lawsuit was seeking more than $60 million in penalties, and no one told her that she could potentially recover money if Woodworth won on her private attorney general claim.

The medical center's lawyers did not tell Picazo that her "'declaration could affect whether this matter is certified as a class action and [her] potential recovery from such a lawsuit, if any.'" She did not understand what those words meant when she read and signed her declaration, but she signed it because she was "honest on the questions" the lawyers asked her in the meeting. They told her that the declaration was in support of the medical center and that it was possible her declaration would be filed in court. The lawyers did not tell her how she could contact the lawyer for the plaintiff, and they did not tell her Antonelli's name. After showing Picazo her declaration and asking whether it was accurate, the lawyers said that she was not obligated to sign it. There was nothing inaccurate in the declaration about her "actual work" at the medical center. Picazo told

40

the lawyers that she had "'no problem signing'" it, and she asked for a copy of it, which they gave her.

### 2. *Defense Counsel's Declaration in Opposition to the Motion to Strike*

In opposition to the motion to strike the putative class members' declarations, the medical center also relied on the declaration of Rachel Lee, a partner at the firm representing the medical center. Lee and an associate attorney at her firm conducted the interviews of the putative class members. The interviews took place at the medical center in a private room. No medical center employees were present at the interviews, other than the employees being interviewed.

Lee's declaration described "standard disclosures" that defense counsel made during each interview. The attorneys introduced themselves and informed the employees that counsel represented only the medical center and did not represent the employees. Next, defense counsel asked whether an attorney represented the employees and whether an attorney had contacted them regarding this case. Defense counsel briefly described "the proposed class action lawsuit and the claims at issue." Lee and the associate attorney explained that they wanted to talk to the employees because "this was being brought as a class action" and counsel "wanted to find out what the employee[s] had experienced in [their] department."

Defense counsel also explained that the interviews were voluntary and that the employees did not have to participate in the interviews. Counsel stated that the medical center could not retaliate against the employees for participating or failing to participate in the interviews or for any information provided during interviews. Counsel then asked

41

the employees to affirm that they were comfortable proceeding with the interview and whether they had any questions before starting the interview. According to Lee, the "amount of information provided to the employees about the lawsuit varied depending on whether they had specific questions about it."

For those employees who chose to participate in the interviews, defense counsel asked that they be as truthful, honest, and accurate as possible, and counsel told them that they could decline to respond to any question. At no time did counsel suggest or recommend to the employees that they should answer the questions in a certain way. At the end of the interviews, counsel asked whether the employees would be willing to provide a declaration summarizing the information that they had conveyed. Counsel advised them that the declaration would be under oath and subject to the perjury laws, that the declaration was voluntary, and that they did not have to provide one. Counsel did not promise the employees anything in exchange for their declarations, and counsel did not obtain declarations from any employee who said that they did not want to provide one.

If an employee was willing to provide a declaration, defense counsel prepared and printed it. Counsel gave the employees a chance to review their declarations and make changes to ensure that they were accurate, and some employees made changes. Counsel asked the employees to let counsel know if they had questions about their declarations.

Defense counsel advised the employees that the declarations "would be used in the case of *Woodworth v. Loma Linda University Medical Center* and filed with the court to defend [the medical center] against the Plaintiff's claims." Counsel explained to the

employees "that the attorney on the other side is trying to bring this case as a class action" and that counsel was "going to use the declarations to try to prevent that from happening, or words to that effect." Consistent with the final numbered paragraph of the declarations, counsel advised the employees that (1) "they could potentially be members of the class if Plaintiff succeeded on her motion," (2) "their statements could affect whether the case was certified as a class action and their potential recovery from the lawsuit," and (3) "if they ever became participants in the lawsuit, their interests would be opposed to [the medical center's] interests." Some employees had questions about those disclosures, so counsel provided "additional information" to those employees.

### 3. *Defense Counsel's PowerPoint Presentation*

The 43 putative class member interviews took place between January 2 and January 14, 2019. The depositions of the 10 putative class members took place between February 7 and February 11, 2019. Before the depositions, on February 6, 2019, defense counsel met with the 10 deponents and reviewed a 23-slide PowerPoint presentation with them. At that meeting, defense counsel confirmed that each employee "already knew and continued to understand" that counsel represented the medical center and not the individual employees.

The PowerPoint presentation included slides briefly describing this lawsuit, identifying the medical center's counsel, and identifying Woodworth's counsel. One slide explained the "[p]urpose of a deposition" and stated: "Your obligation is to tell the truth. [¶] You are not required to guess about anything. [¶] If you don't know or don't remember, saying you don't know is perfectly appropriate." Another slide explained the

43

"[i]ssues in the lawsuit" as (1) "AWS elections," (2) "Regular rate," (3) "Overtime," (4) "Wage statements," (5) "Rest period," and (6) "PAGA." Five more slides briefly addressed the AWS issue, the regular rate claim, the overtime claim, the rest period claim, and the wage statement claim. Other slides showed the medical center's rest period policies and sample wage statements.

### 4. *The Court's Ruling*

At the hearing on the motion to strike the putative class members' declarations and the motion to disqualify defense counsel, the court indicated that it had reviewed all of the materials identified in its written tentative decision. The tentative decision listed all of the parties' filings, including the hundreds of pages of deposition excerpts, the putative class members' declarations, and defense counsel's declaration. At the end of the hearing, the court adopted its tentative decision denying both motions.

As to the motion to disqualify defense counsel, the court's written ruling summarized the evidence on which the parties relied. The court observed that some of the deposition testimony supported Woodworth's argument that the deponents did not understand or retain all of the information that defense counsel conveyed. But the court also observed that the disclosures in the putative class members' declarations and Lee's declaration regarding the interviews were "more reliable" than the "inconsistent" and "less clear" deposition testimony of the putative class members. The court also concluded that Woodworth based her motion largely on federal district court cases "involving facts considerably more serious tha[n] those at issue here." The court ruled that the facts and authorities did not support disqualification.

44

As to the motion to strike, the court's written ruling noted that Woodworth made largely the same arguments in support of her motion to disqualify defense counsel. The court determined that there was no evidence defense counsel had affirmatively misrepresented facts to the putative class members. The court also observed that, as it had explained in connection with the motion to disqualify, the putative class members' declarations and Lee's declaration "demonstrate the lack of coercion or unethical tactics by defense counsel." [4] In addition, the court determined that, under the Code of Civil Procedure, motions to strike applied only to pleadings and not to declarations. The court ruled that (1) the motion to strike was procedurally defective and (2) the evidence did not support Woodworth's argument that defense counsel had misled the declarants. The court therefore denied the motion.

B. *Analysis*

In employment litigation, employers may investigate a plaintiff-employee's allegations and obtain statements from other employees. (*Barriga*, *supra*, 51 Cal.App.5th at p. 327; see Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2022) ¶ 14:92.1 [before class certification, "it is not ethically improper for defendant to contact members of the putative class, conduct informal discovery or

---

[4] Woodworth argues that the trial court should have disregarded Lee's declaration because Lee improperly summarized 43 interviews and drew "numerous improper legal conclusions." Woodworth has forfeited the argument for two reasons. First, she did not object to Lee's declaration in the trial court. (Evid. Code, § 353, subd. (a); *Seibert v. City of San Jose* (2016) 247 Cal.App.4th 1027, 1057.) Second, the argument consists of a conclusory assertion with no citation to legal authority and no identification of which statements amounted to improper legal conclusions. (*Sporn v. Home Depot USA, Inc.* (2005) 126 Cal.App.4th 1294, 1303.)

attempt to defeat the class action by explaining its position, offering settlements, etc."].) However, "[c]ourts must be cognizant of the danger of coercion and exercise a healthy skepticism when assessing the evidentiary weight to be given to employee statements." (*Barriga*, at p. 327.) Thus, when an employer offers declarations of employees in opposition to a motion for class certification, the trial court has "the duty to carefully scrutinize" those declarations "for coercion or abuse." (*Id*. at p. 323.)

Some federal district courts have "concluded an ongoing employer-employee relationship between the class opponent and putative class members is *inherently* conducive to coercive influence." (*Barriga*, *supra*, 51 Cal.App.5th at p. 326.) But "the mere existence of a potentially or inherently coercive relationship is insufficient to support an order" striking employee declarations or "severely discounting the weight to be given those declarations." (*Id*. at p. 327.) On the other hand, "a compelling showing that the employees were misled or that the declarations were not freely and voluntarily given will suffice." (*Ibid.*)

"'In considering whether pre-certification communications between employers and employees are sufficiently deceptive or coercive to warrant relief, courts have considered several factors, including whether the employer adequately informed the employees about: (1) the details underlying the lawsuit, (2) the nature and purpose of the communications, and (3) the fact that any defense attorneys conducting the communications represent the employer and not the employee.'" (*Barriga*, *supra*, 51 Cal.App.5th at p. 330.)

If the court concludes that the employer obtained the employee declarations through coercion or abuse, it has "broad discretion to either strike some or all of the declarations or to discount the evidentiary weight to be given the declarations." (*Barriga*, *supra*, 51 Cal.App.5th at p. 323; see *Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 334 (*Sav-On Drug Stores*) [weight accorded to declarations is "a matter generally entrusted to the trial court's discretion"].) In deciding whether the court abused its discretion, "[w]e are also bound in our reviewing function by the substantial evidence rule. [Citations.] Thus, if substantial evidence supports the trial court's express or implied findings of fact, we review the resulting legal conclusions for an abuse of discretion. [Citation.] The judgment of the trial court is presumed correct; all intendments and presumptions are indulged to support the judgment; conflicts in the [evidence] must be resolved in favor of the prevailing party, and the trial court's resolution of any factual disputes arising from the evidence is conclusive." (*In re Marriage of Zimmerman* (1993) 16 Cal.App.4th 556, 561-562.)

Here, the court did not abuse its discretion by denying the motion to strike the putative class members' declarations. The record contains substantial evidence supporting the trial court's finding that there was a lack of coercion. Eight of the 10 employees testified that their supervisors or managers asked if they would attend the interview with defense counsel, not that they were ordered to attend. Several of those employees also said that they felt comfortable refusing the request or were told that they could refuse the request, and one testified that he did not feel that the environment was coercive. Two of the employees, Baca and Benter, testified that their supervisors told

47

them to attend, not that they asked the employees to attend. But Benter also felt that she could refuse to go to the meeting, and Baca testified that the statements in her declaration were voluntary, no one forced her to sign it, and no one promised her anything for signing it. In addition, according to Lee's declaration, defense counsel told all of the employees that the interviews were voluntary and that the medical center could not retaliate against them for failing to participate. Defense counsel also told the employees that providing a declaration was voluntary, and counsel asked the employees whether they would be willing to provide one. Defense counsel did not obtain declarations from employees who said that they were unwilling. The declarations stated that the declarants' statements were voluntary, and all but one of the employees testified that they reviewed their declarations before signing.

The record also contains substantial evidence supporting the finding that defense counsel did not affirmatively mislead the declarants. The record shows that defense counsel informed the employees that counsel represented the medical center, not the employees. Lee's declaration provided evidence of that, and several employees testified that they were told defense counsel represented the medical center or that they understood that. The declarations all stated that the declarants understood defense counsel represented the medical center and not the employees. And there was no evidence that the employees failed to understand whom defense counsel represented.

Further, there is substantial evidence that defense counsel "'adequately informed the employees about . . . the details underlying the lawsuit.'" (*Barriga*, *supra*, 51 Cal.App.5th at p. 330.) According to Lee, defense counsel briefly described this lawsuit

and Woodworth's claims. Counsel also told the employees that Woodworth had brought the case as a class action and that they could potentially be members of the class if she were successful. Further, the employee declarations contained a brief description of Woodworth's claims and explained that the case was a proposed class action. And much of the employee testimony substantiated defense counsel's statement that counsel had described the lawsuit and Woodworth's claims. For instance, Baca testified that defense counsel told her that a former employee was suing the medical center "over breaks and three 12s" (an apparent reference to the AWS issue). Benter said that counsel told her that Woodworth had filed a proposed class action and that Woodworth was seeking to represent "the whole hospital." Bermudez said that counsel told her that Woodworth was suing over rest breaks and other things, but she could not recall exactly what was said. Clark said something similar—counsel told him that the former employee was suing the medical center over rest periods, pay, and something else, but he did not recall what else was said. Dean said that she was told this case could be a class action and that she could be included as a class member. According to Midget, counsel told him that Woodworth had brought a class action on behalf of herself and other hourly employees. Midget understood that he might be entitled to some money if Woodworth were successful. He was also told about Woodworth's pay stub claim and that Woodworth was trying to invalidate the AWS, and he might have been told that she was seeking overtime wages for her AWS claim.

Lastly, there is substantial evidence that defense counsel informed the employees about "'the nature and purpose'" of the interviews. (*Barriga*, *supra*, 51 Cal.App.5th at

p. 330.) According to Lee, defense counsel told the employees that the declarations would be filed in court to defend the medical center against Woodworth's claims. Counsel also explained that the medical center was going to use the declarations to try to prevent the case from becoming a class action, "or words to that effect." And counsel advised the employees that their statements could affect (1) whether the court certified the case as a class action and (2) the employees' potential recovery from the action. Again, employee testimony corroborated much of Lee's declaration on those points. Benter said that defense counsel told her that the declaration was for this action, and Benter confirmed the truth of the statements in the final numbered paragraph of her declaration. That is, she understood that she could be a member of the class if Woodworth were successful and that her declaration could affect whether the court certified this case as a class action. Clark and Manzo similarly confirmed that, at the time they signed their declarations, the statements in the final numbered paragraph were true. Dean testified that counsel said that her declaration might be used in court and against her as a potential class member. According to Ormerod, defense counsel told her that her declaration could be used in this case. Similarly, Ortiz said that defense counsel told him that his declaration would probably be used in this case.

In sum, the record contains substantial evidence that the medical center did not coerce the employees or affirmatively mislead them into providing declarations. This is not a case in which there was a compelling showing of coercion or abuse. On this record, the trial court did not abuse its discretion by declining to strike the employees' declarations.

Woodworth's arguments do not convince us otherwise. She argues that the court erred because defense counsel affirmatively misrepresented that Woodworth sought to invalidate the AWS. The declarations do state that the declarants understood that Woodworth was alleging she and other hourly employees were "not paid all wages owed due to an invalid" AWS, but that was not a misrepresentation. That was what the TAC alleged—that the AWS was "null and void" because of defects in the process by which employees voted to implement it, and the medical center therefore owed overtime backpay.

Woodworth also argues that defense counsel failed to obtain a signed waiver of or consent to any conflict of interest. The single legal authority that Woodworth cites on this point, *Richardson v. Interstate Hotels & Resorts, Inc.* (N.D. Cal. Mar. 12, 2018, No. C 16-06772 WHA) 2018 U.S.Dist. Lexis 40377, does not show an abuse of discretion. In *Richardson*, the employer's defense counsel also represented the employee declarants at their depositions "without obtaining informed written consent" as to the conflict of interest. (*Id.* at p. *23.) The failure to obtain the employees' consent regarding the conflict was only one factor, among others, that justified striking the employees' declarations. (*Id.* at pp. *19-21.) Woodworth does not contend that defense counsel represented the employees at their depositions. And *Richardson* did not state a blanket rule that a waiver of any conflict of interest was required in every case.

Woodworth further argues that defense counsel omitted important information. For example, she asserts that counsel did not (1) provide a copy of the TAC, (2) provide contact information for Woodworth's counsel, (3) give full detail about each of

51

Woodworth's claims, including that she was alleging a PAGA claim, (4) explain that employees could become class members and would benefit if Woodworth prevailed, and (5) explain how the medical center would use the declarations or how they could affect any recovery. There is evidence that defense counsel explained some of these points, like the fact that employees could be class members if Woodworth prevailed on her motion or that the medical center was going to use the declarations to try to prevent the case from becoming a class action. To the extent that Woodworth relies on conflicting evidence, we defer to the trial court's resolution of conflicts in the evidence and do not reweigh the evidence. (*Eidsmore v. RBB, Inc.* (1994) 25 Cal.App.4th 189, 195.)

As to other points that are undisputed—for instance, defense counsel did not provide a copy of the TAC or contact information for Woodworth's counsel— Woodworth fails to show an abuse of discretion. She cites a handful of federal district court decisions in which the trial courts found defense counsel's communications with putative class members coercive or misleading on the basis of various omissions, plus other evidence. The cases are distinguishable on their facts and do not compel the conclusion that the trial court here abused its discretion. (E.g., *Camp v. Alexander* (N.D. Cal. 2014) 300 F.R.D. 617, 623-624 [letter sent to employees to convince them to sign opt-out declaration predicted that the class action, if successful, would cause the employer to shut down, "with the obvious consequence that employees would lose their jobs"]; *Acosta v. Southwest Fuel Mgmt.* (C.D.Cal. Feb. 20, 2018, No. CV 16-4547 FMO (AGRx)) 2018 U.S.Dist. Lexis 203389, at pp. *4-5 [employees instructed to attend meeting with defense counsel where counsel did not say the meeting was voluntary; one

52

employee signed his declaration because he felt employer would fire him or cut his hours if he did not, and other employees similarly testified]; *Quezada v. Schneider Logistics Transloading & Distrib.* (C.D.Cal. Mar. 25, 2013, No. CV 12-2188 CAS (DTBx)) 2013 U.S.Dist. Lexis 47639, at pp. *14, *16-17 (*Quezada*) [employees were summoned to meeting with defense counsel over loudspeaker or ordered to attend; defense counsel told employees that interviews were an "'internal investigation'"; employees were not told counsel was gathering evidence to use against them in a lawsuit or that document they were signing was a sworn declaration, and some employees felt pressure to sign].)

Woodworth also contends that the court abused its discretion because defense counsel violated the California Rules of Professional Conduct. (Undesignated rule references are to the Rules of Professional Conduct.) More specifically, she asserts that counsel violated rules 1.13(f) and 4.3(a) by coaching the employees before their depositions, which created the false impression that defense counsel represented the employees and amounted to giving legal advice.

Some federal district courts have concluded that violations of former rule 3-600, the predecessor to rule 1.13, weigh in favor of finding improper communications. (*Quezada*, *supra*, 2013 U.S.Dist. Lexis 47639, at pp. *11-12; see *Sprengel v. Zbylut* (2019) 40 Cal.App.5th 1028, 1042 & fn. 3 [former rule 3-600 preceded rule 1.13].) But Woodworth has not shown a violation of rule 1.13 or 4.3 here. Rule 1.13(f) states: "In dealing with an organization's constituents, a lawyer representing the organization shall explain the identity of the lawyer's client whenever the lawyer knows or reasonably should know that the organization's interests are adverse to those of the constituent(s)

53

with whom the lawyer is dealing." (Asterisk omitted.) Ample evidence shows that defense counsel complied with that rule by explaining that counsel represented the medical center. As to rule 4.3(a), it states in relevant part: "If the lawyer knows or reasonably should know that the interests of the unrepresented person are in conflict with the interests of the client, the lawyer shall not give legal advice to that person, except that the lawyer may, but is not required to, advise the person to secure counsel." (Asterisks omitted.) Woodworth cites no evidence that after the predeposition meeting, the employees had the impression that defense counsel represented them. Moreover, beyond the conclusory assertion that the employees were coached, she does not explain what precisely defense counsel did at the meeting that amounted to providing legal advice. We have no duty to develop the argument for her. (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 (*Cahill*).)

Finally, in her reply brief, Woodworth argues that this court's decision in *Barriga* requires us to reverse the order denying the motion to strike. (We decided *Barriga* after Woodworth had filed her opening brief.) While some of *Barriga*'s statements of the law are relevant here, it does not compel a reversal. The facts of the case render it materially distinguishable. In *Barriga*, we reversed for the trial court to reconsider the motion to strike employee declarations. (*Barriga*, *supra*, 51 Cal.App.5th at p. 338.) We did that for two reasons. First, the court concluded that it lacked statutory authority to strike the employee declarations. (*Id.* at p. 335.) And although the court also addressed the merits of the plaintiff's argument, it was "not entirely clear the court scrutinized the declarations

from the perspective that communications between a class opponent and its current employees are fraught with potential abuse." (*Ibid*.)

Second, the trial court "misunderstood the *scope* of its authority," because it ruled that the federal case law on which the plaintiff relied did not warrant striking the declarations of employees who were not putative class members (which amounted to 121 of the 174 declarations at issue). (*Barriga*, *supra*, 51 Cal.App.5th at p. 335.) We held that the court had a duty to scrutinize all of the declarations and had the authority to strike any of them, regardless of whether the declarants were putative class members. (*Id.* at p. 336.)

The circumstances that compelled reversal in *Barriga* are not present here. The record demonstrates that the trial court carefully scrutinized the declarations for coercion and abuse. Even if the court ruled that the Code of Civil Procedure did not authorize the motion to strike, the record is clear that the court also considered all of the evidence and ruled on the merits of the motion. Importantly, the court considered essentially the same evidence and arguments in connection with the motion to disqualify defense counsel. The court did not question the procedural validity of the motion to disqualify and ruled purely on the merits. Moreover, the court here did not misunderstand the scope of its authority in the manner at issue in *Barriga*; the declarants were all putative class members, so there was no question about whether the court had authority to strike declarations from nonmembers. Accordingly, there was no reason to believe that the court carefully scrutinized some declarations but not others.

For all of these reasons, we conclude that the court did not abuse its discretion by denying Woodworth's motion to strike the putative class members' declarations.

IV. *Motion for Class Certification*

Woodworth contends that the court abused its discretion by denying her motion for class certification. We agree that the court abused its discretion as to the class proposed for her stand-alone wage statement claim. But as to the other classes that she sought to certify, the court did not abuse its discretion.

A. *Overview of Class Certification Principles and Standard of Review*

"[T]he class action proponent bears the burden of establishing the propriety of class certification." (*Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906, 922.) The movant "must demonstrate the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives." (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1021 (*Brinker*).) "'In turn, the "community of interest requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class."'" (*Ibid.*)

The predominance element "hinges on 'whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment.'" (*Brinker, supra*, 53 Cal.4th at p. 1021.) The "court must examine the plaintiff's theory of recovery, assess the nature of the legal and factual disputes likely to

56

be presented, and decide whether individual or common issues predominate." (*Id.* at p. 1025.) "The 'ultimate question'" is "whether 'the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.'" (*Id.* at p. 1021.)

"[W]hether common or individual questions predominate will often depend upon resolution of issues closely tied to the merits." (*Brinker*, *supra*, 53 Cal.4th at p. 1024.) To assess predominance, the trial court must examine the law applicable to the plaintiff's causes of action and "determine whether the elements necessary to establish liability are susceptible of common proof or, if not, whether there are ways to manage effectively proof of any elements that may require individualized evidence." (*Ibid.*) In addition, the court must consider the defendant's affirmative defenses, because the individualized issues presented by those defenses may predominate over common issues. (*Walsh v. IKON Office Solutions, Inc.* (2007) 148 Cal.App.4th 1440, 1450.)

Even if common questions predominate, "[i]n considering whether a class action is a superior device for resolving a controversy," the court "must pay careful attention" to the manageability of any individual issues, including those arising from affirmative defenses. (*Duran v. U.S. Bank National Assn.* (2014) 59 Cal.4th 1, 29 (*Duran*).) Class certification is appropriate only if the plaintiff's trial plan shows how the individual issues can be managed fairly and efficiently. (*Id.* at pp. 27, 29.) "[A]ny procedure to determine the defendant's liability to the class must still permit the defendant to introduce its own evidence, both to challenge the plaintiffs' showing and to reduce overall

damages." (*Id.* at p. 38.) The court cannot abridge the defendant's presentation of a defense "simply because that defense [is] cumbersome to litigate in a class action." (*Id.* at p. 35.)

Trial courts have broad discretion to grant or deny certification because they are "ideally situated to evaluate the efficiencies and practicalities of permitting group action." (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435 (*Linder*).) Our review is "narrowly circumscribed." (*Brinker*, *supra*, 53 Cal.4th at p. 1022.) "[W]e must examine the trial court's reasons for denying class certification. 'Any valid pertinent reason stated will be sufficient to uphold the order.'" (*Linder*, *supra*, at p. 436.) But if the court's stated reasons "are erroneous, we must reverse, whether or not other reasons not relied upon might have supported the ruling." (*Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal.4th 522, 530 (*Ayala*).)

We review the court's order granting or denying certification "'for a manifest abuse of discretion.'" (*Brinker*, *supra*, 53 Cal.4th at p. 1022.) At the same time, we review the trial court's underlying factual determinations for substantial evidence, presuming in favor of the order "'the existence of every fact the trial court could reasonably deduce from the record.'" (*Ibid.*) Overall, we will not disturb the court's order "'unless (1) it is unsupported by substantial evidence, (2) it rests on improper criteria, or (3) it rests on erroneous legal assumptions.'" (*Ibid.*)

The predominance element presents a factual question, so we review the trial court's predominance finding for substantial evidence. (*Brinker*, *supra*, 53 Cal.4th at p. 1022; *Sav-On Drug Stores*, *supra*, 34 Cal.4th at p. 328.) "[I]f the parties' evidence is

conflicting on the issue of whether common or individual questions predominate . . . , the trial court is permitted to credit one party's evidence over the other's in determining whether the requirements for class certification have been met." (*Dailey v. Sears, Roebuck & Co.* (2013) 214 Cal.App.4th 974, 991 (*Dailey*); *Sav-On Drug Stores*, at p. 331 ["the trial court was within its discretion to credit plaintiffs' evidence on these points over defendant's, and we have no authority to substitute our own judgment for the trial court's respecting this or any other conflict in the evidence"].) We need not conclude that the prevailing party's evidence is compelling or that the trial court would have abused its discretion if it had credited the other party's evidence instead. (*Sav-On Drug Stores*, at p. 331.) "'[I]t is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.'" (*Ibid.*)

B. *Woodworth's Class Certification Motion*

Woodworth moved to certify five classes of current and former medical center employees. The proposed "'AWS Overtime Class'" consisted of all hourly nonexempt employees who were scheduled to work and did work at least one day of more than eight hours and up to 12 hours without receiving overtime pay. (Boldface omitted.)

The proposed "'Regular Rate Class'" consisted of all hourly nonexempt employees who were paid overtime or a missed meal or rest period premium (the missed

break premium) in a week when the employee earned a Christmas bonus or a "flat sum bonus."[5]  (Boldface omitted.)

The proposed "'Rest Break Class'" consisted of all hourly nonexempt employees who were in patient care and worked under the medical center's policy requiring employees to remain on premises during their rest periods.  "Alternatively," Woodworth proposed a Rest Break Class consisting of nonexempt patient care employees who did not take at least one rest period because the medical center failed to provide a relief worker.  (Boldface omitted.)

The proposed "'Wage Statement Class'" consisted of all hourly nonexempt employees who received a wage statement that did not include "'Total Hours Worked'" or did not accurately report hourly rates and all wages earned.  (Boldface omitted.)  Woodworth characterized this as both a stand-alone class and a derivative class.

The proposed "'Waiting Time Penalty Class'" consisted of all hourly nonexempt employees who no longer worked for the medical center but were members of the AWS Overtime Class, the Regular Rate Class, or the Rest Break Class.  (Boldface omitted.)  Woodworth characterized this as a derivative class only.

---

[5]  California courts and the DLSE use the term "'flat sum' bonuses" to distinguish bonuses that are a flat amount from "bonuses 'based on a percentage of production or some formula other than a flat amount.'"  (*Marin v. Costco Wholesale Corp.* (2008) 169 Cal.App.4th 804, 809; *Alvarado v. Dart Container Corp. of California* (2018) 4 Cal.5th 542, 561, fn. 6 [distinguishing a flat sum bonus from "a production or piecework bonus or a commission"].)

### 1. *AWS Overtime Class*

Woodworth contends that the court abused its discretion by denying certification of the AWS Overtime Class because she presented substantial evidence of common legal and factual issues. The argument lacks merit.

#### i. *Relevant Background*

Woodworth proposed an AWS Overtime Class period starting in June 2010 and ending on the date of certification. According to her moving papers, this class consisted of 5,855 employees who worked shifts of eight and one-half, nine, 10, or 12 hours during which they were paid straight time wages only. The medical center instituted the relevant AWS's through elections dating back to 2001.

Woodworth argued that the medical center would have the burden of proving that it had instituted a valid AWS for the various work units that were subject to an AWS. In her trial plan, she explained that the medical center would have to prove that (1) it made the proper written disclosures to the employees before they voted on whether to adopt the AWS, (2) it duly noticed informational meetings with the employees before the votes, and (3) each unit of affected employees voted in favor of the AWS by a two-thirds majority. She further argued that there were "no true 'individual' issues" as to this class because the medical center used the same method and templates for all of the AWS elections. She asserted that the template disclosures were invalid on their face, so the question of whether the medical center complied with the applicable legal requirements for disclosures, which Wage Order 5 sets forth, was common to all class members.

61

Woodworth's evidence in support of the motion included 12 examples of AWS agreements with various dates. (See Cal. Code Regs., tit. 8, § 11050, subd. 3(C)(1) [requiring that the employer propose an AWS to employees "in the form of a written agreement"].) One agreement had a date of June 2001, and the others had a range of dates from January 2012 through March 2014. The agreements were substantially similar but not identical. For example, two agreements stated that "no regularly scheduled shift shall be for a period of less than four hours." The other agreements did not contain that statement.

Woodworth also offered 18 examples of written disclosures that the medical center had provided to employees for AWS elections in 2013 and 2014. (See Cal. Code Regs., tit. 8, § 11050, subd. 3(C)(3) [requiring the employer to make "a disclosure in writing to the affected employees, including the effects of the proposed arrangement on the employees' wages, hours, and benefits"].) The disclosures were substantially similar but included variations for the name of the relevant work unit, the date of the AWS election, and the schedule proposed (three 12-hour shifts, four 10-hour shifts, or four nine-hour shifts per week).

Woodworth relied on deposition testimony from several medical center employees stating that the medical center used templates for the AWS written disclosures. One employee—Kenya Baker, the manager of compensation in the human resources department—testified that she had made changes to the templates, but she could not recall the specific changes.

Woodworth contended that all of the AWS disclosures failed to comply with Wage Order 5, because they did not fully disclose the proposed AWS's effects on wages, hours, and benefits. She identified eight claimed omissions in the disclosures. Woodworth also claimed that the AWS's were invalid because the AWS disclosures and agreements granted the medical center the right to terminate the AWS's. She further claimed that the medical center had not complied with "additional pre-election requirements," but she did not elaborate further. Instead, she cited her brief in opposition to the medical center's earlier motion for summary adjudication on the AWS defense. That brief is not part of the record.[6]

In opposition to the class certification motion, the medical center argued that Woodworth was not an adequate class representative because she had a conflict of interest with the current medical center employees. The medical center asserted that the AWS's were popular, and the employees had voted overwhelmingly to adopt them. If they were invalidated, the medical center would adopt five eight-hour shifts per week. According to the medical center, because Woodworth sought to invalidate the AWS's and the majority of employees had voted for them, she had a conflict that precluded her from representing the class.

---

[6] The medical center filed two motions for summary adjudication on the AWS defense. The court denied the first one without prejudice in November 2018, before Woodworth had moved for class certification. The medical center filed its second AWS summary adjudication motion in February 2019, after Woodworth had moved for class certification. We address that second motion in a later part.

The medical center also argued that common questions of law or fact did not predominate because liability would depend on reviewing the election procedures for hundreds of AWS elections. The medical center offered evidence that it had conducted more than 390 AWS elections between 2001 and 2013, approximately 150 elections in 2013, and approximately 100 elections since 2013.

The medical center's opposition relied in large part on the declaration of Baker, who had been directly involved in conducting AWS elections since 2003. According to Baker's declaration, the medical center did not use the same templates for all AWS elections. Baker had personally revised most of the template agreements on which Woodworth relied in her moving papers. There were "dozens of other forms" of agreements that the medical center had used for other elections. The medical center offered 12 more examples of AWS agreements that were substantially similar but not identical. Baker asserted that the examples were not an exhaustive set of all templates used for the AWS elections. The medical center also offered 20 more examples of AWS disclosure statements that, again, were substantially similar but not identical.

Setting aside the template agreements and disclosures, the medical center also argued that Woodworth sought to challenge the AWS elections for reasons that did not apply to all of the hundreds of elections. It noted that in discovery, it had asked her to state the facts supporting her allegation that the medical center failed to institute a valid AWS. Woodworth responded with numerous factual theories, including that (1) the medical center had failed to report the results of many AWS elections to the Division of Labor Statistics and Research (DLSR); and (2) a change in work hours could not be

implemented for at least 30 days after the announcement of the election results, but the medical center had implemented some AWS's before the waiting period had expired. The medical center also noted that Woodworth had pursued another theory when deposing a medical center employee—that one AWS was invalid because fewer than two-thirds of the affected employees had approved it. In that deposition, Woodworth questioned the employee about documentation showing that out of 121 employees, 80 of them had voted in favor of the particular AWS, which was one vote shy of the required two-thirds majority.

The medical center argued that the failure to report the results of an AWS election, the failure to observe the 30-day waiting period, or the failure to obtain the required two-thirds approval might, if proven, invalidate some elections but not others in which those failures did not occur. It thus argued that Woodworth's theories would require election-specific evidence and would generate different results for the hundreds of different elections.

In her reply brief, Woodworth continued to argue that whether the AWS disclosures and agreements complied with Wage Order 5 presented a common question applicable to all AWS Overtime Class members. She argued that her other theories of liability—such as the failure to observe the 30-day waiting period or the failure to report AWS election results to the DLSR—did not preclude certification. She contended that to the extent those theories applied to some but not all AWS elections, the court could certify subclasses to address them.

The trial court denied certification of the AWS Overtime Class for several reasons. To start, the court concluded that Woodworth was not an adequate class representative, because she had a conflict of interest with the AWS Overtime Class.

In addition, the court concluded that common questions of law or fact did not predominate, so Woodworth failed to show a well-defined community of interest. It observed that proof of liability would depend on the validity of potentially hundreds of different AWS elections. The court rejected Woodworth's argument that the AWS templates permitted common proof, noting that even if the documents were similar, that "does not show they [were] the same." The court also observed that one of Woodworth's theories of liability—the failure to gain a two-thirds majority approval—would require individual proof. And the court rejected Woodworth's argument that the court could certify subclasses to deal with the various theories of liability, noting that it was unclear whether the proposed subclasses would require the parties "to go back to the drawing board on discovery that should have occurred pre-certification." Lastly, the court ruled that Woodworth had not provided a manageable trial plan for dealing with the validity of hundreds of AWS elections.

ii. *Analysis*

Section 510 mandates that employees receive one and one-half times their regular rate of pay for work in excess of eight hours per workday, unless an exception applies. (§ 510, subd. (a).) A validly adopted AWS is one such exception. (*Ibid*.) As an exception to the overtime rules, a properly adopted AWS constitutes an affirmative defense that the employer bears the burden of proving. (*Ramirez v. Yosemite Water Co.*

66

(1999) 20 Cal.4th 785, 794-795 (*Ramirez*); *Maldonado*, *supra*, 22 Cal.App.5th at p. 1327.)

When the Legislature enacted section 510, it also directed the IWC to issue wage orders regulating AWS's for the health care industry and other industries. (§ 517, subds. (a)-(b); *Singh*, *supra*, 140 Cal.App.4th at pp. 396-397.) The IWC's wage orders "are legislative regulations specifying minimum requirements with respect to wages, hours, and working conditions." (*Augustus v. ABM Security Services, Inc.* (2016) 2 Cal.5th 257, 262, fn. 5 (*Augustus*).) As already explained, "[t]he IWC's wage orders are to be accorded the same dignity as statutes. They are 'presumptively valid' . . . ." (*Brinker*, *supra*, 53 Cal.4th at p. 1027.)

Wage Order 5 governs AWS's in the health care industry. (Cal. Code Regs., tit. 8, § 11050, subds. 1, 2(G), (J), (P)(4); *Singh*, *supra*, 140 Cal.App.4th at pp. 397-398.) According to the wage order, the employer must propose the AWS "in the form of a written agreement." (Cal. Code Regs., tit. 8, § 11050, subd. 3(C)(1).) For an AWS to be valid, at least two-thirds of the employees in the affected work unit must vote in favor of the AWS in a secret-ballot election. (*Id.*, § 11050, subd. 3(C)(2).) Before the election, the employer must disclose in writing "the effects of the proposed [AWS] on the employees' wages, hours, and benefits." (*Id.*, § 11050, subd. 3(C)(3).) "Such a disclosure shall include meeting(s), duly noticed, held at least 14 days prior to voting, for the specific purpose of discussing the effects" of the AWS. (*Ibid.*) The employer must report the results of the election to the DLSR within 30 days. (*Id.*, § 11050, subd. 3(C)(6).) The employer may not require the affected employees to work a newly adopted

67

AWS for at least 30 days after the announcement of the elections results. (*Id.*, § 11050, subd. 3(C)(7).)

Here, the record contains substantial evidence supporting the trial court's finding that common questions of law or fact did not predominate. The medical center proffered evidence that the thousands of employees in the proposed AWS Overtime Class had worked or were working under AWS's implemented through hundreds of separate elections dating back to 2001. In defending against Woodworth's overtime claim, the medical center would have the burden of proving the validity of all those AWS's. That would require the medical center to prove that it had made the proper written disclosures, duly noticed pre-election meetings, held the meetings at least 14 days before the elections, and obtained a two-thirds majority approval for each AWS. In addition, Woodworth's theories of liability included other claimed failures to comply with AWS requirements, such as the failure to report the results of the election to the DLSR and the failure to observe the 30-day waiting period for implementing a newly approved AWS.

Woodworth argued that the medical center's AWS templates would permit common proof of liability because they all contained the same material omissions, but that was not uniformly true. For instance, any AWS agreement adopted under Wage Order 5 "shall provide for not less than four (4) hours of work in any shift." (Cal. Code Regs., tit. 8, § 11050, subd. 3(B)(1), (B)(8)(c).) Woodworth claimed that the templates were deficient in part because neither the disclosures nor the agreements informed employees that they were entitled to at least four hours of work per shift. But two agreements on which Woodworth relied contained that disclosure. ("[N]o regularly

scheduled shift shall be for a period of less than four hours.") The other agreements on which she relied did not contain that disclosure. In addition, five of the agreements on which the medical center relied in its opposition papers contained the same disclosure, but seven others did not. There was thus some evidence that the templates were dissimilar in ways relevant to Woodworth's theories of liability.

In any event, even if the medical center used identical templates for its written disclosures for the hundreds of AWS elections, the sufficiency of those disclosures presented only one issue subject to common proof. The medical center would still have to prove that for each of the hundreds of elections at issue, the other requirements were met. (*Soderstedt v. CBIZ Southern California, LLC* (2011) 197 Cal.App.4th 133, 154 ["'A court may properly deny certification where there are diverse factual issues to be resolved even though there may also be many common questions of law'"].) Each election would present an individualized factual determination regarding whether the medical center duly noticed pre-election meetings and whether each voting unit approved the AWS by a two-thirds vote. And Woodworth had other theories of liability that required an individualized look at the elections—the failure to report election results to the DLSR and the failure to wait 30 days before implementing a new AWS. She did not demonstrate how compliance with those other requirements was subject to common proof. (*Brinker*, *supra*, 53 Cal.4th at p. 1052 [certification not proper when no evidence of uniform practice showing employer knew employees performed off-the-clock work, and nothing before the court demonstrated how that could be shown through common proof].) Substantial evidence thus supports the trial court's finding that common

questions did not predominate, and the court did not abuse its discretion by denying class certification on that ground.

Moreover, the court did not abuse its discretion by concluding that Woodworth failed to present a manageable trial plan for determining the validity of hundreds of AWS elections. While she proposed subclasses in her reply brief to deal with her various theories of noncompliance, she did not explain at all how the subclasses would manage the individualized issues arising from the existence of hundreds of elections. (*Evans v. Lasco Bathware, Inc.* (2009) 178 Cal.App.4th 1417, 1434 (*Evans*) ["creating subclasses here would merely resurrect all of the individualized issues . . . as well as individualized showing[s] of damages, which would splinter the class into thousands of minitrials and largely defeat the benefits of proceeding as a class action"]; *Payton v. CSI Electrical Contractors, Inc.* (2018) 27 Cal.App.5th 832, 844 [general outline of a two-phase trial "'fail[ed] to show how the individualized issues arising from Defendants' defenses can be managed'"].) She therefore failed to carry her burden of showing that class treatment was appropriate.

Woodworth argues that the court abused its discretion because she presented substantial evidence of common questions with respect to the templates. But on appeal, we do not ask whether her evidence may have been sufficient to support class certification. (*Dailey*, *supra*, 214 Cal.App.4th at p. 992.) We ask only whether the record contains substantial evidence supporting the trial court's predominance finding. (*Ibid.*) It does.

For all of these reasons, the court did not abuse its discretion by denying certification of the AWS Overtime Class on the basis of the predominance element or the manageability requirement. In light of that conclusion, we need not reach Woodworth's independent argument that the court erred because she did not have a conflict of interest with the class members. (*Cruz v. Sun World Internat., LLC* (2015) 243 Cal.App.4th 367, 394 (*Cruz*) [because substantial evidence supported trial court's predominance finding, appellate court did not need to address trial court's rulings on other elements of class certification], disapproved on another ground by *Noel v. Thrifty Payless, Inc.* (2019) 7 Cal.5th 955, 986, fn. 15.)

### 2. *Regular Rate Class*

Woodworth argues that the court abused its discretion by denying certification of the Regular Rate Class because common questions predominated. The argument again lacks merit.

### i. *Relevant Background*

According to Woodworth's moving papers, the Regular Rate Class consisted of 1,435 employees who received flat sum bonuses and an unspecified number of employees who received Christmas bonuses. She argued that the medical center had a uniform practice of excluding Christmas bonuses and other flat sum bonuses from the calculation of an employee's regular rate of pay. She contended that Christmas bonuses and flat sum bonuses were nondiscretionary and that the law therefore required them to be included when calculating the regular rate of pay. Moreover, she argued that whether

71

the medical center properly excluded those bonuses from the regular rate of pay presented a common legal question, rendering class treatment appropriate.

Woodworth offered deposition testimony from the medical center's payroll manager, Crystal Bowell, who testified that the medical center uniformly excluded Christmas bonuses from the regular rate calculation. She also offered the medical center's written policy on Christmas bonuses, which described the Christmas bonus as "[a] discretionary bonus provided to eligible employees as a gift for their service."

In its opposition papers, the medical center argued that common questions of fact or law did not predominate, because liability would depend on "employee-specific" and "bonus-specific" evidence. As to the Christmas bonus, the medical center contended that employers were permitted to exclude "'gifts on special occasions'" from the calculation of an employee's regular rate. So long as the Christmas bonus was actually a gift and not paid pursuant to a contract, the bonus thus was excludable. But according to the medical center, Woodworth intended to claim that the medical center had promised the Christmas bonus to employees, rendering it a contractual obligation. The medical center relied on Woodworth's discovery responses. It asked her to state the facts supporting her allegation that it had improperly calculated the regular rate of pay. She responded in part that the medical center had published an "Outline of Benefits," which stated: "'A Christmas bonus is available for full-time regular employees and part-time regular benefit eligible employees.'" (Boldface omitted.) She further responded that the medical center "clearly intended" employees to rely on this summary of benefits without delving into detailed policies or handbooks. The medical center argued that employee-specific

evidence would be required to determine whether any particular employee saw and relied on the Outline of Benefits or some other statement that might be construed as a contractual promise to pay the Christmas bonus.

As to the flat sum bonus, the medical center argued that it did not use that term in the ordinary course of business, although it did pay multiple different types of bonuses using different criteria. According to Bowell's declaration, the medical center's payroll system used the code "BON" to refer to many bonuses that it had paid since the beginning of the class period (June 2010), but the medical center did not treat all BON code bonuses in the same manner. Whether the medical center excluded a particular bonus from the regular rate calculation depended on the reason for the bonus and how the medical center determined the amount of the bonus. Bowell elaborated on six nonexhaustive examples in her declaration: (1) an August 2016 bonus to thank certain employees "for a job well done"; (2) a bonus for employees who supported another hospital when that hospital implemented a new electronic medical records system; (3) a bonus for employees in a particular unit who agreed to perform extra job duties when a coworker was on leave; (4) a "one-time performance bonus" when a particular department wanted to increase the regular pay raise that employees were receiving in the ordinary course of business; (5) a new hire bonus that at least one department sometimes gave new employees; and (6) a bonus for a case manager who worked some hours as a mobile intensive care nurse. Of those six examples, the medical center excluded only the first type of bonus from the employees' regular rate calculation. On the basis of Bowell's declaration, the medical center argued that bonus-specific evidence would be required to

73

determine whether the medical center properly excluded a bonus from the regular rate calculation.

Apart from the predominance element, the medical center also argued that Woodworth was not an adequate representative of the Regular Rate Class, because there was no evidence that she had been promised a Christmas bonus, and she never received another type of bonus. She testified at her deposition that she did not expect to receive a Christmas bonus until a coworker told her that the medical center would be paying one. Also, she had never seen the Outline of Benefits, which the medical center published in January 2015, months after Woodworth had left the medical center.

In her reply brief, Woodworth argued that the Christmas bonus issue "turn[ed] on whether the bonus was discretionary" (and thus properly excluded from the regular rate) "or promised (and thus improperly excluded)." She asserted that this common legal question predominated. Similarly, she continued to argue that the exclusion of the flat sum bonus from the regular rate was a predominant common legal question.

The trial court denied certification of the Regular Rate Class. It concluded that Woodworth was not an adequate representative of the class. In addition, it found that common questions of law or fact did not predominate, because the trier of fact would have to make individualized determinations about (1) which BON code bonuses were discretionary and (2) whether the medical center promised employees bonuses. In addition, the court ruled that Woodworth failed to offer a manageable trial plan for determining which bonuses were discretionary (and thus excludable from the regular rate calculation).

ii. *Analysis*

"Under California law, employers must provide employees with overtime pay when employees work more than a certain amount of time." (*Ferra v. Loews Hollywood Hotel, LLC* (2021) 11 Cal.5th 858, 863 (*Ferra*).)  Section 510, subdivision (a), requires employers to compensate employees for overtime at one and one-half or twice their "regular rate of pay," depending on the number of overtime hours.  "California law also provides for meal, rest, and recovery periods.  If an employer does not provide an employee with a compliant meal, rest, or recovery period, section 226.7, subdivision (c) . . . requires the employer to 'pay the employee one additional hour of pay at the employee's regular rate of compensation.'" (*Ferra*, *supra*, at p. 863.)  For purposes of calculating an employee's overtime rate and missed break premium, the terms "'regular rate of pay'" and "'regular rate of compensation'" are synonymous.  (*Ibid.*)

California courts construe "'regular rate of pay' . . . to have the same meaning as 'regular rate'" in the Fair Labor Standards Act of 1938 (FLSA) (29 U.S.C. § 201 et seq.). (*Ferra*, *supra*, 11 Cal.5th at p. 868; *Prachasaisoradej v. Ralphs Grocery Co., Inc.* (2007) 42 Cal.4th 217, 242, fn. 14.)  FLSA defines the regular rate as including "all remuneration for employment," subject to numerous exclusions.  (29 U.S.C. § 207(e); *Huntington Memorial Hospital v. Superior Court* (2005) 131 Cal.App.4th 893, 903 (*Huntington Memorial*).)  Bonuses that do not fall within one of the exclusions "must be added into the total compensation received by the employee before his [or her] regular hourly rate of pay is determined." (29 C.F.R. § 778.200(c) (2022); *id*., § 778.208; *Huntington Memorial*, *supra*, at p. 904.)  Thus, the employee's regular rate of pay "can

75

change from pay period to pay period," depending on whether the employee received a qualifying bonus during the period. (*Ferra*, at p. 869.)

Two of the regular rate exclusions are relevant here. First, the regular rate calculation need not include "payments in the nature of gifts made at Christmas time or on other special occasions, as a reward for service." (29 U.S.C. § 207(e)(1); 29 C.F.R. § 778.200(a)(1) (2022).) To qualify for this special occasion gift exclusion, the amount of a Christmas bonus must not be "measured by or dependent on hours worked, production, or efficiency." (29 U.S.C. § 207(e)(1).) In addition, a Christmas bonus does not qualify for the exclusion if it "is paid pursuant to contract (so that the employee has a legal right to the payment and could bring suit to enforce it)." (29 C.F.R. § 778.212(b) (2022).) But a Christmas bonus qualifies for the exclusion even if it is paid "to all employees" and "with regularity so that the employees are led to expect it." (*Id.*, § 778.212(c).)

Second, the regular rate calculation need not include discretionary bonuses. (29 C.F.R. §§ 778.208, 778.211 (2022).) Discretionary bonuses are "[s]ums paid in recognition of services performed during a given period," so long as both the fact of payment and "the amount of the payment are determined at the sole discretion of the employer at or near the end of the period and not pursuant to any prior contract, agreement, or promise causing the employee to expect such payments regularly." (29 U.S.C. § 207(e)(3); 29 C.F.R. § 778.200(a)(3) (2022).) "The label assigned to a bonus does not conclusively determine whether a bonus is discretionary . . . ." (29 C.F.R.

76

§ 778.211(d) (2022).)  Instead, FLSA's terms "and the facts specific to the bonus at issue determine whether bonuses are excludable discretionary bonuses."  (*Ibid.*)

In this case, substantial evidence supports the trial court's finding that common questions did not predominate for the Regular Rate Class.  Woodworth asserted that a common legal question predominated:  Did the medical center properly exclude the Christmas bonus and the flat sum bonus from the regular rate calculation?  But as to the Christmas bonus, the precise factual and legal dispute likely to be presented was whether it qualified for the special occasion gift exclusion.  (See *Brinker*, *supra*, 53 Cal.4th at p. 1025 [court must "assess the nature of the legal and factual disputes likely to be presented" when evaluating predominance element].)  Woodworth acknowledged that whether the Christmas bonus was excludable turned on whether the employees had been promised the bonus.  That might show that the bonus was "paid pursuant to contract." (29 C.F.R. § 778.212(b) (2022).)  However, Woodworth did not explain how the existence of that promise would be subject to common proof.  On appeal, she argues that the Outline of Benefits gave rise to an implied promise that the medical center would pay the Christmas bonus, at least as "to those employees who actually saw the Outline of Benefits."  That would require individualized evidence regarding which employees saw the document and understood it as a promise to pay the Christmas bonus.  Moreover, Woodworth proposed a class period starting in June 2010, nearly five years before the medical center published the Outline of Benefits.  She does not explain what method of common proof would show promises dating back to 2010.  And the fact that the medical center might have paid the Christmas bonus regularly or to all employees who were

77

eligible did not give rise to a promise disqualifying it from the gift exclusion. The regulations implementing the gift exclusion expressly permit employers to exclude such a bonus. (29 C.F.R. § 778.212(c) (2022).)

With respect to the flat sum bonus, the medical center offered evidence that there was no single type of flat sum bonus. Rather, it paid many types of bonuses during the proposed class period, and the medical center included some of those in the regular rate calculation. Bonus-specific evidence would be required to determine whether the medical center had properly excluded a particular bonus as discretionary. That is, "facts specific to the bonus at issue" (29 C.F.R. § 778.211(d) (2022)) would be necessary to determine (1) whether the bonus was "paid in recognition of services performed during a given period," (2) whether the medical center determined the fact and amount of the bonus in its sole discretion, (3) whether the medical center made those determinations "at or near the end" of the relevant period, and (4) whether there was a "prior contract, agreement, or promise causing the employee" to expect the bonus regularly. (29 U.S.C. § 207(e)(3).) Again, Woodworth did not explain how any of those elements would be subject to common proof as to any one bonus, much less as to the potentially numerous bonuses at issue for 1,435 class members. (See *Lampe v. Queen of the Valley Medical Center* (2018) 19 Cal.App.5th 832, 843-844 (*Lampe*) ["'vague assertion'" that the employer miscalculated the regular rate without any specific detail as to what bonus categories were or were not excluded was insufficient to show common issues predominated].)

For all of these reasons, substantial evidence supports the trial court's finding that common questions of fact or law did not predominate with respect to the Regular Rate Class. The court therefore did not abuse its discretion by denying certification of the class. Given that conclusion, we need not reach Woodworth's additional argument that the court erred by concluding that she was an inadequate class representative. (*Cruz*, *supra*, 243 Cal.App.4th at p. 394.)

### 3. *Rest Break Class*

Woodworth argues that the court's reasons for denying certification of the Rest Break Class were "unsound," so it abused its discretion. We conclude that Woodworth has not shown an abuse of discretion.

### i. *Relevant Background*

According to Woodworth's moving papers, the Rest Break Class consisted of 7,083 patient care employees. In support of the class certification motion, Woodworth offered the declaration of Elsie Crowninshield, a doctor of nursing practice. Crowninshield determined which employees were patient care employees by reviewing the medical center's "department descriptions and job titles." The list of job titles representing those 7,083 patient care employees was 73 pages long.

As discussed, Woodworth proposed two options for the Rest Break Class—the on-premises Rest Break Class and the no-relief Rest Break Class. Regarding the on-premises Rest Break Class, she argued that the medical center had a facially invalid rest period policy, presenting a predominant common legal question for the class. In relevant part, the rest period policy applied to all nonexempt employees and provided for

79

one 10-minute rest period for each four hours worked. It specified that employees working between 10 and 14 hours were entitled to three rest periods. The policy also stated: "It is expected that ten minute rest periods will be taken on the premises." Woodworth contended that requiring employees to remain on premises was unlawful per se, because the law required employers to relinquish control over employees during rest periods.

As for the no-relief Rest Break Class, Woodworth argued that the medical center failed to provide dedicated relief personnel for patient care employees who worked 10- and 12-hour shifts. Crowninshield explained in her declaration that the medical center had "staff-to-patient ratio obligations" and that certain licensed patient care employees (like nurses) had similar ethical obligations. She opined that without adequate relief personnel, patient care employees were prone to missing breaks to ensure that they were providing appropriate care. After reviewing certain of the medical center's written policies and deposition testimony, Crowninshield opined that the medical center had no system for providing dedicated rest period relief. She asserted that the medical center planned rest periods on an informal basis, did not provide formal training on rest period coverage, had no daily log or journal showing when rest periods were scheduled or taken, had no operational plan to ensure adequate staffing for rest periods, and had an onerous and intimidating process for claiming the missed break premium. (While an exhibit to Crowninshield's declaration listed the documents and deposition testimony that she had reviewed in forming her opinions, Woodworth did not provide the majority of those documents with her moving papers.)

According to Woodworth's declaration in support of her motion, she rarely took any of her rest periods on her 12-hour shifts. She attributed that to the medical center's failure to provide relief personnel and stated that the medical center rarely provided a dedicated relief nurse.

In her trial plan, Woodworth asserted that she would prove the failure to provide rest periods by deposing a random sample of Rest Break Class members. She would ask them whether they were restricted to the medical center's premises for rest periods and how often, on average, they took rest periods in which they were permitted to leave the premises. In addition, she would ask them how often relief personnel was available. She would also rely on Crowninshield's testimony, scheduling documents, and "daily assignment sheets."

Regarding sampling, Woodworth offered a declaration from Kriegler, the same statistician on whom she relied in connection with the motion for summary adjudication on the rounding claim. Kriegler opined that the parties could randomly select class members to depose in increments of 25. The parties would analyze the testimony from the first 25 Rest Break Class members to gauge whether the margins of error were sufficiently small. If the margins were small enough, there would be no need for further depositions. If they were not sufficiently small, the parties would proceed with the next batch of 25 depositions. Kriegler provided calculations for the margin of error under various hypothetical circumstances, using sample sizes ranging from 20 to 200 class members.

In opposition, the medical center argued that common questions of law or fact did not predominate with respect to the Rest Break Class. As to the on-premises class, the medical center argued that the "expect[ation]" stated in the rest period policy was not a requirement, and the vast majority of supervisors and employees did not interpret the policy as requiring them to stay on premises. It contended that proof of liability would require individualized evidence as to what supervisors communicated to employees and whether employees were actually prevented from leaving the premises when they wanted. The medical center offered a declaration from the executive director of benefits and compensation, who stated that the medical center does not track whether employees remain on premises during rest periods. In addition, most of the putative class member declarants stated that no one told them about an on-premises requirement. A number of them also said that they were free to leave or were not, in fact, required to stay on premises. And a number of them stated that they did not leave the medical center because they had only 10 minutes for rest periods or they did not want to leave. At least one supervisor explained that he never told employees that they could not leave the premises during rest periods; they were free to do whatever they pleased, so long as they returned to work by the end of the 10-minute rest period.

Regarding the no-relief class, the medical center likewise argued that the theory would require an individualized inquiry, because there was no uniform policy or practice of failing to provide relief or rest periods. It again relied on the putative class members' declarations. Many of the 12-hour employees said that they could take three rest periods if they wanted to do so, they had someone to relieve them while they took their breaks, or

they had never been denied a rest period. Some of them said that they actually did take three rest periods some or all of the time. Many of them said that they often chose to skip one or more rest periods voluntarily. Some putative class members described how certain employees were assigned to provide relief during rest periods. Some described how their unit used a sign-up sheet to schedule rest periods or how a supervisor created a schedule for rest periods. Others described a more informal process in which employees took their rest breaks whenever they wanted, so long as they had coverage at the time or notified their supervisors.

The medical center also argued that Woodworth had not shown that the Rest Break Class was ascertainable. She defined it as all patient care employees, but according to the executive director of benefits and compensation, Woodworth's 73-page list of patient care job titles did not accurately identify patient care employees. The list included whole departments that had nothing to do with patient care, employees who did not provide patient care, or employees who might provide patient care on some days but not others. Overall, there were hundreds of job titles on the list that did not involve patient care at all or most of the time. There was no accurate, existing list that identified patient care positions by job title and department. The medical center argued that to develop an accurate list, the court would need to hear evidence on what hundreds of employees do.

The medical center further argued that Woodworth had no manageable trial plan for dealing with the individual issues raised by both the on-premises and the no-relief classes. It asserted that her plan to randomly sample class members for deposition was

not statistically valid.  The medical center offered the declaration of the applied economist, Buchanan, on whom it had relied in connection with the motion for summary adjudication on the rounding claim.  Applying a mathematical formula, Buchanan calculated that the parties would have to depose at least 365 randomly selected class members to get a correct sample size for a homogenous population of 7,083 people, assuming a confidence level of 95 percent and an error tolerance of 5 percent.  The medical center argued that Kriegler provided no statistical basis for his claim that, at most, 200 depositions would be required, nor had he provided a basis for starting with an initial sample size of 25.  Moreover, it argued, Woodworth had offered no evidence that the Rest Break Class members were a homogenous population, whereas the putative class members' declarations suggested that the hundreds of different types of employees in the class would have different rest period experiences.

In her reply brief, Woodworth narrowed the definition of the Rest Break Class, proposing two alternatives.  The first option was all patient care employees who worked only 12-hour shifts.  Using her 73-page list of patient care positions, she narrowed the class down to 4,584 members fitting that description.  The second option was patient care employees who were registered nurses and worked only 12-hour shifts.  She did not specify how many people would be in that second alternative class.

Woodworth continued to argue that the legality of the on-premises rest break policy presented a predominant common question warranting certification.  She further argued that the medical center had a systematic practice of failing to provide 12-hour patient care employees with relief personnel and that damages could be resolved through

84

Kriegler's random sampling method. She submitted a reply declaration from Kriegler stating that he had reviewed the putative class members' declarations and the testimony of the 10 deponents from that group. On the basis of that information, he estimated that the class members missed their third rest period at a rate of between 60 and 80 percent.

The court denied certification of the Rest Break Class. As to the proposed on-premises class, the court's order was somewhat unclear on the predominance element. In the section of the order addressing that element, the court noted that Woodworth based her theory of liability on the on-premises policy. But it did not expressly decide whether common questions predominated for the on-premises class. However, in the section of the order addressing manageability, the court concluded that Woodworth had "failed to demonstrate manageability in her trial plan," given that it would have to determine which patient care employees "missed breaks because they were required to remain on premises."

As to the proposed no-relief class, the court ruled that common questions did not predominate. It observed that Woodworth had not produced evidence of a common policy or practice of denying 12-hour employees rest periods and that individualized inquiries would predominate as to the reasons that employees did not take rest periods. The court additionally observed that the "'patient care' label" was "problematic," because the medical center had shown that Woodworth's list of patient care job titles included employees who did not provide patient care. The court ruled that Woodworth had not provided a manageable trial plan for determining which employees were patient care employees.

ii. *Analysis*

"California law requires employers to relieve their employees of all work-related duties and employer control during 10-minute rest periods." (*Augustus*, *supra*, 2 Cal.5th at p. 272.) As relevant here, employees are entitled to 10 minutes of rest for every four hours worked "or major fraction thereof." (Cal. Code Regs., tit. 8, § 11050, subd. 12(A).) Accordingly, employees who work 12-hour shifts are entitled to three 10-minute rest periods during which they are relieved of all duties and free from employer control.

In this case, Woodworth fails to show that the court erred by denying certification of the on-premises Rest Break Class. Her theory of liability asserts that the medical center's written policy violated the law requiring rest periods free from duties and employer control.[7] The medical center would defend itself by showing that regardless of its written policy, it did not actually require employees to remain on premises. In other words, even if the policy were unlawful on its face, the medical center did not enforce the

---

[7]     In *Augustus*, our Supreme Court reasoned that "[b]ecause rest periods are 10 minutes in length [citation], they impose practical limitations on an employee's movement. That is, during a rest period an employee generally can travel at most five minutes from a work post before returning to make it back on time. Thus, one would expect that employees will ordinarily have to remain on site or nearby. This constraint, which is of course common to all rest periods, is not sufficient to establish employer control." (*Augustus*, *supra*, 2 Cal.5th at p. 270.)

The medical center argues that the trial court properly denied certification because the on-premises rest period policy was facially valid under *Augustus*. It does not explain why the facial validity of the policy means that class treatment is inappropriate. In any event, the medical center did not make this argument in the trial court, and the court did not base its decision on any determination about the merits of Woodworth's on-premises theory. Given that we must review the court's actual reasons for granting or denying certification, we decline to affirm the order on grounds not relied on by the court. (*Ayala*, *supra*, 59 Cal.4th at p. 530.)

policy. The court's stated reason for denying certification was that Woodworth lacked a manageable trial plan for dealing with that defense and determining which employees were required to remain on premises. (See *Duran*, *supra*, 59 Cal.4th at p. 29 [when the plaintiff seeks class certification on the basis that the employer imposed a uniform policy, the plaintiff "must still demonstrate that the illegal effects of this conduct can be proven efficiently and manageably within a class setting"].) Woodworth does not carry her burden of demonstrating that the manageability ruling constituted an abuse of discretion. (*Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 80 [appellant bears the burden of showing an abuse of discretion].) In a conclusory fashion, she asserts that she will depose a randomly selected group of class members and that random sampling can be used to determine the number of class members to testify at trial. But she does not attempt to describe Kriegler's method in any detail, Buchanan's criticisms of it, or why the court erred by implicitly crediting Buchanan over Kriegler. She does not even mention Buchanan's declaration. Nor does she apply the controlling case law on manageability and sampling, *Duran*, to any of the experts' disputes. (*Duran*, at p. 31 [holding that while "it may be possible to manage individual issues through the use of surveys and statistical sampling," any "statistical plan for managing individual issues must be conducted with sufficient rigor"].) And the record is clear that the court considered both declarations—the court's order contains a section discussing the declarations and overruling the medical center's objections to Kriegler's declaration. We decline to reverse the court's order, in the absence of any reasoned discussion of the

evidence about manageability or the relevant legal authority. (*Cahill*, *supra*, 194 Cal.App.4th at p. 956.)

With respect to the no-relief Rest Break Class, substantial evidence supports the court's finding that common questions did not predominate. The evidence showed that the formal rest period policy complied with the law by providing for three rest periods when an employee worked a 12-hour shift. Crowninshield opined that the medical center had no system for providing dedicated relief personnel, but beyond Woodworth's own declaration, Woodworth did not proffer any evidence that the medical center denied rest periods because relief personnel were lacking. Woodworth's individual experience did not constitute evidence of a "uniform, companywide policy." (*Brinker*, *supra*, 53 Cal.4th at p. 1052.)

The medical center, on the other hand, proffered evidence that there was no uniform practice of denying rest periods for lack of relief personnel, and Woodworth does not persuasively explain how liability could be shown through common proof. (See, e.g., *Arenas v. El Torito Restaurants, Inc.* (2010) 183 Cal.App.4th 723, 734 ["having credited defendants' evidence over plaintiffs', the trial court could reasonably conclude there was insufficient evidence of widespread misclassification, hence plaintiffs' theory of recovery was not susceptible to common proof"].) Many of the putative class member declarants took three rest periods on their 12-hour shifts. Even if the declarants did not take all of their rest periods, some said that they voluntarily chose to skip rest periods and that relief was available if they wanted to take the rest periods. And the declarations showed that the process for taking rest periods varied. Some supervisors scheduled rest

periods for the employees. Some units had employees sign up for rest periods during a shift. And other declarants described a more informal process in which employees notified supervisors when they wanted to take a rest period. On this record, the court could reasonably conclude that there was no uniform policy of denying rest periods for lack of relief, and proof of liability "would have had to continue in an employee-by-employee fashion," demonstrating who did not take all of their rest periods and the reasons for any failure to take them. (*Brinker*, *supra*, 53 Cal.4th at p. 1052; *Lampe*, *supra*, 19 Cal.App.5th at p. 848 [question of whether a missed meal period "was due to the employer's failure to allow it or from the employee's voluntary choice" required an individualized inquiry, precluding class certification].)

In sum, substantial evidence supports the trial court's predominance finding on the no-relief Rest Break Class, so the court did not abuse its discretion by denying certification of the class. Moreover, Woodworth has not shown that the court abused its discretion by denying certification of the on-premises Rest Break Class on manageability grounds. Given those conclusions, we need not reach Woodworth's additional argument that the court erred by rejecting her definition of patient care employees for the Rest Break Class. (*Cruz*, *supra*, 243 Cal.App.4th at p. 394.)

### 4. *Wage Statement Class*

Woodworth argues that the court abused its discretion when it determined that common questions did not predominate as to the Wage Statement Class and that she was an inadequate representative. We conclude that the court abused its discretion by

89

denying certification of the stand-alone Wage Statement Class but not the derivative Wage Statement Class.

### i. *Relevant Background*

Under section 226, employers must provide employees with "an accurate itemized statement in writing showing" nine categories of information. (§ 226, subd (a).) For a nonexempt employee, the wage statement must show "total hours worked by the employee," gross wages earned, and net wages earned, among other things. (§ 226, subd. (a); § 226, subd. (j).)

Woodworth sought to certify the Wage Statement Class on stand-alone and derivative theories. As to the stand-alone class, Woodworth presented evidence that before June 2018, the medical center issued wage statements that did not include a line item showing the total hours worked by an employee. Beginning in June 2018, the medical center added a line item setting forth "Total Worked Hours" (capitalization and boldface omitted), as the following example illustrates:

| HOURS AND EARNINGS | | | | | |
|---|---|---|---|---|---|
| | | ---- Current ---- | | ---- YTD ---- | |
| Description | Rate | Hours | Earnings | Hours | Earnings |
| Budget Time | | 11.00 | 0.00 | 11.00 | 0.00 |
| Double Pay | 80.044980 | 0.10 | 8.00 | 2.50 | 199.61 |
| Night Differential | 2.700000 | 51.00 | 137.70 | 718.10 | 1,938.87 |
| Weekend Differential | 2.700000 | 32.00 | 86.40 | 315.30 | 851.31 |
| Regular Pay | 37.020000 | 20.00 | 740.40 | 781.30 | 29,836.02 |
| Training | 37.020000 | 5.00 | 185.10 | 14.80 | 547.90 |
| Regular Pay | 38.730000 | 36.00 | 1,394.28 | | 0.00 |
| Holiday Bonus | | | 0.00 | 24.00 | 454.50 |
| Paid Leave | | | 0.00 | 81.20 | 3,006.02 |
| Paid Leave Sick | | | 0.00 | 36.00 | 1,332.72 |
| Sick Pay | | | 0.00 | 12.00 | 444.24 |
| Training Double | | | 0.00 | 1.00 | 85.30 |
| TOTAL WORKED HOURS: | | 61.10 | | | |
| TOTAL: | | 155.10 | 2,551.88 | 1,997.20 | 38,696.49 |

Woodworth therefore argued that the wage statements issued before June 2018 did not comply with section 226 because they failed to show total hours worked. She asserted that whether the wage statements complied with section 226 presented a predominant legal question common to the class. The class consisted of over 10,000 members who received wage statements.

As to the derivative Wage Statement Class, Woodworth argued that liability would depend on the class members' overtime and regular rate claim. That is, to the extent that the medical center owed class members overtime pay or missed break premiums, the wage statements did not accurately reflect all of their overtime pay or premium pay.

The medical center argued in opposition that common questions did not predominate for this class. It contended that under *Morgan v. United Retail Inc.* (2010) 186 Cal.App.4th 1136 (*Morgan*), section 226 did not require a separate line item showing total hours worked. According to the medical center, so long as the employee could use simple arithmetic to "determine the sum of all hours worked without referring to time records or other documents," the wage statement complied with section 226. (*Morgan*, *supra*, at p. 1147.)

The medical center contended that common proof of liability was lacking because the employees' wage statements differed greatly. Even before June 2018, some employees received simple wage statements that did not require arithmetic at all to

91

determine the total hours worked, such as this one:

| HOURS AND EARNINGS | | | | | |
|---|---|---|---|---|---|
| | | Current | | YTD | |
| Description | Rate | Hours | Earnings | Hours | Earnings |
| Regular Pay | 15.370000 | 80.00 | 1,229.60 | 829.90 | 12,755.57 |
| Budget Time | | | 0.00 | 5.10 | 0.00 |
| Convert Paid Leave | | | 0.00 | 80.00 | 1,229.60 |
| General Orientation | | | 0.00 | 8.00 | 122.96 |
| Paid Leave | | | 0.00 | 33.90 | 521.03 |
| Paid Leave Budget | | | 0.00 | 0.80 | 12.30 |
| Premium Overtime Pay | | | 0.00 | 2.30 | 53.04 |
| TOTAL: | | 80.00 | 1,229.60 | 960.00 | 14,694.50 |

This employee worked 80 regular hours during the pay period, and the line item for the total accurately reported 80 total hours worked. Other employees received wage statements that included regular hours and overtime hours, like this one:

| HOURS AND EARNINGS | | | | | |
|---|---|---|---|---|---|
| | | Current | | YTD | |
| Description | Rate | Hours | Earnings | Hours | Earnings |
| Premium Overtime Pay | 33.585000 | 0.80 | 26.87 | 10.60 | 356.04 |
| Regular Pay | 22.390000 | 79.80 | 1,786.72 | 827.80 | 18,534.44 |
| Paid Leave | | | 0.00 | 46.50 | 1,041.14 |
| TOTAL: | | 80.60 | 1,813.59 | 884.90 | 19,931.62 |

This employee worked 79.8 regular hours and 0.8 overtime hours, and the line item for the total accurately reported 80.6 total hours worked.

Other employees received more complex wage statements, like this one that Woodworth received in April 2012:

| HOURS AND EARNINGS | | | | | |
|---|---|---|---|---|---|
| | | Current | | YTD | |
| Description | Rate | Hours | Earnings | Hours | Earnings |
| Double Pay | 67.015700 | 0.80 | 53.61 | 1.50 | 101.60 |
| Night Differential | 4.000000 | 70.40 | 281.60 | 175.10 | 700.40 |
| Regular Pay | 31.610000 | 73.00 | 2,307.13 | 109.60 | 3,464.46 |
| Double Pay | 67.024880 | 0.30 | 20.11 | | 0.00 |
| General Orientation | | | 0.00 | 16.40 | 518.40 |
| Rest/Meal Period Pay | | | 0.00 | 2.00 | 67.45 |
| Training Double | | | 0.00 | 4.20 | 269.05 |
| Training | | | 0.00 | 367.30 | 11,610.35 |
| Weekend Differential | | | 0.00 | 85.50 | 342.00 |
| TOTAL: | | 144.50 | 2,661.85 | 761.60 | 17,073.71 |

92

During this two-week pay period, Woodworth worked 73 regular hours, 0.8 double time hours one week, and 0.3 double time hours the second week, for a total of 74.1 hours. The wage statement also reported that she worked 70.4 hours for which the medical center paid her a night differential. Those night differential hours were part of the 74.1 hours that she had worked. But the line item reporting the total hours added the night differential hours to the 74.1 hours she had worked, so the wage statement reported 144.50 total hours. Woodworth testified at her deposition, however, that she could determine her total hours worked by adding the regular hours and the double time hours, and she could determine from this wage statement that she had worked 74.1 hours during the pay period.

The medical center argued that Woodworth's theory of liability turned on the complexity of the wage statement and whether the employee could use simple arithmetic to determine total hours worked, which would require individual inquiries for each employee and each wage statement. The medical center would seek to introduce the wage statements of hundreds of employees and would call those employees to testify that they had no difficulty determining the total hours worked from their wage statements. Thus, individual questions predominated, and Woodworth had no manageable trial plan for that. In addition, the medical center argued that Woodworth could not represent the class because she had admitted that she could determine her total hours worked by adding her regular hours and double time hours.

As to the derivative Wage Statement Class, the medical center argued that California law did not permit derivative wage statement liability for an underlying wage

93

and hour violation.  Even if a derivative claim were permitted, the medical center argued, certification of a derivate Wage Statement Class was not appropriate because certification of the underlying classes was not appropriate.

In Woodworth's reply brief, she argued that *Morgan* did not apply because it was factually distinguishable, and in any event, whether it applied was a legal question common to the entire class.  She further argued that even if the medical center were not required to include a single line item accurately reporting total hours worked, there was a common predominant question as to whether employees could determine their total hours worked from the more complex wage statements.  She used another of her wage statements as an example, this one from October 2013:

| HOURS AND EARNINGS | | | | | |
|---|---|---|---|---|---|
| | Current | | | YTD | |
| Description | Rate | Hours | Earnings | Hours | Earnings |
| Night Differential | 4.000000 | 58.40 | 233.60 | 1,211.70 | 4,846.80 |
| Weekend Differential | 4.000000 | 24.40 | 97.60 | 616.90 | 2,467.60 |
| Double Pay | 73.227390 | 0.80 | 58.58 | 37.40 | 2,655.95 |
| Regular Pay | 33.380000 | 60.00 | 2,002.80 | 1,221.50 | 39,827.52 |
| Paid Leave Sick | 33.380000 | 12.00 | 400.56 | 39.80 | 1,279.32 |
| Double Pay | 70.564080 | 0.50 | 35.28 | | 0.00 |
| EPIC Training | | | 0.00 | 14.30 | 452.02 |
| Holiday Bonus | | | 0.00 | 28.80 | 480.69 |
| Paid Leave | | | 0.00 | 96.80 | 3,208.53 |
| Premium Overtime Pay | | | 0.00 | 1.20 | 62.03 |
| Retro Pay | | | 0.00 | | 2,888.35 |
| Rest/Meal Period Pay | | | 0.00 | 1.00 | 38.08 |
| Other | | | 0.00 | 63.60 | 1,828.45 |
| TOTAL: | | 156.10 | 2,828.42 | 3,333.00 | 60,035.34 |

The line item reporting total hours did not accurately reflect her total hours worked for the period, because the figure included night differential hours, weekend differential hours, and paid leave hours.  The line item for night differential and weekend differential hours merely reported extra pay that she received for working night and weekend shifts, and she did not work during the paid sick leave hours.  Thus, the total reported on more

94

complex wage statements like this one double-counted some work hours and included some nonwork hours.

Woodworth relied again on Kriegler's declaration in support of her reply brief. He had examined the payroll data for all current and former employees from June 2013 to August 2015. According to him, 90.4 percent of the pay periods included hours for shift differentials, paid time off, and/or holiday bonuses in the total reported hours. Thus, the total did not accurately reflect hours actually worked on 90.4 percent of the wage statements for that period. He identified 13 earnings codes that he characterized as shift differentials or paid time off resulting in the discrepancy. Woodworth contended that whether those 90.4 percent of wage statements violated section 226 presented a predominant legal question common to the class. The question did not require individualized inquiries because all wage statements in the group inaccurately reported total hours worked by including shift differentials and paid time off. Moreover, Woodworth argued, she was an adequate representative of the class. It did not matter that she could determine her total hours worked after the medical center's counsel "'coached'" her through the process at her deposition.

The court denied certification of the stand-alone Wage Statement Class. Citing *Morgan*, the court observed that section 226 did not require a separate line item for total hours worked. It further observed that some employees received more complex wage statements than others. It concluded that determining liability would require an individualized review of the allegedly noncompliant wage statements, which "'would generate different results for different employees (and different results for different wage

95

statements issued to the same employee).'" The court thus ruled that common questions did not predominate.

In addition, because Woodworth had testified that she could add the hours on her wage statement and determine her total hours worked, the court ruled that she was not an adequate representative for the class. As to the derivative Wage Statement Class, the court denied certification because it was denying certification on the underlying AWS Overtime and Regular Rate Classes.

ii. *Analysis*

As discussed, section 226, subdivision (a), requires employers to furnish accurate itemized wage statements showing "total hours worked by the employee." Subdivision (e) of the statute describes an employer's liability for failing to furnish compliant wage statements. (*Morgan*, *supra*, 186 Cal.App.4th at p. 1143.) It provides that "[a]n employee suffering injury as a result of a knowing and intentional failure by an employer to comply with subdivision (a) is entitled to recover the greater of all actual damages" or statutory penalties. (§ 226, subd. (e)(1).) An employee suffers injury for this purpose if (1) the employer fails to provide the required "accurate and complete information" and (2) "the employee cannot promptly and easily determine" their total hours worked "from the wage statement alone." (§ 226, subd. (e)(2)(B), (e)(2)(B)(i).) "'[P]romptly and easily determine' means a reasonable person would be able to readily ascertain the information without reference to other documents or information." (§ 226, subd. (e)(2)(C).)

Here, the record does not contain substantial evidence to support the court's predominance finding on the stand-alone Wage Statement Class. The evidence showed

96

that the simpler wage statements reported only regular hours or regular and overtime hours, and the more complex ones like Woodworth's reported hours for differential pay and paid time off. But that did not mean that proof of liability would require an individualized inquiry for each employee or wage statement. The wage statements could be grouped into two categories—those reporting regular and overtime hours only, and those reporting hours under one or more of the earning codes that Kriegler had identified as shift differentials or paid time off. Common questions apply to each of the two categories: Did the wage statement provide accurate and complete information about total hours worked? (§ 226, subd. (e)(2)(B).) And could a reasonable person readily ascertain total hours worked from the statement alone, without reference to other documents or information? (*Id.*, subd. (e)(2)(C).) As Woodworth argues, her theory of liability would require review of samples from each category but not review of each wage statement. Moreover, it would not require each and every employee to testify about whether they could determine their total hours worked from any one wage statement. The statute establishes an objective "reasonable person" standard for that determination. Some employees' testimony might be probative to establish whether a reasonable person could ascertain the information, but it is not a subjective, individualized inquiry. Woodworth thus showed that common proof was possible and common questions predominated, and there is not substantial evidence to support a contrary conclusion.

Moreover, the court abused its discretion by concluding that Woodworth was an inadequate representative of the stand-alone Wage Statement Class. The trial court may conclude that the class representative does not satisfy the adequacy requirement if the

97

representative "'fail[s] to raise claims reasonably expected to be raised by the members of the class.'" (*Evans*, *supra*, 178 Cal.App.4th at p. 1432.) The rule applies, for instance, when the class representative seeks only one form of available damages and would be waiving other forms of available damages on behalf of all other putative class members. (*Id.* at pp. 1432-1433.) But nothing like that was at issue here. Woodworth asserted a wage statement claim on behalf of class members whose statements closely resembled hers, in that the statements included hours for shift differentials and paid time off. The court prejudged the merits of her claim on the basis of her deposition testimony, but she was not required to show that her claim has merit to demonstrate that she was an adequate representative. (See *Linder*, *supra*, 23 Cal.4th at pp. 439-440 ["the question of certification [is] essentially a procedural one that does not ask whether an action is legally or factually meritorious"].) The court therefore applied improper criteria and abused its discretion when it determined that Woodworth was an inadequate representative. (*Id.* at p. 436 ["an order based upon improper criteria or incorrect assumptions calls for reversal"].)

As to the derivative Wage Statement Class, however, Woodworth fails to show an abuse of discretion. She argues that the court erred by denying certification of the underlying AWS Overtime and Regular Rate Classes, so it necessarily erred by denying certification of the derivative class. But because we have determined that the court properly denied certification of the underlying classes, we reject Woodworth's argument.

In sum, the court abused its discretion by denying certification of the stand-alone Wage Statement Class. The record does not contain substantial evidence to support the

98

predominance finding, and the court applied improper criteria when it found that Woodworth was an inadequate class representative. We therefore reverse the order denying certification of the stand-alone Wage Statement Class and remand for the court to consider (1) whether Woodworth carried her burden on the other elements of class certification and (2) any other arguments that the parties made (or may make in light of this opinion) concerning certification of this class. (See, e.g., *Linder*, *supra*, 23 Cal.4th at pp. 448-449 [reversing and remanding for reconsideration because the court was not "prepared to say that class treatment necessarily is proper," and "upon a fresh look [the trial court] may discern valid reasons for denying" the certification motion].) However, we do not disturb the portion of the court's order denying certification of the derivative Wage Statement Class.

### 5. *Waiting Time Penalty Class*

Woodworth sought to certify a Waiting Time Penalty Class that was "purely derivative" of her AWS Overtime, Regular Rate, and Rest Break Classes. Her moving papers addressed the Waiting Time Penalty Class in three brief sentences and did not discuss any evidence or authorities. The court denied certification of the Waiting Time Penalty Class because there was "no support in [Woodworth's] motion for certification" of the class. On appeal, Woodworth argues that the court abused its discretion because it should have certified the underlying classes. Because we have determined that the court properly denied certification of the underlying classes, we reject the argument.

V. *Motion for Summary Adjudication on the Regular Rate Claim, the Wage Statement Claim, and the Waiting Time Claim*

The medical center moved for summary adjudication on Woodworth's regular rate, wage statement, and waiting time claims. (The medical center labeled the motion, "Motion for Summary Adjudication No. 1" (capitalization and boldface omitted).) It sought summary adjudication of her individual claims as well as the PAGA cause of action, to the extent that she based that cause of action on the regular rate, wage statement, and waiting time claims. The court granted the motion in its entirety. We conclude that the court erred with respect to (1) the PAGA regular rate claim, (2) Woodworth's individual wage statement claim and the PAGA wage statement claim, and (3) the PAGA waiting time claim. The court properly granted summary adjudication, however, on Woodworth's individual regular rate and waiting time claims.

A. *Regular Rate Claim*

Woodworth argues that the court erred by granting summary adjudication in favor of the medical center as to her individual regular rate claim and the PAGA regular rate claim. We disagree that the court erred by granting summary adjudication on her individual claim. But as to the PAGA regular rate claim, we agree that the court erred.

1. *Relevant Background*

The medical center offered its written policy on the Christmas bonus in support of the motion for summary adjudication. The policy described the bonus as a "discretionary bonus provided to eligible employees as a gift for their service." "The availability of the bonus, the amount, and the eligibility criteria [were] discretionary and subject to review,

100

change, and approval each year." "Generally," eligibility for the bonus was based on "the average number of eligible hours paid during a specified six (6) pay periods prior to the bonus payment." If the medical center had paid the employee for an average of 39.90 eligible hours or more, the employee generally was eligible for the bonus. In addition, the employee had to be an active employee who had passed their "90-day introductory period" by a specified date before the bonus payment. The policy identified 13 types of hours that would count toward an employee's average eligible hours—for example, regular hours, overtime hours, sick leave hours, jury duty hours, funeral leave hours, and voluntary time off. The policy stated that "[g]enerally, bonus payments are paid to all eligible employees during December of each year."

In support of the motion, the medical center also offered another declaration from Bowell, the payroll manager. According to her, management met each fall and instructed payroll whether it would be giving Christmas bonuses that year and, if so, how to determine who would receive the bonus and the dollar amount. Bowell explained that the medical center did not strictly follow the eligibility factors in the written policy. For instance, in 2012 and 2013, the medical center gave Christmas bonuses to employees who did not qualify under the eligibility factors.

Each year since 2010, the medical center paid Christmas bonuses of between $50 and $500. It gave Woodworth Christmas bonuses in 2012 and 2013 of $344.11 and $356.40, respectively. The medical center did not pay Woodworth any other type of bonus. It did not base the amount of her Christmas bonuses on the number of hours she worked, her production, or her efficiency. The medical center gave whatever dollar

101

amount it decided was appropriate, and in the years it paid Woodworth the bonus, it gave different gross amounts to different employees. The amounts awarded to full-time employees "were much more influenced by their estimated taxes than by the factors listed in the bonus policy."

In January 2015, the medical center published an outline of employee benefits. That outline explained that "[a] Christmas bonus is available for full-time regular employees and part-time regular benefit eligible employees." It also referred employees to the full policy on Christmas bonuses.

According to Woodworth's deposition testimony, the medical center did not promise to pay her a Christmas bonus when it hired her. She did not expect a Christmas bonus until a coworker told her that they would be receiving one. She had never seen the outline of employee benefits and did not rely on any of the information in it.

On the basis of the foregoing evidence, the medical center argued that it properly excluded the Christmas bonus from the regular rate calculation under both the special occasion gift exclusion and the discretionary bonus exclusion. It further argued that Woodworth was precluded from pursuing her flat sum bonus theory; she did not allege it in the TAC or disclose it in her discovery responses but raised it for the first time in her class certification motion. In the alternative, the medical center argued that her flat sum bonus theory lacked merit because she never received a bonus apart from the Christmas bonus. Finally, the medical center argued that it was entitled to summary adjudication on the PAGA regular rate claim because Woodworth's regular rate claim lacked merit.

102

In opposition to the summary adjudication motion, Woodworth argued that the medical center's Christmas bonus policy and outline of benefits gave rise to an implied promise to pay the bonus. Moreover, she argued that all aggrieved employees including herself (for purposes of the PAGA cause of action) were entitled to the Christmas bonus because virtually all eligible employees received it every year since 2010, and the eligibility requirements were not discretionary. And as to the flat sum bonus theory, Woodworth argued that she had adequately alleged the theory in her TAC. She also asserted that the medical center failed to carry its burden with respect to the aggrieved employees' PAGA claim—the medical center's showing was limited to Woodworth.

The medical center submitted another declaration from Bowell with its reply papers. Bowell explained that in 2012 and 2013, the medical center's administration instructed payroll to give Woodworth a bonus that would yield $200 after taxes were deducted. Her Christmas bonuses of $344.11 and $356.40 yielded after-tax gifts of $200.

The trial court granted the summary adjudication motion on Woodworth's individual regular rate claim and the PAGA regular rate claim. The court ruled that the medical center's evidence showed that it properly calculated the regular rate of pay, and there was no triable issue of material fact.

## 2. *Analysis*

The medical center carried its initial burden of demonstrating that Woodworth's individual regular rate claim lacked merit. The medical center's evidence showed that the Christmas bonus qualified for the special occasion gift exclusion, and the medical center therefore could exclude the bonus when calculating employees' regular rate of

103

pay.  (29 U.S.C. § 207(e)(1); 29 C.F.R. § 778.200(a)(1) (2022).)  "[P]ayments in the nature of gifts made at Christmas time . . . as a reward for service" qualify, so long as "the amounts . . . are not measured by or dependent on hours worked, production, or efficiency."  (29 U.S.C. § 207(e)(1); 29 C.F.R. § 778.212(c) (2022).)  The medical center's policy showed that the bonus was a gift for employees' service and that it generally paid the bonus in December (Christmas time).  According to Bowell, the medical center did not base the amount of the bonus on hours worked, production, or efficiency.  The medical center determined whether employees were eligible for the Christmas bonus on the basis of the hours for which they were paid during a specified period.  But the eligibility criteria merely established whether someone was qualified to receive the bonus at all, not the amount of the bonus.  (See *De Vries v. Regents of University of California* (2016) 6 Cal.App.5th 574, 592 ["the ordinary meaning of 'eligibility' connotes qualification for a benefit"].)  Moreover, the medical center based eligibility on hours paid, not hours worked.  The hours that counted toward eligibility included numerous types of nonwork hours, like sick leave or jury duty.

In response to the medical center's showing on the Christmas bonus, Woodworth failed to show a triable issue of material fact.  She argues that there was a factual dispute as to whether the Christmas bonus qualified as a discretionary bonus.  However, the discretionary bonus and the special occasion gift are independent exclusions.  A bonus need qualify for only "one of these types" of exclusions to be excluded from the regular rate calculation.  (29 C.F.R. § 778.208 (2022).)

104

Woodworth also asserts that virtually all employees received the Christmas bonus every year since 2010, but a bonus qualifies for the special occasion gift exclusion even if is paid "to all employees" and "with regularity so that the employees are led to expect it." (29 C.F.R. § 778.212(c) (2022).) She further relies on the Christmas bonus policy and the outline of employee benefits to argue that the medical center implicitly promised to pay the bonus. It is true that a bonus does not qualify for the special occasion gift exclusion if it "is paid pursuant to contract (so that the employee has a legal right to the payment and could bring suit to enforce it)." (29 C.F.R. § 778.212(b) (2022).) But the policy specified that the availability and amount of the bonus were subject to review, change, and approval each year. In other words, there was no guarantee that the medical center would provide the Christmas bonus. And the outline merely stated that the bonus was "available." No reasonable trier of fact would find that those statements gave rise to an enforceable contract to pay the bonus. Indeed, Woodworth introduced no evidence that she or any employee saw those documents and reasonably interpreted them as a contract to pay the Christmas bonus. Nor did she introduce evidence of any other conduct that would give rise to an enforceable contract.

Woodworth further argues that the trial court erred by implicitly overruling her objections to Bowell's declaration and relying on the declaration. She does not explain the basis for her objections, why the court erred by overruling them, and why any error was prejudicial. She thus forfeited the argument. (*Cahill*, *supra*, 194 Cal.App.4th at p. 956.)

105

With respect to Woodworth's flat sum bonus theory, the medical center also carried its initial burden of demonstrating that her individual regular rate claim lacked merit. The evidence showed that Woodworth received a Christmas bonus but no other type of bonus, so she had no claim that the medical center improperly excluded some other bonus from her regular rate of pay. Woodworth did not dispute that evidence. Accordingly, the court did not err by granting summary adjudication in favor of the medical center on Woodworth's individual regular rate claim, whether she based it on the Christmas bonus or some other type of bonus.

The court's PAGA ruling, however, is a different matter. The medical center argued that it was entitled to summary adjudication on the PAGA regular rate claim because Woodworth's individual claim lacked merit. But the regular rate claim of the aggrieved employees is not wholly derivative of Woodworth's individual claim. In the TAC, Woodworth alleged that the medical center had "failed to properly include items of remuneration when determining the employees' regular rate," including "non-discretionary bonuses paid to all eligible employees." Similarly, in Woodworth's prelawsuit PAGA notice to the LWDA and the medical center, she alleged that the medical center failed "to include all required remuneration (including but not limited to bonuses) when calculating the regular rate."

The medical center offered evidence that Woodworth did not receive a bonus besides the Christmas bonus, but it did not offer evidence about any other discretionary bonus that it excluded from the regular rate calculation for other employees. Nor did it claim that such bonuses do not exist. (On appeal, the medical center acknowledges that

106

at least one such bonus exists—"a discretionary 'thank you' bonus.'") Instead, the medical center argued that Woodworth did not sufficiently allege a flat sum bonus theory apart from the Christmas bonus theory. The argument lacks merit because the TAC did not limit her theory to the Christmas bonus. Fairly read, it encompassed any bonus that the medical center excluded as a discretionary bonus, whether it was a flat sum or not. By failing to offer any evidence that showed it properly excluded other bonuses from the regular rate calculation, the medical center failed to carry its initial burden on the PAGA cause of action. The court consequently erred by granting summary adjudication in favor of the medical center on the PAGA cause of action, to the extent that it was based on the regular rate claim.

For all of these reasons, the court properly granted the summary adjudication motion as to Woodworth's individual regular rate claim, but it erred by granting the motion as to the PAGA regular rate claim.

B. *Wage Statement Claim*

Woodworth contends that the court erred by granting the medical center's summary adjudication motion on her wage statement claim. We agree. Under the Supreme Court's recent decision in *Naranjo*, the medical center was not entitled to summary adjudication on the derivative form of this claim, i.e., the claim that the wage statements failed to accurately report premium pay for missed rest periods or overtime. (*Naranjo*, *supra*, 13 Cal.5th at p. 121.) Given that the motion did not "completely dispose[]" of the claim, the court should not have granted it. (Code Civ. Proc., § 437c, subd. (f)(1).)

107

1. *Relevant Background*

As the medical center argued in connection with the class certification motion, it again argued that under *Morgan*, section 226 does not require a separate line item showing the sum of all hours worked. Instead, so long as the employee could add the regular hours and overtime hours shown on the statement and determine total hours worked, the statement complied with section 226. The medical center further argued that California law did not permit derivative wage statement liability.

In support of the summary adjudication motion, the medical center offered all of Woodworth's wage statements. It also relied on her deposition testimony concerning her wage statements. In the deposition excerpt, counsel questioned Woodworth about six of her wage statements, including this one from April 2012 (which we also discussed in the earlier section about the class certification motion):

| HOURS AND EARNINGS | | | | | |
|---|---|---|---|---|---|
| | | Current | | YTD | |
| Description | Rate | Hours | Earnings | Hours | Earnings |
| Double Pay | 67.015700 | 0.80 | 53.61 | 1.50 | 101.60 |
| Night Differential | 4.000000 | 70.40 | 281.60 | 175.10 | 700.40 |
| Regular Pay | 31.610000 | 73.00 | 2,307.53 | 109.60 | 3,464.46 |
| Double Pay | 67.024880 | 0.30 | 20.11 | | 0.00 |
| General Orientation | | | 0.00 | 16.40 | 518.40 |
| Rest/Meal Period Pay | | | 0.00 | 2.00 | 67.45 |
| Training Double | | | 0.00 | 4.20 | 269.05 |
| Training | | | 0.00 | 367.30 | 11,618.35 |
| Weekend Differential | | | 0.00 | 85.50 | 342.00 |
| TOTAL | | 144.50 | 2,662.65 | 761.60 | 17,073.71 |

Woodworth testified that she could determine her total hours worked by adding the hours for "Regular Pay" and "Double Pay" on this statement. Counsel asked if she could "tell from reading this wage statement" that "70.40 of [her] 73 regular hours [were] paid for the night differential." She replied in the affirmative. At the end of the questioning about

all six wage statements, Woodworth confirmed that she would be able to follow the same procedure with her other wage statements to figure out her total hours worked. On the basis of Woodworth's testimony and wage statements, the medical center argued that Woodworth, "like any reasonable person," could easily determine her total hours worked by adding the regular pay and double pay entries on the wage statements. Accordingly, there was no basis to presume that she suffered an injury from her wage statements.

In opposition to the medical center's motion, Woodworth argued that the medical center was not entitled to summary adjudication because it furnished inaccurate and misleading wage statements. That is, the wage statements reflected an inaccurate total for hours worked, given that the total figure double counted shift differential hours and included nonwork hours, like paid sick leave. Woodworth contended that the wage statements did not comply with section 226 because the total hours figure did not accurately reflect worked hours, and there was no other line item showing total hours worked. Woodworth relied on the same Kriegler declaration that she had offered in connection with the class certification motion, in which Kriegler concluded that 90.4 percent of the wage statements from June 2013 to August 2015 inaccurately reflected total hours by including shift differentials, paid time off, and/or holiday bonuses.

Regarding the PAGA wage statement claim, Woodworth argued that there was no injury requirement, so the medical center's injury argument was irrelevant. Woodworth also argued that she and the aggrieved employees had a derivative wage statement claim based on the regular rate claim, the overtime claim, and the rest period claim—that is, the wage statements were inaccurate in that they reflected an improperly calculated regular

109

rate, failed to reflect overtime compensation that was owing, and failed to reflect missed break premiums. She asserted that the authority on which the medical center relied was distinguishable and inconsistent with other cases approving derivative wage statement claims.

The court granted the summary adjudication motion as to Woodworth's individual and PAGA wage statement claims. The court ruled that *Morgan*, *supra*, 186 Cal.App.4th 1136, rejected Woodworth's theory that the wage statements must include "a separate line item for 'Total Hours Worked' and a summation of the total hours worked[,] as this was easily determined from the information provided on the wage statements." The court did not expressly address the derivative form of her wage statement claim.

### 2. *Analysis*

To review, under section 226, subdivision (a), the employer must provide accurate wage statements reporting nine categories of information, including gross wages earned, net wages earned, all relevant hourly rates in effect during the pay period, and "total hours worked by the employee." Under subdivision (e) of the statute, to recover actual damages or statutory penalties, the employee must demonstrate that (1) the employer's failure to comply with subdivision (a) was "knowing and intentional," and (2) the employee suffered injury as a result of the failure. (§ 226, subd. (e)(1).) An employee "is deemed to suffer injury . . . if the employer fails to provide accurate and complete information" regarding total hours worked, and "the employee cannot promptly and easily determine" their total hours worked "from the wage statement alone." (§ 226, subd. (e)(2)(B) & (i).) "'[P]romptly and easily determine' means a reasonable person

110

would be able to readily ascertain the information without reference to other documents or information." (§ 226, subd. (e)(2)(C).)

Not all of the foregoing elements apply to a PAGA cause of action. (*Lopez v. Friant & Associates, LLC* (2017) 15 Cal.App.5th 773, 784 (*Lopez*).) Specifically, a plaintiff seeking civil penalties under PAGA for a violation of section 226, subdivision (a), "does not have to satisfy the 'injury' and 'knowing and intentional' requirements" of subdivision (e). (*Lopez*, *supra*, at p. 788; *Raines v. Coastal Pacific Food Distributors, Inc.* (2018) 23 Cal.App.5th 667, 679.) The PAGA plaintiff need only show that the employer failed to provide an accurate wage statement under subdivision (a) of section 226. (*Raines*, *supra*, at p. 679; *Lopez*, at p. 785.)

*Morgan* construed the requirement that wage statements show total hours worked under section 226, subdivision (a). (*Morgan*, *supra*, 186 Cal.App.4th at pp. 1144-1149.) There, the employer's wage statements accurately listed the regular hours worked and overtime hours worked, but the statements did not include a separate line item reporting the sum of those two figures. (*Id.* at pp. 1140, 1147.) At her deposition, the employee admitted that the wage statements "'reflected'" her total hours worked. (*Id.* at p. 1140.) The court held that the wage statements complied with section 226, subdivision (a)'s requirement to show total hours worked. (*Morgan*, at p. 1149 & fn. 9.) It reasoned that "nothing in the plain language of section 226" supported the employee's argument "that wage statements which accurately list the total regular hours and overtime hours worked during the pay period must also contain a separate category with the sum of those two figures." (*Id.* at p. 1147.) "The employee could simply add together the total regular

hours figure and the total overtime hours figure shown on the wage statement to arrive at the sum of hours worked." (*Ibid.*)

The *Morgan* court addressed a DLSE opinion letter interpreting section 226.[8] (*Morgan*, *supra*, 186 Cal.App.4th at pp. 1144-1145 [discussing "DLSE Opn. Letter No. 2002.05.17 (May 17, 2002)]".) The DLSE was responding to a query from an employer that listed 86.67 hours worked, which the employer calculated by "dividing the total number of non-overtime hours in a year (2,080) by the number of pay periods in a year (24)." (DLSE Opn. Letter No. 2002.05.17 (May 17, 2002), at p. 1.) The employer acknowledged that its "pay periods never consist[ed] of precisely 86.67 hours," because the number of workdays and non-overtime work hours varied in each pay period. (*Id.* at p. 2.) The agency concluded that the employer's practice violated section 226: "[T]he obligation to list the total hours worked during the pay period can only be satisfied by listing the precise, actual number of hours worked. . . . The reason for this requirement is simple enough—it is designed to provide the employee with a record of hours worked, and to assist the employee in determining whether he [or she] has been compensated properly for all of his or her hours worked. The failure to list the precise number of hours worked during the pay period conflicts with the express language of the statute and stands in the way of the statutory purpose." (DLSE Opn. Letter, *supra*, at p. 3.) The DLSE opined that the employer could satisfy its obligation by attaching time records to the

---

[8] "The DLSE is the state agency authorized to interpret and enforce California wage and hour laws." (*Morgan*, *supra*, 186 Cal.App.4th at p. 1144, fn. 5.) "While the DLSE's construction of a statute is entitled to consideration and respect, it is not binding" on the courts. (*Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1105, fn. 7.)

employee's wage statement, but only if the time records "separately listed" the total hours worked and did not leave it "to the employee to add up the daily hours shown on the time cards or other records." (*Id*. at p. 6.)

*Morgan* reasoned that the wage statements separately listing regular hours and overtime hours were consistent with the DLSE's opinion letter. (*Morgan*, *supra*, 186 Cal.App.4th at p. 1147.) The statements satisfied the obligation to list the "'precise, actual number of hours worked,'" and they did not leave it to the employees to add up the daily number of hours shown on time records. (*Ibid.*) Moreover, the wage statements were consistent with an exemplar wage statement posted on the DLSE's website. (*Ibid.*) The exemplar statement separately listed the total regular hours worked and the total overtime hours worked during the pay period, but it did not include a line item showing the sum of those hours.[9] (*Ibid.*)

In this case, the court properly determined that the medical center had carried its burden with respect to the stand-alone wage statement claim of Woodworth and the aggrieved employees. The medical center demonstrated that its wage statements complied with section 226 by reporting the total number of hours worked by an employee. It offered evidence of Woodworth's wage statements, which precisely listed her regular pay hours and double pay hours for the pay period. Woodworth could derive

---

[9] For the exemplar statement described in *Morgan*, see https://www.dir.ca.gov/dlse/faq_paydays.htm (directing readers to click a link for "an example of an itemized wage statement (pay stub) as required by Labor Code Section 226 for an employee paid an hourly wage"), and https://www.dir.ca.gov/dlse/PayStub.pdf (linked exemplar statement).

her total hours worked by adding those entries. And listing those hours separately, along with the applicable rates of pay, permitted her to determine whether she had been compensated properly for all of her hours worked. (*Morgan*, *supra*, 186 Cal.App.4th at p. 1145.) The medical center thus showed that, consistent with *Morgan*, it provided accurate wage statements "showing . . . total hours worked." (§ 226, subd. (a).) That compliance with subdivision (a) of section 226 defeats her individual, "private cause of action" as well as the PAGA claim. (*Lopez*, *supra*, 15 Cal.App.5th at p. 784.)

Woodworth argues that the court erred because the wage statements "failed to provide 'total hours worked.'" To the extent that she means there was no line reporting the sum of regular and overtime hours worked, that was not required under *Morgan*. (*Morgan*, *supra*, 186 Cal.App.4th at p. 1147.) She also argues that the wage statements "provided an inaccurate hours total." She presumably refers to the fact that the "TOTAL" on the wage statements reflected the sum of regular pay hours, double pay hours, and other earnings codes on the wage statements (like differential pay hours or paid leave hours). But on its face, that total does not purport to reflect only total hours worked, as opposed to a total of the various types of hours listed on the statement. The fact that the medical center reported that latter total does not mean that it failed to accurately report her total hours worked. Woodworth does not dispute the accuracy of the entries for regular pay hours and double pay hours, the sum of which showed total hours worked.

Notwithstanding the court's correct ruling on the stand-alone wage statement claim, the court erred by implicitly rejecting Woodworth's derivative wage statement

114

claim. The medical center argued that California law does not permit derivative wage statement claims, but our Supreme Court recently rejected that proposition in *Naranjo*. That case involved an underlying claim for missed meal breaks. (*Naranjo*, *supra*, 13 Cal.5th at pp. 102-103.) The plaintiff alleged that his employer unlawfully required employees to remain on duty during meal periods, and he sought missed break premiums under section 226.7, subdivision (c), for the on-duty meal periods. (*Naranjo*, at pp. 102-103.) He further alleged that the employer was liable under section 226 for failing to report those missed break premiums on the employees' wage statements, and he sought damages on that basis for inaccurate wage statements. (*Naranjo*, at p. 103.) The high court held that the missed break premium constituted wages subject to the wage statement reporting requirements of section 226. (*Naranjo*, at pp. 102, 117-121, 125.) Thus, the failure to report the missed break premium could support liability "for failure to supply an accurate itemized statement reflecting an employee's gross wages earned, net wages earned, and credited hours worked." (*Id.* at p. 121.)

Woodworth and the aggrieved employees may pursue a derivative wage statement claim under *Naranjo*. Woodworth's rest period claim survives, and as we discuss in a following subpart, the PAGA rest period claim survives as well. To the extent that Woodworth proves the medical center unlawfully denied her and the aggrieved employees rest periods, the medical center owes them missed break premiums. (§ 226.7, subd. (c).) And the omission of those missed break premiums from the employees' wage statements may support liability for inaccurate wage statements. (*Naranjo*, *supra*, 13 Cal.5th at p. 121.) Likewise, the aggrieved employees' regular rate claim survives and

115

may support derivative liability for inaccurate wage statements. Overtime pay, like the additional hour of pay that constitutes the missed break premium, is a form of wages that the employer must accurately report on wage statements. (*Id.* at pp. 107, 109.) To the extent that Woodworth proves the medical center miscalculated the regular rate by excluding nondiscretionary bonuses, the corresponding wage statements would not accurately reflect the employees' overtime rate or their hourly rate for the missed break premium. The wage statements thus would inaccurately report overtime wages and premium pay. According to *Naranjo*, those inaccuracies would support liability under section 226.

In sum, the court correctly determined that the medical center was entitled to summary adjudication on the stand-alone wage statement claim. But the medical center was not entitled to summary adjudication on the derivative form of the wage statement claim, so its motion did not completely dispose of the claim. The court therefore erred by granting summary adjudication on the claim. (Code Civ. Proc., § 437c, subd. (f)(1) ["A motion for summary adjudication shall be granted only if it completely disposes of a cause of action, an affirmative defense, a claim for damages, or an issue of duty"].)

C. *Waiting Time Claim*

Woodworth argues that the court erred by granting the medical center's summary adjudication motion on the waiting time claim. We agree with respect to the PAGA claim but not as to her individual claim.

### 1. *Relevant Background*

In support of the medical center's arguments on this claim, it relied again on Bowell's declaration. She declared that the medical center had paid Woodworth for all hours that she worked, for all vacation time, and all other compensation owed to her. The medical center also submitted Woodworth's response to an interrogatory asking her to state all facts in support of her individual waiting time claim. She responded that the medical center had not paid her all wages due because of its rounding policy, the failure to include all remuneration in her regular rate calculation, the failure to pay her overtime for shifts over eight hours, and the failure to pay her missed break premiums.

The medical center argued that the waiting time claim failed because the underlying claims failed—the court had granted summary adjudication for the medical center on the rounding claim and the claim for missed meal periods, the instant motion showed her regular rate claim lacked merit, and her overtime claim failed based on a valid AWS (which was addressed in the concurrently filed summary adjudication motion on that defense). The medical center further argued that even if the underlying claims had merit, the law mandated waiting time penalties only if the failure to pay wages was willful. It contended that Woodworth's interrogatory response failed to set forth any facts showing willfulness. In addition, it argued, a good faith dispute that wages were due precluded a willfulness finding, and the summary adjudication motions presented a good faith dispute about whether Woodworth was due wages for the underlying claims.

Woodworth argued in her opposition brief that the medical center knew what it was doing and intended to pay the amounts set forth in the wage statements of

117

Woodworth and the aggrieved employees. She asserted that such conduct was willful and that the medical center had offered no contrary argument. She additionally argued that the medical center failed to present evidence of a good faith dispute with respect to the regular rate claim or the AWS defense. And she contended that she had a stand-alone waiting time claim based on a check issued several days late. Her evidence showed that on May 19, 2014, she resigned and informed the medical center that her last day of work would be June 1, 2014. On May 30, 2014, the medical center issued her a check for net earnings and sick pay of over $1,300. But on June 5, 2014, the medical center issued her a second check for net "Retro Pay" of over $300.

In its reply brief, the medical center generally argued that Woodworth had offered no evidence to dispute Bowell's declaration, and she had offered no evidence of a willful failure to pay wages owed at the time of her separation.

The court granted summary adjudication for the medical center on the waiting time claim. It ruled that Bowell's declaration showed that the medical center had paid Woodworth all wages owed. Moreover, the court ruled, Woodworth failed to offer evidence showing a triable issue of fact as to the willfulness element.

2. *Analysis*

If an employee gives "72 hours previous notice of his or her intention to quit," the "employee is entitled to his or her wages at the time of quitting." (§ 202, subd. (a).) When an employer discharges the employee, "the wages earned and unpaid at the time of discharge are due and payable immediately." (§ 201, subd. (a).) The employer must pay a penalty for "willfully fail[ing] to pay" the employee's wages in accordance with those

118

deadlines. (§ 203, subd. (a).) "A willful failure to pay wages" means that the employer intentionally failed to pay when the wages were due. (Cal. Code Regs., tit. 8, § 13520.) A failure to pay that is inadvertent or a mistake is not "'willful'" for these purposes. (*Nishiki v. Danko Meredith, APC* (2018) 25 Cal.App.5th 883, 892.)

Also, "a good faith dispute that any wages are due will preclude imposition of waiting time penalties." (Cal. Code Regs., tit. 8, § 13520.) "A 'good faith dispute' that any wages are due occurs when an employer presents a defense, based in law or fact which, if successful, would preclude any recovery on the part of the employee. The fact that a defense is ultimately unsuccessful will not preclude a finding that a good faith dispute did exist. Defenses presented which, under all the circumstances, are unsupported by any evidence, are unreasonable, or are presented in bad faith, will preclude a finding of a 'good faith dispute.'" (Cal. Code Regs., tit. 8, § 13520(a).) Whether a good faith dispute exists is "an issue of fact." (*Maldonado*, *supra*, 22 Cal.App.5th at p. 1332.)

Here, Woodworth fails to show that the court erred by granting the summary adjudication motion on her individual waiting time claim. (*Dinslage v. City and County of San Francisco* (2016) 5 Cal.App.5th 368, 379 [appellant seeking review of an order granting summary adjudication bears the burden of affirmatively demonstrating error, as in any appeal].) First, she argues that the court erred by implicitly overruling her objections to the statements in Bowell's declaration that the medical center had paid her all compensation owing. But as before, Woodworth forfeited the argument. (*Cahill*, *supra*, 194 Cal.App.4th at p. 956.) She asserts that Bowell's statements amounted to

improper legal conclusions, offering no further argument or citation to authority. That conclusory assertion does not establish that the court abused its discretion or that any error was prejudicial.

Second, Woodworth contends that evidence of the "Retro Pay" check (issued four days after she resigned) created a triable issue of fact as to whether she had a stand-alone waiting time claim. That argument lacks merit. The TAC did not allege that the medical center had issued her a check several days late. And the medical center submitted Woodworth's interrogatory response describing her waiting time claim as a derivative one based on underlying wage and hour violations. She made no mention of a stand-alone waiting time claim. That shifted the burden to Woodworth to show a triable issue of material fact as to a stand-alone waiting time claim. (*Silva*, *supra*, 7 Cal.App.5th at pp. 259-260 [plaintiff's interrogatory response was devoid of facts to support certain claims, shifting the burden to her to show a triable issue of fact on those claims]; *Union Bank v. Superior Court* (1995) 31 Cal.App.4th 573, 581.) Even if the check for "Retro Pay" constituted wages that were due upon her separation, she proffered no evidence that the medical center intentionally—as opposed to inadvertently or mistakenly—failed to issue the payment four days earlier. She thus did not show a triable issue of material fact on any stand-alone waiting time claim.

Third, Woodworth argues that the medical center failed to present evidence of a good faith dispute about the regular rate claim or the AWS defense, so her derivative waiting time claim should survive. We also reject that argument. A good faith defense based in law or fact constitutes a good faith dispute. The medical center presented such

defenses. The same motion showed that Woodworth's regular rate claim lacked merit, and the concurrently filed motion on the AWS defense showed that the defense had merit. (We discuss the merits of the AWS motion in a following subpart.) The medical center therefore showed a good faith dispute precluding liability for waiting time penalties based on Woodworth's individual regular rate claim and overtime claim.[10]

However, as to the waiting time claim of the aggrieved employees, the court erred by granting summary adjudication on the PAGA waiting time claim. The medical center argued that the waiting time claim lacked merit insofar as the regular rate claim lacked merit. But we have concluded that the court erred by granting summary adjudication in favor of the medical center on the PAGA regular rate claim. Because that underlying claim survives, the derivative waiting time claim survives. Moreover, the medical center did not carry its burden of showing a good faith dispute about the PAGA regular rate claim, such that a finding of willful failure to pay would be precluded. As discussed, the

---

[10]     At oral argument in this matter, Woodworth argued that her derivative waiting time claim survives on the basis of her surviving rest period claim, and the medical center did not show a good faith dispute regarding her rest period claim. But Woodworth forfeited the argument that the medical center was not entitled to summary adjudication on that ground. Her brief opposing the summary adjudication motion did not argue that she had a derivative waiting time claim on the basis of the surviving rest period claim. Similarly, neither her opening nor her reply brief on appeal made that argument. Woodworth's failure to preserve the argument in the trial court and failure to raise it in her appellate briefing forfeited the argument. (*Animal Protection & Rescue League v. City of San Diego* (2015) 237 Cal.App.4th 99, 107, fn. 5 [declining to consider an argument raised for the first time at oral argument on appeal]; *Saville v. Sierra College* (2005) 133 Cal.App.4th 857, 872-873 [appellant's failure to make an argument in opposition to the summary judgment motion forfeited the argument on appeal].) By contrast, her briefing both in the trial court and on appeal argued that she had a derivative wage statement claim on the basis of her rest period claim, so she did not forfeit that argument.

medical center presented no evidence whatsoever about flat sum bonuses it excluded from the regular rate calculation, except for the Christmas bonus.  A defense that is "unsupported by any evidence" precludes a finding of a good faith dispute.  (Cal. Code Regs., tit. 8, § 13520(a); see *Maldonado*, *supra*, 22 Cal.App.5th at p. 1333 [affirming finding of no good faith dispute when "there was no objectively reasonable factual basis for [the employer's] defense" to overtime claim on which derivative waiting time claim was based].)

In sum, we conclude that the court properly granted summary adjudication in favor of the medical center on Woodworth's individual waiting time claim but not on the PAGA waiting time claim.

## VI. *Motion for Summary Adjudication on the AWS Defense*

The medical center moved for summary adjudication on its affirmative defense to the overtime claim, the AWS defense.  (The medical center labeled the motion, "Motion for Summary Adjudication No. 3" (capitalization and boldface omitted).)  The trial court granted the motion as to Woodworth's individual overtime claim and the PAGA cause of action, to the extent that she based the latter on allegedly invalid AWS's.  We conclude that the court did not err.

### A. *Relevant Background*

The medical center offered the declaration of its vice president of human resources, Lizette Norton, in support of the motion.  Norton started working at the medical center in July 2001, left in 2010, and returned in 2016.  She was familiar with the medical center's policies and procedures for AWS elections from 2001 to the present.

122

According to Norton, Woodworth was a clinical nurse in the cardio thoracic intensive care unit. Before Woodworth's time at the medical center, the clinical nurses voted to adopt an AWS—namely, a workweek consisting of three 12-hour workdays (3/12 AWS). The AWS election took place in September 2001. Norton declared that the election followed certain procedures set forth in a memorandum sent to employees. The election was by secret ballot and occurred during regular work hours at the employees' work site. The medical center mailed the clinical nurses a disclosure document, a proposed AWS agreement, and the secret ballot. In relevant part, the disclosure document stated:

- "Duly noticed meetings will be held for the specific purpose of discussing" the effects of the AWS.

- The AWS "shall consist of a regularly scheduled workweek of three workdays of 12 hours each," and "[e]mployees will not receive overtime pay for their regularly scheduled hours."

- "Employees will be paid one and one-half times their regular rate of pay for all hours worked in excess of 40 in a workweek." They "will be paid two times their regular rate of pay for all hours worked in excess of 12 in a workday."

- "The amount of overtime that an employee will be required to work will be subject to the requirements of sections 3(B1)(8) and (9) of Wage Order 5-2000."

- "Employees who work an alternative work schedule will be eligible for all Medical Center-sponsored benefits on the same basis as other employees. . . . Employee benefits are summarized in the Employee Handbook and the summary plan descriptions given to each employee."

123

- "The Medical Center may terminate the use of the alternative work schedule described above upon two weeks' advance notice. In such an event, the Medical Center may institute and implement a different schedule, workweek or work period that is consistent with any applicable legal requirements."

Similar to the disclosure document, the AWS agreement stated that the medical center could terminate the AWS with two weeks' advance notice to the affected employees.

The medical center posted notices to inform the employees that it would hold meetings to discuss the effects of the AWS, and it held those meetings at least 14 days before the voting began. It distributed the disclosure document again at the meetings. The medical center placed ballot boxes in the departments to collect the secret ballots. After a two-week voting period, it collected and counted the ballots. Out of 1,785 nurses eligible to vote in the election, 1,583 voted, and 1,545 voted in favor of the AWS. The work unit did not include 5 percent or more employees who primarily spoke a non-English language. The medical center reported the election results to the DLSR in October 2001.

When the medical center hired Woodworth, she agreed to the 3/12 AWS that the clinical nurses had adopted in 2001. She executed an AWS agreement in December 2011.

The 2001 AWS was in effect until 2013. The medical center restructured the AWS work units that year. In June 2013, it conducted an AWS election for registered nurses in various units, including Woodworth's unit. The medical center's policy and

practice at all times was to hold AWS elections during regular working hours at the work site.

Norton was not at the medical center during the 2013 election, but she had reviewed the medical center's records for the election, which records had been made at the time by medical center employees in the regular course of business. Those records were attached to Norton's declaration and showed that in April 2013, a human resources employee emailed the AWS disclosure document and a schedule for pre-election meetings to Woodworth and the other registered nurses eligible to vote in the AWS election. The medical center proposed to retain the 3/12 AWS. The relevant disclosures in the 2013 document were nearly identical to those in the 2001 disclosure document.

The medical center held pre-election meetings on various dates between May 6 and May 25, 2013. According to the medical center's records, Woodworth attended the May 22 meeting and voted in the election, which took place from June 11 through June 13. Out of 701 nurses eligible to vote in the election, 575 nurses voted. They all voted in favor of the 3/12 AWS. The medical center reported those results to the DLSR in June 2013. Woodworth executed a new AWS agreement in July 2013. Like the earlier AWS agreement, the new agreement stated that the medical center could terminate the AWS with two weeks' notice to the affected employees.

Norton declared that the medical center required all clinical and registered nurses to be capable of reading, writing, and speaking English at a professional level. That was because the medical center maintained patient records in English, and doctors' orders and other patient care information were conveyed in English. The nurses who were eligible

to vote in the 2013 AWS election could read, write, and speak English "with professional quality as their primary language."

Apart from Norton's declaration, the medical center offered the declaration of Beth Cook, a registered nurse employed by the medical center from 1996 to the present. During the 2013 AWS election, Cook was director of patient care for two departments (orthopedics and transplant). Human resources copied her and other directors on the 2013 email attaching the AWS disclosures. According to Cook, the medical center sent that email to all registered nurses who were eligible to vote in the election.

The trial court granted the medical center's motion for summary adjudication on the AWS defense in its entirety. The court ruled that there was no triable issue of material fact and, more specifically, that the medical center's evidence showed that it had substantially complied with the AWS election procedures. The court thus concluded that the medical center was entitled to summary adjudication on Woodworth's individual overtime claim as well as the PAGA claim, to the extent that Woodworth based the latter on the overtime claim. In addition, the court overruled Woodworth's objections to Norton's declaration. (Woodworth had filed a 37-page document consisting of 59 objections to Norton's declaration.)

B. *Analysis*

To recap, a validly adopted AWS is an exception to the overtime rules and an affirmative defense that the employer bears the burden of proving. (§ 510, subd. (a); *Ramirez*, *supra*, 20 Cal.4th at pp. 794-795; *Maldonado*, *supra*, 22 Cal.App.5th at p. 1327.) Wage Order 5 governs AWS's in the health care industry. (Cal. Code Regs.,

126

tit. 8, § 11050, subds. 1, 2(G), (J), (P)(4); *Singh*, *supra*, 140 Cal.App.4th at pp. 397-398.)

We liberally construe the IWC's wage orders to favor the protection of employees. (*Augustus*, *supra*, 2 Cal.5th at p. 262.) The "usual rules of statutory interpretation apply." (*Brinker*, *supra*, 53 Cal.4th at p. 1027.) Thus, if the wage order is clear, we give effect to the ordinary, plain meaning of the language. (*Singh*, at p. 392.)

Under Wage Order 5, the employer's proposal for an AWS shall be in the form of a written agreement. (Cal. Code Regs., tit. 8, § 11050, subd. 3(C)(1).) For an AWS to be valid, at least two-thirds of the employees in the affected work unit must vote in favor of the AWS in a secret-ballot election. (*Id.*, § 11050, subd. 3(C)(2).) The employer shall hold the election during regular working hours at the employees' work site. (*Ibid.*)

Before the election, the employer must disclose in writing "the effects of the proposed [AWS] on the employees' wages, hours, and benefits." (*Id.*, § 11050, subd. 3(C)(3).) "Such a disclosure shall include meeting(s), duly noticed, held at least 14 days prior to voting, for the specific purpose of discussing the effects" of the AWS. (*Ibid.*) Further, the "employer shall provide that disclosure in a non-English language, as well as in English, if at least five (5) percent of the affected employees primarily speak that non-English language. The employer shall mail the written disclosure to employees who do not attend the meeting." (*Ibid.*) The failure to comply with these pre-election requirements "shall make the election null and void." (*Ibid.*)

Wage Order 5 also requires any AWS agreement adopted under the order to "provide for not less than four (4) hours of work in any shift." (Cal. Code Regs., tit. 8, § 11050, subd. 3(B)(1), (B)(8)(c).) In addition, the order requires the employer to report

127

the results of the AWS election to the DLSR within 30 days.  (*Id.*, § 11050, subd. 3(C)(6).)

In this case, the court did not err by granting the medical center's motion for summary adjudication.  The medical center proffered evidence that it complied with the AWS election procedures for both of the AWS's under which Woodworth worked.  With respect to the 2001 election, Norton's declaration and exhibits to it established the following:  The medical center mailed the AWS disclosure document to the affected employees and held meetings to discuss the proposed AWS at least 14 days before the election.  The medical center provided another copy of the disclosures to the employees who attended the meetings.  The population of affected employees did not consist of 5 percent or more non-English speakers, so there was no need to provide the disclosures in a language other than English.  The disclosures informed employees about the AWS's effect on wages and hours—that is, employees would not receive overtime pay for their regularly scheduled 12-hour shifts, but they would receive overtime pay if they worked over 40 hours in the workweek or over 12 hours in the workday.  As to the AWS's effect on benefits, the disclosures informed employees that they would be eligible for benefits on the same basis as all other employees, as summarized in the employee handbook.  The secret-ballot election took place at the work site during regular work hours, which was the medical center's policy and practice at all times.  And 1,545 out of 1,785 affected employees approved the AWS—well beyond the two-thirds vote required.

The medical center's evidence with respect to the 2013 election was similar.  Norton's and Cook's declarations, along with their exhibits, established that the medical

128

center emailed the AWS disclosures to the affected employees in April 2013. The employees who were eligible to vote spoke English as their primary language, so they did not need the disclosures in another language. The medical center held meetings to discuss the AWS in May 2013, at least 14 days before the June election. The medical center disclosed the same information about the AWS's effect on wages, hours, and benefits that it did in connection with the 2001 election. Five hundred seventy-five out of 701 employees voted in favor of the AWS, more than the two-thirds required.

On the basis of the foregoing evidence, the medical center carried its initial burden of showing a validly adopted AWS in 2001 and 2013. None of Woodworth's arguments persuades us that she raised a triable issue of material fact or that the court otherwise erred by granting the motion. (*Dinslage*, *supra*, 5 Cal.App.5th at p. 379 [appellant bears the burden of affirmatively demonstrating error on appeal from summary adjudication order].)

Woodworth first argues that the court erred by overruling her objections to Norton's declaration because Norton lacked personal knowledge of (1) what occurred during the 2001 election, (2) the email to employees regarding the 2013 election, and (3) the English language skills of the voting employees. We are not persuaded that the court committed prejudicial error here. Woodworth claims that Norton started working at the medical center after the 2001 election, but that is incorrect. Norton declared that she began working there in July 2001, and the election took place in September 2001. The court thus could reasonably conclude that Norton had personal knowledge of the 2001 election. Similarly, the court could reasonably conclude that Norton, a long-time human

resources employee at the medical center, knew what language skills the medical center required for nurses. And even though Norton was not at the medical center for the 2013 election, Woodworth does not challenge the admissibility of the business records showing that another human resources employee emailed the 2013 disclosures to the affected employees. (See Evid. Code, § 1271 [permitting the admission of business records to establish the truth of the matters contained therein].) Nor does Woodworth challenge the declaration of Cook, who declared that she received the 2013 email and that it was sent to all nurses eligible to vote.

Besides her evidentiary challenge to Norton's declaration, Woodworth argues that the medical center did not fully disclose the AWS's effects on wages, hours, and benefits, rendering the elections "null and void." (Cal. Code Regs., tit. 8, § 11050, subd. 3(C)(3).) In particular, she asserts that the medical center failed to disclose the AWS's effect on meal and rest periods and benefits.

Wage Order 5 requires disclosure of the AWS's effects, but it does not require the employer to disclose when the AWS will have no effect. Woodworth does not identify what claimed effect the AWS had on meal and rest periods, so she fails to show any deficiency on that issue. She claims that the disclosures falsely informed the affected employees that they would be eligible for benefits on the same basis as all other employees, but that argument also is meritless. Paid leave hours provide an apt example. According to the employee handbook, employees accrued paid leave on the basis of hours worked and paid, "up to 80 hours each pay period." The handbook also described the rate at which paid leave hours would accrue, which varied depending on how long the

130

employee had worked at the medical center. In other words, a formula determined paid leave hours—the number of hours worked and paid multiplied by the accrual rate. Given that employees on a 3/12 AWS worked only 72 hours in a two-week pay period, they accrued fewer paid leave hours than those working 80 hours during the same period. But that would have been true for any employee who worked fewer than 80 hours in a pay period, regardless of whether they worked under an AWS. Woodworth points to no evidence that the AWS changed the formula for determining paid leave hours or any other benefit, so there was no effect to disclose.

In a similar vein, Woodworth claims that the medical center failed to disclose that the employees were entitled to at least four hours of work per shift. That argument also fails. She relies on the provision of Wage Order 5 stating that the AWS agreement "shall provide for not less than four (4) hours of work in any shift." (Cal. Code Regs., tit. 8, § 11050, subd. 3(B)(8)(c).) Woodworth's AWS agreements provided for shifts of four hours or more—they provided for shifts of 12 hours, thereby complying with that portion of the wage order. Moreover, the disclosures informed employees that they would be working regularly scheduled shifts of 12 hours. There was no other "effect[]" to disclose. (*Id.*, § 11050, subd. 3(C)(3).)

Woodworth also claims that the medical center failed to disclose when it may require employees to work overtime. She points to the 2001 disclosure stating that the "amount of overtime that an employee will be required to work will be subject to the requirements of sections 3(B1)(8) and (9) of Wage Order 5-2000." The cited wage order is a former version of Wage Order 5. (See IWC Wage Order 5-2000, available at

131

https://www.dir.ca.gov/iwc/wageorderindustriesprior.htm.) The 2013 disclosures referred employees to the equivalent provisions of current Wage Order 5. (Cal. Code Regs., tit. 8, § 11050, subd. 3(B)(9)-(11).) Those provisions set forth detailed rules for when employees who work a 12-hour shift may be required to work more than 12 hours in any 24-hour period.[11] (*Ibid*.)

Woodworth contends that even though the AWS disclosures cited the relevant provisions of the wage order, the medical center had to provide a copy of Wage Order 5. Otherwise, she argues, the medical center failed to disclose the AWS's effects on hours, and the elections were null and void. We are not persuaded by that argument for two reasons. First, the disclosures put employees on notice that special rules would govern overtime under Wage Order 5. The employees were free to ask for a copy of the wage order if it was not already posted in an employee area, and the medical center would have been obligated to provide it. (Cal. Code Regs., tit. 8, § 11050, subd. 22 [requiring employers to post the wage order except when "the location of work or other conditions make this impractical," in which case employers must "keep a copy of [the] order and

---

[11]    In particular, the employer may require a 12-hour employee to work up to 13 hours if the employee scheduled to relieve them does not report for duty and does not provide more than two hours' advance notice. (Cal. Code Regs., tit. 8, § 11050, subd. 3(B)(11).) In addition, the 12-hour employee may be required to work up to 16 hours if an authorized executive declares that (1) a healthcare emergency exists, (2) the employer has taken reasonable steps to provide required staffing, and (3) "[c]onsidering overall operational status needs, continued overtime is necessary to provide required staffing." (*Id.*, § 11050, subd. 3(B)(9)(a)-(c).) Beyond that, the 12-hour employee must voluntarily agree to work more than 16 hours, and they may not work more than 24 consecutive hours unless they have at least eight consecutive hours off duty immediately following the 24 hours of work. (*Id.*, § 11050, subd. 3(B)(10).)

132

make it available to every employee upon request"].)  Woodworth proffered no evidence that an employee requested the wage order and that the medical center failed to respond.

Second, the omission of Wage Order 5's detailed rules did not qualify as a "[f]ailure to comply" that justified nullification of the elections.  (Cal. Code Regs., tit. 8, § 11050, subd. 3(C)(3).)  We hold that an employer's failure to comply with the pre-election disclosure requirement renders the election null and void only if the employer omits material information about the proposed AWS's effects.  Materiality can be determined by the familiar prejudice standard applicable to errors of state law.  (See *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800 [error is prejudicial if "'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error'"].)  That is, information is material if it is reasonably probable that disclosure of the information would tend to cause more employees to vote against the AWS.

That is not to say that employers may pick and choose which "effects . . . on the employees' wages, hours, and benefits" to disclose.  (Cal. Code Regs., tit. 8, § 11050, subd. 3(C)(3).)  Rather, employers should attempt to comply with their disclosure obligations in full and in good faith by disclosing all such effects.  In the event of a disclosure error, however, the reviewing court should assess the materiality of the omission.  And if there is a reasonable probability that disclosure of the information would tend to cause more employees to vote against the AWS, the omission renders the AWS election null and void.

133

That standard is not met here. Although we gave Woodworth the opportunity to submit supplemental briefing on this issue (Gov. Code, § 68081; Code Civ. Proc. § 437c, subd. (m)(2)), she articulates no way in which the relevant omission could have prejudiced the employees. Nor does she contend that we should remand to allow her to present evidence or conduct discovery on the issue. (Code Civ. Proc., § 437c, subd. (m)(2).) The wage order's rules governing work over 12 hours are favorable to employees. They protect employees from having to work more than 12 hours except under narrowly defined circumstances (discussed in fn. 11, *ante*). Consequently, disclosure of those rules in a more explicit, detailed fashion would have persuaded an employee to vote against the AWS only if the employee preferred that the medical center be less constrained in requiring employees to work overtime. On this record, we see no reasonable probability that more employees would have voted against the AWS if the medical center had set forth those rules in detail. Indeed, if anything, disclosure of the details would have made the AWS more likely to pass. The omission therefore was not material. Wage Order 5 does not require employers to reproduce every potentially applicable provision of the order in their AWS disclosures to protect against nullification of the election by a reviewing court.

Woodworth next argues that (1) both AWS's were invalid because the disclosures and agreements gave the medical center the right to terminate the AWS and (2) the 2013 AWS was invalid because the employees never repealed the 2001 AWS. We also reject those arguments. Wage Order 5 states that an AWS "may be repealed by the affected employees," and the order sets forth how the employees may accomplish that through a

petition and new secret-ballot election. (Cal. Code Regs., tit. 8, § 11050, subd. 3(C)(5).) But nothing in the wage order states that the employees have the exclusive right to terminate the AWS, and nothing in it states that the employer may not reserve the right to terminate the AWS. Even if there were some authority to that effect, Woodworth cites no authority for the further proposition that merely reserving the right to terminate the AWS automatically voids or invalidates the election. Similarly, beyond the wage order, she cites no authority for the proposition that the employees had to repeal an old AWS before a newly constituted work unit could vote to adopt a new AWS. Nothing in Wage Order 5 requires a vote to repeal under those circumstances.

Woodworth also challenges the validity of both AWS's because the medical center failed to report the election results to the DLSE (in addition to the DLSR). She cites section 511, subdivision (e), for the DLSE reporting requirement. That provision does not apply here. Section 511 authorizes a secret-ballot election for AWS's of "no longer than 10 hours per day within a 40-hour workweek without the payment to the affected employees of an overtime rate of compensation." (§ 511, subd. (a).) It is true that an employer must report the results to the DLSE if it conducted the election pursuant to section 511. (§ 511, subd. (e) ["The results of any election conducted pursuant to this section shall be reported by an employer to the [DLSE] within 30 days after the results are final"].) But the medical center conducted the elections here pursuant to Wage Order 5—that is the authority permitting a 3/12 AWS in the healthcare industry. (Cal. Code Regs., tit. 8, § 11050, subd. 3(B)(8); *Singh*, *supra*, 140 Cal.App.4th at p. 398.) Wage Order 5 requires reporting to the DLSR, the agency to which the medical center reported

135

the results.  The medical center could not have conducted the election under section 511, which does not authorize a 3/12 AWS in which the employees waive overtime for their 12-hour shifts.  (See *Mitchell v. Yoplait* (2004) 122 Cal.App.4th Supp. 8, 12 [§ 511 limits the number of hours in an AWS shift to 10 per day without triggering daily overtime].)

Woodworth further argues that the AWS's were invalid because the medical center failed to present evidence that it executed the AWS agreements.  As authority for the argument, she cites the provisions of Wage Order 5 dealing with meal periods.  In particular, the wage order permits health care employees to waive one of their two meal periods when they work shifts longer than eight hours.  (Cal. Code Regs., tit. 8, § 11050, subd. 11(D).)  The parties must document that waiver in a written agreement signed by both the employer and the employee.  (*Ibid.*)  On its face, that rule governing meal period waivers does not apply to AWS agreements.  Nothing in Wage Order 5 indicates that employers must sign AWS agreements.

Lastly, Woodworth challenges the 2013 AWS on the basis of two documents that the medical center produced in discovery—a script and a document answering frequently asked questions.  She contends that the script erroneously informed employees that they had to vote in favor of the AWS, but she mischaracterizes the document.  The script merely explained that two-thirds of the affected employees had to vote in favor of the AWS for it to pass—not that the employees were somehow required to cast a vote in favor of it.  The script contemplated that the AWS could fail to pass, and it informed the employees that they would switch to eight-hour shifts if that occurred.  Woodworth further contends that the documents erroneously informed the employees that they were

136

voting to reaffirm an existing AWS. But the evidence indeed showed that the employees were working under the existing 2001 AWS at that point. There was nothing inaccurate about that statement.

As for the court's ruling on the PAGA claim, the validity of the two AWS's is a defense to Woodworth's overtime claim and the overtime claim of any aggrieved employees who worked under the same AWS's. In her opposition brief, Woodworth did not argue that the medical center failed to carry its burden with respect to aggrieved employees outside of her work unit. Likewise, on appeal, she does not contend that her PAGA claim extended to aggrieved employees outside of her work unit or that the medical center failed to produce evidence about other AWS elections. She therefore forfeited any such argument, and the court properly granted summary adjudication for the medical center on the PAGA overtime claim. (*DiCola*, *supra*, 158 Cal.App.4th at p. 676; *Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6.)

For the foregoing reasons, we conclude that the court did not err by granting the medical center's summary adjudication motion on the AWS defense.[12]

---

[12]    The medical center requests that we take judicial notice of a DLSE opinion letter and documents representing legislative history of section 511. Woodworth requests that we take judicial notice of a document disseminated by the IWC in connection with Wage Order 5 and other wage orders. Additionally, amicus curiae California Hospital Association requests that we take judicial notice of various IWC documents relating to the current and former versions of Wage Order 5. We deny all of the requests for judicial notice because they are unnecessary to our resolution of this appeal. (*County of San Diego v. State of California* (2008) 164 Cal.App.4th 580, 613, fn. 29.)

VII.  *Motion for Summary Adjudication on the PAGA Cause of Action*

The medical center moved for summary adjudication on the PAGA cause of action for failure to exhaust administrative remedies.  (The medical center labeled this motion, "Motion for Summary Adjudication No. 2" (capitalization and boldface omitted).)  After the court's other rulings, only the PAGA rest period claim survived.  The court granted this motion as to the rest period claim, concluding that Woodworth failed to give the LWDA proper notice of the rest period claim.  We agree with Woodworth that the court erred as to the rest period claim.  Moreover, Woodworth gave the LWDA sufficient notice of the regular rate, wage statement, waiting time, and rounding claims under PAGA, so those claims survive as well.

A.  *Relevant Background*

Woodworth filed her original complaint in this action on June 11, 2014.  The complaint did not include a PAGA cause of action.  On June 18, 2014, she sent a letter to the LWDA and the medical center, advising them of alleged Labor Code violations by the medical center (the PAGA letter).  As relevant here, the PAGA letter alleged as follows:

- The medical center "failed to properly compensate its non-exempt work force the proper amount of straight time and overtime wages as a result of, but not limited to, its unlawful rounding policies and failure to include all required remuneration (including but not limited to bonuses) when calculating the regular rate for overtime purposes."

138

- The medical center's "rounding policy is set up such that it systematically underpays California based non-exempt employees for all hours worked."

- The medical center did "not provide the requisite number of rest periods for a 12 hour shift, such that only two (2) rest periods are provided to the non-exempt hourly employees." Further, Woodworth was "denied . . . rest periods . . . and thus entitled to an extra hour of pay at the regular rate of pay."

- "[E]ach non-exempt employee that is no longer employed with [the medical center], [who] was subjected to the . . . improper regular rate calculation, was not paid all earned wages at termination." Similarly, Woodworth "and the aggrieved employees were not paid all their wages at the time of termination," so they were "entitled to recover back wages" and waiting time "penalties under [section] 203."

- The medical center "failed to provide accurate itemized wage statements based on the underlying wage and hour violations." Similarly, "the pay stubs issued by the [medical center] did not comply with the provisions of [section] 226."

The PAGA letter elsewhere alleged that the medical center had violated numerous Labor Code sections, including sections 203, 226, 226.7, and 510.

Woodworth offered her counsel's declaration to show that she attached her original complaint to the PAGA letter. The letter stated that the complaint was attached, and it referenced the complaint several times. For instance, at the beginning of the letter, it stated that it was from Woodworth "on behalf of herself and all aggrieved employees who were subject to the employer's wage and hour policies as set forth below and in the attached Complaint."

139

In relevant part, the complaint alleged that the medical center "failed . . . or refused to implement a relief system by which [Woodworth] and aggrieved employees could receive rest breaks and/or work free rest breaks for every four hours worked, or major fraction thereof." It also alleged that the medical center had "failed to properly include items of remuneration when determining the employees' regular rate," including "non-discretionary bonuses paid to all eligible employees." Additionally, the complaint alleged that the medical center failed to provide "accurate wage and hour statements showing gross wages earned, total hours worked, . . . net wages earned, . . . and all applicable hourly rates in effect during each pay period." And it alleged that the medical center had "[r]ounded the actual time worked and recorded by" employees such that they "were paid far less than they would have been paid had they been paid for actual recorded time rather than 'rounded' time." Finally, it alleged that the medical center had violated sections 201, 202, 226, 226.7, and 510, among other sections, as well as a wage order provision (Cal. Code Regs., tit. 8, § 11050, subd. 4(A)).

On June 23, 2014, Woodworth filed her first amended complaint, which added the PAGA cause of action. The LWDA responded to Woodworth's PAGA letter on July 21, 2014. It stated that it did not intend to investigate her allegations.

The medical center argued in its moving papers that Woodworth had failed to exhaust her administrative remedies under PAGA. More specifically, it argued that the PAGA letter was a string of legal conclusions without any supporting facts and theories, and the letter therefore failed to give the LWDA and the medical center proper notice of any of Woodworth's claims. It additionally argued that Woodworth had brought her

140

PAGA cause of action prematurely, because she did not wait the requisite 33 days for the LWDA to respond. The medical center contended that the court should dismiss the PAGA cause of action in its entirety.

Woodworth opposed the motion, arguing that her PAGA letter and the attached complaint sufficiently set forth the facts and theories underlying her PAGA cause of action. She further contended that her prematurely filed first amended complaint did not mandate dismissal of the PAGA cause of action, because the LWDA's later response cured any problem.

The court granted the medical center's motion "as to all claims alleged in the [PAGA cause of action] not otherwise summarily adjudicated in favor" of the medical center—namely, the PAGA rest period claim. The court concluded that Woodworth had two rest period theories: (1) the medical center's written policy unlawfully required employees to stay on premises during rest periods; and (2) the medical center failed to provide sufficient relief personnel so that nurses who work 12-hour shifts could take a third rest period. The court ruled that the PAGA notice and attached complaint did not provide sufficient notice of either theory of liability.

B. *Analysis*

Under PAGA, "an 'aggrieved employee' may bring a civil action personally and on behalf of other current or former employees to recover civil penalties for Labor Code violations. [Citation.] Of the civil penalties recovered, 75 percent goes to the [LWDA], leaving the remaining 25 percent for the 'aggrieved employees.'" (*Arias v. Superior Court* (2009) 46 Cal.4th 969, 980-981 (*Arias*), fn. omitted.) "PAGA created a type of *qui*

*tam* action . . . . When an employee brings a representative action under PAGA, he or she does so 'as the proxy or agent of the state's labor law enforcement agencies, not other employees.'" (*Huff v. Securitas Security Services USA, Inc.* (2018) 23 Cal.App.5th 745, 753 (*Huff*).)

Because a PAGA action "is fundamentally a law enforcement action, a plaintiff must first allow the appropriate state authorities to investigate the alleged Labor Code violations." (*Huff*, *supra*, 23 Cal.App.5th at p. 753.) Thus, PAGA requires that the aggrieved employee "give written notice" to the LWDA and the employer "of the specific provisions of [the Labor Code] alleged to have been violated, including the facts and theories to support the alleged violation." (§ 2699.3, subd. (a)(1)(A).) If the LWDA decides not to investigate or fails to respond to the aggrieved employee's notice within a specified time frame, the employee may bring the PAGA action as an agent of the state. (§ 2699.3, subd. (a)(2)(A).) When Woodworth sent the PAGA letter in 2014, PAGA gave the LWDA 30 calendar days to notify her that it did not intend to investigate her allegations. (Former § 2699.3, subd. (a)(2)(A), added by Stats. 2004, ch. 221, § 4.) Upon receipt of the agency's notice, or if the agency did not respond within 33 calendar days, she could commence the PAGA action. (*Ibid.*)

"The evident purpose of the notice requirement is to afford the relevant state agency, the [LWDA], the opportunity to decide whether to allocate scarce resources to an investigation, a decision better made with knowledge of the allegations an aggrieved employee is making and any basis for those allegations. Notice to the employer serves the purpose of allowing the employer to submit a response to the agency [citation], again

142

thereby promoting an informed agency decision as to whether to allocate resources toward an investigation." (*Williams v. Superior Court* (2017) 3 Cal.5th 531, 545-546.)

A """"PAGA notice must be specific enough such that the LWDA and the defendant can glean the underlying factual basis for the alleged violations." [Citation.] Conversely, "a string of legal conclusions with no factual allegations or theories of liability to support them . . . is insufficient to allow the [LWDA] to intelligently assess the seriousness of the alleged violations." [Citations.] Plaintiff, however, need not set forth "every potential fact or every future theory." [Citations.] "Under California's Labor Code, a written notice is sufficient so long as it contains some basic facts about the violations, such as which provision was allegedly violated and who was allegedly harmed."""" (*Gunther v. Alaska Airlines, Inc.* (2021) 72 Cal.App.5th 334, 350 (*Gunther*).)

Here, the trial court erred by concluding that the PAGA letter and attached complaint did not give sufficient notice of Woodworth's rest period claim. The PAGA letter identified the specific Labor Code violation at issue—a violation of section 226.7, which prohibits requiring an employee to work through a mandated rest period and requires the missed break premium. (§ 226.7, subds. (b), (c).) Moreover, the PAGA letter set forth some basic facts to support Woodworth's no-relief theory of liability. It stated that the medical center provided only two rest periods during 12-hour shifts. The attached complaint provided even more detail. It stated that the medical center failed to implement a relief system so that employees could take the rest periods to which they were entitled. The allegations of the PAGA letter and complaint were not merely legal conclusions, and they did more than "parrot[] the allegedly violated Labor Code

143

provisions." (*Brown v. Ralphs Grocery Co.* (2018) 28 Cal.App.5th 824, 837 (*Brown*).) Rather, the documents alleged the factual basis for her no-relief theory of liability, putting the LWDA and the medical center "on notice for potential investigation." (*Gunther*, *supra*, 72 Cal.App.5th at p. 351.)

At the same time, no facts alleged in the PAGA letter or complaint addressed Woodworth's alternative theory that the on-premises rest period policy was unlawful on its face. To that extent, the court properly concluded that the PAGA letter did not comply with the notice requirement. Still, the medical center was not entitled to summary adjudication on the PAGA rest period claim, given that the motion did not completely dispose of the claim. (See *Rojas-Cifuentes v. Superior Court* (2020) 58 Cal.App.5th 1051, 1058 (*Rojas-Cifuentes*) ["PAGA notice supplied sufficient 'facts and theories' to support at least some of the violations" alleged, so court should have denied motion seeking summary adjudication of entire cause of action].)

Because we conclude that the court improperly granted summary adjudication on the PAGA regular rate, wage statement, waiting time, and rounding claims, we also examine whether the PAGA letter and attached complaint gave sufficient notice of those claims. We conclude that they did. (We need not address whether Woodworth gave sufficient notice of the overtime claim because, as discussed in another part of this opinion, that PAGA claim fails for different reasons.)

The PAGA letter identified the sections of the Labor Code that the medical center had allegedly violated in connection with the regular rate claim—sections 226.7 and 510. (§§ 226.7, subd. (c) [requiring the employer to pay "one additional hour of pay at the

144

employee's regular rate of compensation" for missed rest periods], 510, subd. (a) [requiring the employer to compensate overtime hours at one and one-half or two times the employee's "regular rate of pay"].)  The letter also alleged that the medical center failed to compensate employees properly by excluding bonuses when calculating the regular rate.  The complaint further alleged that the medical center excluded nondiscretionary bonuses when determining the regular rate.  Those basic facts and theories "satisfied PAGA's minimal notice requirements" for the regular rate claim. (*Gunther*, *supra*, 72 Cal.App.5th at p. 351.)

We reach the same conclusion with respect to the wage statement claim.  The PAGA letter identified the specific provision of the Labor Code allegedly violated (§ 226), and it identified the claim as a derivative one based on the underlying wage and hour violations.  The letter elsewhere explained the underlying regular rate and rest period claims, as discussed.  Moreover, the complaint alleged that the wage statements did not accurately report gross wages earned, net wages earned, and all applicable hourly rates in effect during the pay period.  Those were the portions of the wage statements affected by the underlying wage and hour violations alleged.  The combined allegations were sufficient to give notice of the derivative wage statement claim.  (*Brown*, *supra*, 28 Cal.App.5th at pp. 837-838 [employee gave sufficient notice of alleged wage statement violation by identifying the category of information missing from wage statements].)

The PAGA letter also gave sufficient notice of the waiting time claim.  The letter alleged that the aggrieved employees were entitled to waiting time penalties under section 203, and the complaint alleged that the medical center had violated sections 201 and 202

145

(which set forth the timelines for paying wages owed when an employee quits or is discharged). The PAGA letter set forth some basic facts to support the alleged violations. It alleged that the employees who were no longer employed by the medical center and who were subjected to an improper regular rate calculation were not paid all wages earned, entitling them to recover waiting time penalties. The allegations provided sufficient notice of the facts and theories on which Woodworth based the waiting time claim. (See *Rojas-Cifuentes*, *supra*, 58 Cal.App.5th at p. 1059 [PAGA notice that did not "exhaustively explain" why wage statements were inadequate but gave "general basis" for the claim was sufficient].)

Finally, the PAGA letter gave sufficient notice of the rounding claim. The letter alleged that the medical center's rounding policy systematically underpaid employees. The attached complaint alleged that the medical center rounded the employees' actual time worked and paid them less than they would have received if their worktime had not been rounded. And the letter and complaint identified the wage order provision and statute that the rounding policy allegedly violated—subdivision 4(A) of Wage Order 5 (Cal. Code Regs., tit. 8, § 11050, subd. 4(A) [requiring employers to pay at least the minimum wage "for all hours worked"]) and section 510 (requiring employers to pay a premium for "[a]ny work" that constitutes overtime). Woodworth therefore gave notice of the specific provisions allegedly violated by the rounding policy and the facts and theories to support the alleged violation.

The medical center argues that Woodworth failed to submit admissible evidence that she attached a copy of her complaint to the PAGA letter. The medical center points

out that the copy of the PAGA letter submitted as an exhibit to the TAC does not include any attachments. The argument does not persuade us to disregard the complaint. Woodworth's counsel filed a declaration in support of her opposition brief; he stated that his office had sent the PAGA letter to the LWDA and had attached the complaint. The medical center does not explain why counsel's declaration was inadmissible to show what his office sent to the LWDA.

The medical center also argues that the court properly granted its motion because Woodworth filed her PAGA cause of action prematurely. We also reject that argument. PAGA provides that the aggrieved employee's action "shall commence only after" the prelawsuit requirements have been met, including the notice and waiting period requirements. (§ 2699.3, subd. (a).) And it is true that Woodworth added the PAGA cause of action to the first amended complaint before the LWDA had responded and before the 33-day waiting period had expired. But we agree with her that the subsequent response of the LWDA cured her violation. The medical center has not identified any case law—either in the trial court or on appeal—disposing of a PAGA action because the plaintiff filed it before the waiting period had expired or before the LWDA's response. Nor are we aware of any such cases. On the other hand, a number of federal district courts in this state have concluded that a violation of the waiting period requirement was cured by the LWDA's subsequent response or the subsequent expiration of the waiting period. (*Magadia v. Wal-Mart Associates, Inc.* (N.D.Cal. 2018) 319 F.Supp.3d 1180, 1188-1189 (*Magadia*); *Bradescu v. Hillstone Rest. Group, Inc.* (C.D.Cal. Sept. 18, 2014, No. SACV 13-1289-GW(RZx)) 2014 U.S.Dist. Lexis 150978, at pp. *30-31; *Harris v.*

*Vector Mktg. Corp.* (N.D.Cal. Jan. 5, 2010, No. C-08-5198 EMC) 2010 U.S.Dist. Lexis 5659, at pp. *7-8; *Hoang v. Vinh Phat Supermarket, Inc.* (E.D.Cal. Aug. 12, 2013, No. Civ. 2:13-00724 WBS GGH) 2013 U.S.Dist. Lexis 114475, at pp. *12, *20-21.) Like those courts, we see no reason to punish Woodworth for "'acting too quickly,'" given that exhaustion of her administrative remedy "subsequently occurred" when the LWDA responded. (*Magadia*, *supra*, 319 F.Supp.3d at p. 1189.)

In sum, the court erred by granting the medical center's motion for summary adjudication on the PAGA cause of action. Woodworth gave sufficient notice of at least one theory of liability underlying the rest period claim. Also, her PAGA regular rate claim, PAGA wage statement claim, PAGA waiting time claim, and PAGA rounding claim remain viable, and she gave sufficient notice of those claims. Moreover, the premature filing of her first amended complaint did not defeat her PAGA cause of action. The medical center therefore was not entitled to summary adjudication on the PAGA cause of action.

VIII. *Motion to Strike the PAGA Allegations*

The medical center moved to strike all of the PAGA allegations from the TAC, arguing that the PAGA cause of action was unmanageable and could not be tried without violating the medical center's due process rights. At the time, there was no published California decision addressing whether PAGA actions are subject to a manageability requirement. The court denied the motion, reasoning that although it had discretion to grant the motion, it would not do so "in the absence of controlling California authority

148

and conflicting [federal] district court authority." It further ruled that the motion was moot, in light of its other rulings disposing of the PAGA claims.

In the medical center's cross-appeal, it argues that (1) we should impose a manageability requirement for PAGA claims and (2) Woodworth failed to demonstrate the PAGA cause of action was manageable. Although we grant Woodworth's motion to dismiss the cross-appeal, we consider the medical center's arguments. If they are meritorious, they would provide alternative grounds to affirm the erroneous rulings disposing of the PAGA claims. (See part I.B. of the discussion, *ante*.) We conclude, however, that the arguments lack merit.

Since the trial court's ruling, two appellate decisions have addressed the manageability of PAGA claims: *Wesson*, *supra*, 68 Cal.App.5th 746, and *Estrada*, *supra*, 76 Cal.App.5th 685. *Wesson* held that "courts have inherent authority to ensure that PAGA claims can be fairly and efficiently tried and, if necessary, may strike claims that cannot be rendered manageable." (*Wesson*, at p. 756.) *Estrada* came to the opposite conclusion. (*Estrada*, at p. 697.) It held that courts "cannot strike a PAGA claim based on manageability," but they "may still, where appropriate and within reason, limit the amount of evidence PAGA plaintiffs may introduce at trial." (*Ibid.*)

Our Supreme Court is reviewing the issue and will resolve the split. In the meantime, we agree with *Estrada*. Trial courts may not strike a PAGA claim for lack of manageability. They may limit the evidence to be presented at trial or otherwise limit the scope of the PAGA claim, but they may not strike the claim altogether.

149

*Wesson* observed that courts have inherent power under the state Constitution to control and manage litigation, as the courts have done with respect to class actions. (*Wesson*, *supra*, 68 Cal.App.5th at pp. 763-764.)  Specifically, "[i]n the class action context, the courts have required class action proponents to demonstrate that 'litigation of individual issues, including those arising from affirmative defenses, can be managed fairly and efficiently.'"  (*Id.* at p. 764, quoting *Duran*, *supra*, 59 Cal.4th at pp. 28-29.)  The *Wesson* court also relied on a UCL case, which it characterized as "approv[ing] a trial court's use of its inherent authority to bar a representative . . . UCL claim as unmanageable."  (*Wesson*, at p. 764, citing *South Bay Chevrolet v. General Motors Acceptance Corp.* (1999) 72 Cal.App.4th 861 (*South Bay Chevrolet*).)[13]  *Wesson* reasoned that "[t]he same concerns attendant to the fair and efficient trial of representative claims apply in the context of PAGA actions.  . . . [Citation.]  A PAGA action may . . . cover a vast number of employees, each of whom may have markedly different experiences relevant to the alleged violations.  Under those circumstances, determining whether the employer committed Labor Code violations with respect to each

---

[13]    The trial court in *South Bay Chevrolet* did not dismiss the representative UCL claim as unmanageable before trial or rely on the inherent authority to manage litigation. Rather, after a bench trial, the court granted the defendant's motion for judgment under Code of Civil Procedure section 631.8.  (*South Bay Chevrolet*, *supra*, 72 Cal.App.4th at pp. 869, 875.)  The trial court determined that the plaintiff (a car dealership) "failed to meet its evidentiary burden to show that its individual claim should be afforded private attorney general status."  (*Id.* at p. 891.)  The court based that determination on a lack of evidence that any car dealership was likely to be deceived by the defendant's practices or that dealerships "were similarly situated as to their likelihood of deception."  (*Ibid.*)  The appellate court held that the ruling was supported by substantial evidence, so the trial "court properly determined it could not make any determination that [the defendant] was liable statewide."  (*Id.* at p. 895.)

150

employee may raise practical difficulties and may prove to be unmanageable." (*Wesson*, at pp. 765-766.) The court therefore concluded "that courts have inherent authority to ensure that PAGA claims can be fairly and efficiently tried and, if necessary, may strike a claim that cannot be rendered manageable." (*Id.* at p. 765.)

*Estrada* disagreed with *Wesson* for reasons that we find persuasive. First, our Supreme Court held in *Arias* that an aggrieved employee bringing a representative PAGA action need not satisfy class action requirements. (*Arias*, *supra*, 46 Cal.4th at p. 975; *Estrada*, *supra*, 76 Cal.App.5th at pp. 711-712.) The high court has emphasized that a PAGA action is a law enforcement action on behalf of the state and "is different from a class action." (*Kim v. Reins International California, Inc.* (2020) 9 Cal.5th 73, 86; *Estrada*, at p. 711.) The manageability requirement in the class action context permits courts to deny class certification, in effect dismissing the class claims from the action. Permitting courts to strike or otherwise dismiss PAGA claims on manageability grounds "would effectively graft a class action requirement onto PAGA claims, undermining" *Arias*'s holding that PAGA plaintiffs need not satisfy class action requirements. (*Estrada*, at p. 697.)

Second, permitting courts to strike or dismiss PAGA claims on the basis of "manageability would interfere with PAGA's express design as a law enforcement mechanism." (*Estrada*, *supra*, 76 Cal.App.5th at p. 712.) The Legislature enacted PAGA to incentivize private parties to recover civil penalties on behalf of the overburdened state agency. (*Arias*, *supra*, 46 Cal.4th at p. 986 [Legislature's declared purpose in enacting PAGA was "to supplement enforcement actions by public agencies,

151

which lack adequate resources to bring all such actions themselves"]; § 2699, subd. (i) [75 percent of the penalties recovered in a PAGA action go to the LWDA, and 25 percent go to the aggrieved employees].)  The LWDA "is not subject to a manageability requirement when it investigates Labor Code violations and assesses fines internally." (*Estrada*, at p. 712.)  Allowing courts to dismiss PAGA claims for unmanageability places a burden on PAGA plaintiffs that does not fall on the LWDA in its own enforcement proceedings, thus undermining PAGA's purpose and the Legislature's objectives.  (*Ibid.*)

While *Estrada* held that trial courts may not strike or dismiss PAGA claims on the basis of manageability, it also held that "courts are not powerless when facing unwieldy PAGA claims."  (*Estrada*, *supra*, 76 Cal.App.5th at p. 697.)  We agree with *Estrada* on that point as well.  "[C]ourts may, where appropriate and within reason, limit witness testimony and other forms of evidence when determining the number of violations that occurred and the amount of penalties to assess.  [Citations.]  Consequently, in cases with individualized circumstances and vast numbers of alleged aggrieved employees, PAGA plaintiffs may have difficulty proving purported violations suffered by other employees." (*Id.* at p. 713.)  Like the court in *Estrada*, we encourage the parties to try to overcome any difficulties by "work[ing] with the trial courts . . . to define a workable group or groups of aggrieved employees for which violations can more easily be shown."  (*Ibid.*)  For instance, the parties could agree to limit the scope of the PAGA claim by defining the aggrieved employees as those in a single department or at a single location.  (*Id*. at p. 713, fn. 8.)

*Estrada*'s approach to PAGA claims has the virtue of incentivizing the parties to cooperate in devising a plan that works for trial. *Wesson*'s approach, however, disincentivizes cooperation and instead incentivizes employers to portray PAGA claims as hopelessly unmanageable. Ultimately, PAGA plaintiffs may prove that the employer violated the Labor Code with respect to all of the aggrieved employees, some of them, or none at all. (*Estrada*, *supra*, 76 Cal.App.5th at p. 713.) But even if a PAGA claim is somewhat burdensome to try, it should "'not mean that [the plaintiff] cannot bring it at all.'" (*Ibid.*)

For all of these reasons, we conclude that trial courts may not strike or dismiss a PAGA claim for lack of manageability. When faced with unwieldy PAGA claims, the courts may limit the scope of the claims or the evidence to be presented at trial, but they may not prohibit PAGA plaintiffs from presenting their claims entirely. Accordingly, the medical center's argument that the PAGA cause of action should have been stricken as unmanageable does not provide an alternative ground to affirm the erroneous orders terminating the PAGA claims.

## DISPOSITION

The medical center's motion for partial dismissal of the appeal is denied. Woodworth's motion to dismiss the cross-appeal is granted. The November 2018 order granting the medical center's motion for summary adjudication on the rounding claim is reversed. On remand, the trial court shall enter a new order denying the motion for summary adjudication on the rounding claim.

The March 2019 order denying Woodworth's motion for class certification and denying her motion to strike the putative class members' declarations is affirmed in part and reversed in part. To the extent that the order denied the motion to strike the putative class members' declarations, it is affirmed. To the extent that the order denied certification of the stand-alone Wage Statement Class, it is reversed and the matter is remanded for the court to reconsider the certification motion as to that class, consistent with this opinion. The order denying the class certification motion is otherwise affirmed.

The May 2019 order granting the medical center's motions for summary adjudication is reversed. On remand, the trial court shall enter a new order: (1) denying the medical center's motion for summary adjudication no. 1 as to the PAGA regular rate claim, the PAGA wage statement claim, Woodworth's individual wage statement claim, and the PAGA waiting time claim, but granting the motion as to Woodworth's individual regular rate and waiting time claims; (2) denying the medical center's motion for summary adjudication no. 2 on the PAGA cause of action; and (3) granting the medical center's motion for summary adjudication no. 3 on the AWS defense.

The parties shall bear their own costs of appeal.  (Cal. Rules of Court, rule 8.278(a)(3).)

CERTIFIED FOR PARTIAL PUBLICATION

MENETREZ _____
J.

We concur:

MILLER _____
Acting P. J.
FIELDS _____
J.